Michael D. Prough, Esq. (No. 168741)
mdp@proughlaw.com
Yas-Banoo Omidi, Esq. (254962)
yo@proughlaw.com
PROUGH LAW, APC
1550 Parkside Drive, Suite 200
Walnut Creek, CA 94596
Tel:  (925) 433-5894
Fax:  (925) 482-0929

Attorneys for RLI Insurance Company

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| RLI INSURANCE COMPANY, an Illinois corporation,<br><br>Plaintiff,<br><br>v.<br><br>GREATER LOS ANGELES ZOO ASSOCIATION, a California nonprofit corporation,<br><br>Defendants. | Case No.:<br><br>COMPLAINT FOR:<br><br>1. DECLARATORY RELIEF – NO DUTY TO DEFEND<br><br>2. DECLARATORY RELIEF – NO DUTY TO INDEMNIFY<br><br>3. RECOUPMENT OF INSURER PAYMENTS |

Plaintiff, RLI Insurance Company ("RLI") hereby asserts the following complaint against Defendant Greater Los Angeles Zoo Association ("GLAZA"):

1.     RLI brings this action for a declaration concerning the rights and obligations of the parties under a liability insurance Policy issued to GLAZA with respect to the pending lawsuit styled *The City of Los Angeles v. Greater Los Angeles Zoo Association*, California Superior Court, Los Angeles County, Central District, Case No. 24STCV33753, filed on December 20, 2024 ("Underlying Action") which involves a contractual dispute between GLAZA and The City of

Los Angeles relating to, *inter alia*, control over certain funds and accounts presently under GLAZA's management.

2.    RLI is defending GLAZA in the Underlying Action under a complete reservation of rights, under the Management and Entity Liability Coverage Section of a Non-Profit Asset Protection Policy, policy no. EPG0041373 (the "Policy"). RLI contends that under the terms and conditions of the Policy, it owes no contractual duty to defend or indemnify GLAZA for the claims asserted in the Underlying Action. Without waiver of any other contractual provisions and exclusions, RLI contends that various of the Policy's terms, conditions, and exclusions apply to preclude all potential and actual coverage for the Underlying Action. RLI is informed and believes that GLAZA disputes this contention.

3.    Accordingly, RLI seeks a judgment declaring that no potential for coverage or actual coverage exists for the Underlying Action under the Policy, and that RLI therefore owes no duty to defend or indemnify GLAZA from or against liability it may sustain in that case. RLI also seeks recoupment of sums incurred by it on the defense or indemnity for uncovered claims.

**THE PARTIES**

4.    Plaintiff RLI is a corporation organized and existing under the laws of the State of Illinois, with its principal place of business in Peoria, Illinois. RLI is a citizen of Illinois.

5.    Defendant GLAZA is a nonprofit public benefit corporation organized and existing under the laws of the State of California, with its principal place of business in Los Angeles, California. GLAZA is a citizen of California.

**JURISDICTION AND VENUE**

6.    The Court has original jurisdiction over the present action under 28 U.S.C. § 1332 because there exists complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000. The applicable Policy limits affected by the claims for declaratory relief are $5 million, and the monetary

- 2 -
COMPLAINT

CASE:

claims at issue in the Underlying Action seek in excess of $75,000. Venue is proper within this District pursuant to 28 U.S.C. §§1391(b)(1)-(2) and 1391(c)(2). Defendant, a nonprofit corporate defendant, is subject to personal jurisdiction in this District, and additionally, a substantial part of the events or omissions giving rise to the claim occurred in this District.

## FACTS

**The RLI Policy**

7. RLI issued Non-Profit Asset Protection Policy No. EPG0041373 to GLAZA, effective January 1, 2024 to January 1, 2025 (subsequently extended by endorsement to July 1, 2025) (the "Policy"). The Policy includes a Management and Entity Liability Coverage Section with a $5,000,000 aggregate limit of liability and a $25,000 retention per Claim.

8. A true and correct copy of the certified Policy is attached hereto as **Exhibit A.**

9. Subject to its terms, limitations, and exclusions, the Policy includes the following Insuring Clause under its Management and Entity Liability Coverage Section:

> I. Insuring Clauses
> . . .
>
> C. Entity Liability Coverage
>
> The Insurer will pay on behalf of the **Entity**, **Loss** incurred by the **Entity** as a result of **Claims** first made against the **Entity** during the **Policy Period**, or during the Discovery Period (if purchased), for **Wrongful Acts**.

10. The Policy includes the following exclusions under its Management and Entity Liability Coverage Section:

> IV. EXCLUSIONS
> . . .
>
> C. The Insurer shall not be liable for **Loss** on account of that portion of any **Claim** made against any **Insured** based upon, arising out of, directly or indirectly resulting from, or in consequence of:
> . . .

- 3 -
COMPLAINT

CASE:

5. the rendering of, or actual or alleged failure to render, and **Professional Services**, provided that this Exclusion C. 5. shall not apply to **Claims** brought by a securityholder of the **Entity** in their capacity as such without any active assistance or participation of, or solicitation by, any **Insured**.

D. The Insurer shall not be liable under Insuring Clause C. Entity Liability Coverage, for **Loss** on account of that portion of any **Claim** made against any **Entity** based upon, arising out of, directly or indirectly resulting from or in consequence of:

. . .

3. any actual or alleged obligation under or breach of any written, oral, express, or implied contract or agreement except to the extent that such **Entity** would have been liable in the absence of such contract or agreement.

…

11. The Policy includes the following pertinent definitions under its General Terms and Conditions:

. . .

D. "**Defense Expenses**" means reasonable fees and expenses (including without limitation attorneys' fees and experts' fees) incurred in the investigation, defense or appeal of a **Claim**, or the opposition or revocation of an **Extradition** or any judicial ruling related thereto, after notice of such **Claim** is given to the Insurer pursuant to Section IV. NOTICE AND CLAIM REPORTING PROVISIONS, of these General Terms and Conditions, including premiums for any appeal bond, attachment bond or similar bond arising out of a covered judgment, but without any obligation to apply for or furnish any such bond. **Defense Expenses** shall not include the **Entity's** overhead expenses or any salaries, wages, fees or benefits of its directors, officers or **Employees**.

. . .

G. "**Entity**" means, collectively, the **Parent Company** and its **Subsidiaries**, including any such organization as a debtor in possession under United States bankruptcy law or an equivalent status under the law of any other country.

. . .

V. "**Policy Period**" means the period of time specified in Item 2. of the Declarations, subject to prior cancellation or termination in accordance with Section XV. CANCELLATION AND NONRENEWAL, of these General Terms and Conditions. If this period is less than or greater than one (1) year, then the **Policy Period** Limits of Liability and Sublimits of Liability specified in the Declarations shall be the Insurer's maximum liability under such coverage section for the entire period.

. . .

- 4 -

COMPLAINT

CASE:

Z.   "**Wrongful Acts**" means, with respect to any **Liability Coverage Section**, the acts, errors, omissions and other matters defined as **Wrongful Acts** in such coverage section.

12.   The Policy includes the following endorsement to its General Terms and Conditions:

AMEND SECTION V. D., DEFENSE AND SETTLEMENT;

ALLOCATION OF LOSS ENDORSEMENT

It is hereby understood and agreed that Section V. D., DEFENSE AND SETTLEMENT; ALLOCATION OF LOSS, of this Policy is deleted in its entirety and replaced with the following:

D.   If in any **Claim** the **Insureds** who are afforded coverage for such **Claim** incur **Loss** covered by this Policy jointly with others (including **Insureds**) who are not afforded coverage for such **Claim**, or incur an amount consisting of both **Loss** covered by this Policy and loss not covered by this Policy because such **Claim** includes both covered and uncovered matters, then the **Insureds** and the Insurer shall allocate such amount between covered **Loss** and uncovered **Loss** based upon the relative legal exposures of all parties to covered and uncovered matters. If there can be an agreement on an allocation of **Defense Expenses**, the Insurer shall, upon request, advance on a current basis **Defense Expenses** allocated to covered **Loss**. If there can be no agreement on an allocation of **Defense Expenses**, the Insurer shall advance on a current basis **Defense Expenses** which the Insurer believes to be covered under any purchased **Liability Coverage Section** until a different allocation is negotiated or judicially determined.

13.   The Policy includes the following pertinent definitions under its Management and Entity Liability Coverage Section:

. . .

B.   "**Claim**" means:

1.   a written demand for monetary, non-monetary or injunctive relief against any **Insured**; or

2.   a civil or criminal proceeding against any **Insured** commenced by the service of a complaint or similar pleading or the return of an indictment, information or similar charging document; or

3.   a formal administrative or regulatory proceeding against any **Insured Person**, or against the **Entity** but only while such proceeding is also pending against an **Insured Person**, commenced by the filing of a notice of charges, formal investigative order or similar document; or

- 5 -

COMPLAINT

CASE:

4.      a formal or informal civil, criminal, administrative or regulatory investigation against any **Insured Person** commenced by the service upon or other receipt by the **Insured Person** of a written notice or subpoena from the investigating authority identifying such **Insured Person** as an individual against whom a formal proceeding may be commenced, including without limitation a Wells notice or target letter (subject to Title 9, §11.151 of the U.S. Attorney's Manual); or

5.      a written request received by an **Insured** to toll or waive a statute of limitations relating to a **Wrongful Act** by an **Insured**; or

6.      an official request for **Extradition** of any **Insured Person** or the execution of a warrant for the arrest of an **Insured Person** where such execution is an element of **Extradition**; or

7.      any demand for arbitration or mediation received by any **Insured** relating to a **Wrongful Act** by an **Insured**; or

8.      solely with respect to coverage under Section II. A., a **Pre-Claim Inquiry**, including any appeal related to any of the above.

. . .

D.      "**Insured**" means the **Entity** and **Insured Person** collectively or individually.

. . .

F.      "**Loss**" means monetary amounts the **Insureds** are legally obligated to pay as a result of a covered **Claim**, including but not limited to monetary damages, judgments, settlements, pre- and post-judgment interest with respect to covered damages, punitive, exemplary or the multiple portion of multiplied damages where insurable under applicable law, **Defense Expenses**, claimant's attorney's fees and costs for which an **Insured** against whom the **Claim** is made is legally obligated to pay by reason of a court order or settlement agreement to which the Insurer consents, taxes imposed on an **Entity** for which an **Insured Person** is legally obligated to pay solely by reason of the **Entity's Financial Impairment**, civil fines or penalties assessed against an **Insured Person** for an unintentional or non-willful violation of any federal, state, local or foreign law, including without limitation any such violation of the Foreign Corrupt Practices Act (FCPA), and any **Excess Benefit Tax** that an **Insured Person** is obligated to pay as a result of a **Claim**, provided the maximum aggregate liability of the Insurer under this Coverage Section for all **Excess Benefit Taxes** shall be the respective Sublimit of Liability as stated in Item 7. Of the Declarations which further limits and does not increase any other applicable Limit of Liability under this Policy.
. . .

**Loss** shall not include taxes, civil or criminal fines or penalties imposed by law other than the taxes, civil fines or penalties described above, any amount for which the **Insureds** are absolved from

CASE:

payment, any amount allocated to uncovered loss pursuant to Section V. of the General Terms and Conditions, the cost to comply with any injunctive or other non-monetary relief or any agreement to provide such relief, any amount which represents or is substantially equivalent to an increase in the consideration paid or proposed to be paid by the **Entity** in connection with the purchase of any securities or assets except to the extent the **Insured Persons** are legally liable for such amount and the **Entity** is not legally permitted or is not financially able to indemnify the **Insured Persons** for such amount, or matters which are uninsurable under the law pursuant to which this Policy shall be construed, except as otherwise provided above.

K.    "**Professional Services**" means services which are performed by or on behalf of an **Insured** for others in connection with the **Entity's** business, regardless of whether or not such services are compensated or uncompensated.

O.    "**Wrongful Act**" means:

1.    any actual or alleged error, omission, act, misstatement, misleading statement, or breach of duty by the **Entity** or an **Insured Person** individually or otherwise, in his or her capacity as such or in an **Outside Position**; or

2.    any matter claimed against an **Insured Person** solely by reason of his or her status as an **Insured Person**;

including without limitation an **Anti-Trust Violation**, **Publishers Wrongdoing** and **Personal Injury** by any **Insureds** in their capacity as such.

## The Claim and Underlying Action

14.    On or about November 15, 2024, RLI received from GLAZA's Interim President a notice under the Policy of a November 8, 2024 letter from the Los Angeles City Attorney to GLAZA containing allegations against GLAZA—including that GLAZA was allegedly signaling an attempt to claim some ownership or beneficial interest in the Zoo's endowment and/or other of the Zoo's financial and intangible assets—and threatening action in the event GLAZA did not respond, as well as GLAZA's November 12, 2024 response to that letter.

15.    On or about December 20, 2024, the City of Los Angeles (the "City") filed a complaint against GLAZA in the Underlying Action for: (1) Breach of Contract; (2) Breach of the Implied Covenant of Good Faith and Fair Dealing; (3) Breach of Fiduciary Duty; (4) Conversion; and (5) Declaratory relief (the "City

COMPLAINT

CASE:

Complaint").

16.     A true and correct copy of the City's Complaint is attached hereto as **Exhibit B**.

17.     The City Complaint makes the following allegations:

(a)     The City owns and operates the Los Angeles Zoo and Botanical Gardens ("Zoo"). (Ex. B at ¶ 1.) For the nearly 60 years since its formation, GLAZA's sole purpose has been to perform—pursuant to contract and on behalf of the City and for the benefit of the Zoo—specified functions, including assisting and aiding the City in establishing, developing, operating, caring for, and maintaining the Zoo. (*Id.* at ¶¶ 1-3, 32.)

(b)     GLAZA's core mission has been to seek and obtain financial support for the Zoo and to fund its capital improvements. (*Id.* at ¶ 3.) GLAZA has fundraised millions of dollars; $48,887,762.51 in assets are on deposit in an endowment; and GLAZA administers other funds. Pursuant to its contractual obligations, all these monies were raised by GLAZA on the City's behalf for the benefit of the Zoo. (*Id.*, at ¶4.)

(c)     For nearly 60 years, GLAZA's corporate governance documents and contracts established GLAZA's undivided loyalty to the Zoo and acknowledged that all assets developed and maintained by GLAZA ultimately belong to the City for Zoo purposes. (*Id.* at ¶¶ 33-35.)

(d)     During the parties' most recent contract negotiations, the City informed GLAZA that it would—for various reasons—publicly solicit proposals for the services GLAZA has been providing. The City encouraged GLAZA to participate in the City's Requests for Proposal ("RFP") process by submitting its own bid. (*Id.* at ¶ 5.)

(e)     On or about May 30, 2024, the parties entered into an Interim Agreement which governs GLAZA's contractual duties from October

COMPLAINT
CASE:

1, 2023 through June 30, 2025, and which was designed to ensure the continuity of critical programs and services while the City completes the RFP process for the long-term management of the Zoo. (*Id.* at ¶¶ 6, 39-40.)

(f) The Interim Agreement provides that GLAZA's mission is to support the Zoo and to assist the City in establishing, developing, beautifying, and improving the Zoo. (*Id.* at ¶ 41.)

(g) The Interim Agreement further provides that GLAZA shall act as the City's fiduciary and fiscal agent in collecting and managing funds for the Zoo on behalf of the City; that GLAZA shall manage and perform all of its fundraising, membership, and other specified duties "for the benefit of the Zoo"; and GLAZA may only raise funds effectively "on behalf of the City" and "for the benefit of the Zoo," regardless of the purpose of the solicitation or the form of the donation. (*Id.* at ¶¶ 7, 41, 48(f).) The Interim Agreement states that: "In collecting and managing funds for the Zoo on behalf of the City, GLAZA shall act as the City's fiduciary and fiscal agent and ensure proper accounting for all funds collected, including any interest earned." (*Id.* at Ex. A [Interim Agreement], Section 5.C.)

(h) The Interim Agreement also provides that "all finished and unfinished works, tangible or not" originated or prepared by GLAZA constitute the exclusive property of the City for its use in any manner the City deems appropriate"; GLAZA shall maintain all records pertaining to the performance of its duties, which the City may inspect and audit; and if GLAZA is not the contractor selected from the competitive bidding process, GLAZA shall cooperate and coordinate with the City and the newly selected contractor to ensure a smooth transition of services, including by providing information and records reasonably

- 9 -
COMPLAINT

CASE:

related to the services GLAZA has provided for the City. (*Id.*, ¶¶ 7, 42.)

(i)     The Interim Agreement also provides that a monetary remedy for breach of the Interim Agreement may be inadequate, impracticable, or difficult to prove and that a breach may cause the City irreparable harm; the City may therefore seek "injunctive relief and specific performance, without any necessity of showing actual damage or irreparable harm." (*Id.* at ¶ 43.)

(j)     Finally, the Interim Agreement provides that, in the event of GLAZA's dissolution, all net monies remaining in GLAZA funds and accounts for the specific benefit of the Zoo shall be paid over in full to the City, subject to all applicable laws and regulations. (*Id.* at ¶ 44.)

(k)     According to the City's Complaint, on May 5, 2024—just weeks before executing the Interim Agreement and without prior notice to the City—GLAZA amended and restated its articles of incorporation to contradict six decades of precedent, by stating that: its specific purpose is to support the mission of the Zoo "and/or other organizations in the greater Los Angeles area whose primary mission is to protect and support wildlife conservation and habitats", and that upon the dissolution or winding up of GLAZA, its assets remaining after payments of debts and liabilities shall be distributed exclusively for charitable purposes to one or more organizations which are then described in Section 501(c)(3) of the Internal Revenue Code, "as determined by [GLAZA's] Board of Directors[.]" (*Id.* at ¶¶ 37-38.)

(l)     On May 29, 2024—the same date that it signed the Interim Agreement—GLAZA sent the City a letter stating that it would not extend the Interim Agreement, bid on any RFP containing terms similar to those in the Interim Agreement, characterized the Zoo's

COMPLAINT

CASE:

endowment as GLAZA's endorsement, and claimed that City has no authority over the allocation of GLAZA's endowment. (*Id.*, ¶ 46.)

(m)  On July 31, 2024, the City responded to GLAZA's May 29, 2024 letter, reminding GLAZA that, amongst other things, all GLAZA's fundraising efforts were as the City's fiduciary and fiscal agent, "on behalf of the city" and for the sole Zoo's benefit, and that all funds must be returned to the City upon termination of GLAZA's duties. (*Id.*, at ¶¶ 47-48.) The City also asked GLAZA to substantiate its claims to ownership or beneficial interest in the Zoo's endowments or other funds. (*Id.* at ¶ 49.) GLAZA never responded to this letter. (*Id.*, at ¶ 50.)

(n)  GLAZA sent the City an October 17, 2024 letter, advising that GLAZA would not bid the City's RFP's; that the parties' relationship will end June 30, 2025; and that the City "cannot and does not maintain any direct control over GLAZA's operations or fiduciary responsibilities, as a matter of law." (*Id.*, at ¶ 51.)

(o)  After amending its articles of incorporation, GLAZA allegedly began to serially breach its contractual, good faith, and fiduciary obligations to the detriment of the City and the Zoo.

(p)  GLAZA allegedly ran afoul of the Interim Agreement's requirement that GLAZA cooperate with and provide the Zoo, upon request, information relating to Zoo funds and GLAZA operations. (*Id.* at ¶57.). In May 2024, GLAZA created a new "GLAZA Restricted" account and deposited a lump-sum of $675,000 into it. (*Id.* at ¶ 53.) The City also alleges GLAZA continues to generate revenue for and pay expenses from this GLAZA Restricted account. From May 1, 2024 through September 30, 2024 alone, GLAZA generated an additional $384,144.61 in revenue for and paid $357,424.47 in expenses from

COMPLAINT

CASE:

this account. As of September 30, 2024, the account maintained a $701,720.14 positive balance. (*Id*. at ¶ 54.) GLAZA has not answered the City's request for an explanation of the purpose of the GLAZA Restricted account or the restricted uses associated with it. (*Id.* at ¶ 55.) The Zoo still does not know the source of the funds in this account; the specific circumstances under which GLAZA initially allocated to, generated revenue for, and incurred and paid expenses in connection with the GLAZA Restricted account; why GLAZA waited 16 months to disclose the account; and why GLAZA continues to generate revenue for and pay expenses in connection with this account. (*Id*. at ¶¶ 57-58.)

(q)    The City's Complaint alleges GLAZA ran afoul of the Interim Agreement's requirement that GLAZA fundraise throughout the entire term of the contract, for the benefit of the Zoo from a variety of sources, including charitable events such as the Beastly Ball—the Zoo's annual fundraising gala held in June. (*Id*. at ¶¶ 59-61.) On October 30, 2024, GLAZA informed the Zoo that it would not present the 2025 Beastly Ball which was scheduled to take place before expiration of the Interim Agreement. (*Id*. at ¶¶ 62, 64,66.) Cancellation of the 2025 Beastly Ball will result in a net loss of $975,000 in revenue. (*Id*. at ¶ 62.)

(r)    The City's Complaint further alleges GLAZA ran afoul of the Interim Agreement's requirement that, while GLAZA may engage in limited "additional restricted" fundraising, any of those funds must "be used for the benefit of the Zoo" and such activities "shall be limited so as to not interfere with GLAZA's services and obligations to the City." (*Id*. at ¶ 66). GLAZA cancelled one of the Zoo Director's biweekly meetings with a GLAZA Vice President because the GLAZA Vice

COMPLAINT

CASE:

President was "focused on other priorities." GLAZA then ignored the Zoo's request for an explanation of the Vice President's "other priorities." To the extent GLAZA is presently engaging in fundraising efforts that are not for the Zoo's exclusive benefit, such endeavors would be in breach of GLAZA's contractual, good faith, and fiduciary obligations that GLAZA owes to the City. (*Id*. at ¶ 67.)

(s)     GLAZA allegedly ran afoul of the Interim Agreement's requirement that GLAZA recruit, train, and manage volunteer docents throughout the entire term of the Interim Agreement based on the Zoo's needs and input. GLAZA abruptly canceled an informational meeting for the 2025 Docent Class, which had been scheduled for November 2, 2024. GLAZA has admitted that it suspended the 2025 Docent Class without any input from the Zoo, even though the Interim Agreement did not expire for another eight months. (*Id*. at ¶¶ 68-71.) "[G]iven the critical role that the docents serve,"-these acts are also inconsistent with GLAZA's duty under the Interim Agreement to cooperate and coordinate with the City to "ensure a smooth transition of services".

(t)     GLAZA allegedly ran afoul of the Interim Agreement's requirement that GLAZA transfer the ownership, access, usernames, and passwords for the Zoo website, domain, and social media accounts to the Zoo "as soon as practicable after execution of this Agreement." GLAZA has still not transferred ownership, access, and control of the Zoo's digital media, even though the Interim Agreement was executed over six months ago and despite the Zoo's requests. (*Id*. at ¶¶ 73-76.)

(u)     GLAZA allegedly ran afoul of the Interim Agreement's requirement that GLAZA perform all of its specified duties for the benefit of the Zoo throughout the entire term of the contract. In October 2024, GLAZA sent mass communications to Zoo donors, members and

- 13 -

volunteers that addressed the Zoo's donors as GLAZA's donors; stated that the RFPs are not in the best interest of the Zoo, the City, or GLAZA; stated that GLAZA will move forward separately from the Zoo; suggested that Zoo donors have been supporting GLAZA in some independent capacity; and/or informed Zoo donors that GLAZA will continue to communicate new developments with them. (*Id*. at ¶¶ 79-80). GLAZA also posted to the Zoo volunteer Facebook page that same month, portraying the City and Zoo in a negative light. (*Id*. at ¶ 80.)

(v)   On November 8, 2024, the City issued GLAZA a letter instructing GLAZA to do the following by November 18, 2024: designate the City as the sole owner and beneficiary of all financial assets relating to the Zoo under GLAZA's management and/or control; add the Zoo Director as authorized signer for all such financial assets; provide the Zoo Director with credential information that GLAZA uses for online access to such financial assets; confirm that GLAZA will not use any donor, member, or volunteer list or any of the City's other assets for any fundraising purposes that are not for the exclusive benefit of the Zoo or that otherwise conflict with the duties GLAZA owes the City; identify several dates during the first two weeks of January 2025 when GLAZA is available meet and discuss the scope, timing, and process for the City's inspection of GLAZA's books and records; provide names, contact, and financial contribution information of Zoo members, Zoo donors, and Zoo sponsors; provide records for the 2024 and 2025 Beastly Balls and Docent Classes; and confirm that GLAZA will no longer disseminate mass communications to Zoo donors, members, volunteers, or sponsors, using any of the City's property, relating to the RFPs, the parties' separation, or GLAZA's prospective

- 14 -

COMPLAINT

CASE:

independent plans without first providing a draft of the proposed communication to and obtaining written approval from the Zoo. (*Id*. at ¶ 84.)

(w)   The City's Complaint alleges GLAZA responded on December 6, 2024, refusing to comply with any of these instructions aside from agreeing to meet with the City on January 22, 2025 to discuss the City's inspection of GLAZA records. (*Id*. at ¶ 85.) GLAZA also claimed that it has the right to continue to exert control over the Zoo's endowment even after the Interim Agreement expires. (*Id*. at ¶ 86.)

18.   The City alleges that GLAZA has breached the Interim Agreement (First Cause of Action), the implied covenant of good faith and fair dealing (Second Cause of Action), and its fiduciary duty to the City (Third Cause of Action) by: claiming an exclusive interest over the Zoo's endowment and other funds; refusing to relinquish its management and control over the Zoo's endowment and other funds; allocating funds to, generating revenue, for, paying expenses from, and withholding material information associated with the GLAZA Restricted account; pursuing fundraising not for the exclusive benefit of the Zoo; refusing to provide the Zoo with member, donor, volunteer, and sponsor data; unilaterally canceling the 2025 Beastly Ball; unilaterally suspending the 2025 Docent Class and conferring with current docents about the transition of services without any notice to or input from the Zoo; refusing to timely transfer to the Zoo the ownership, access, and control of the Zoo's digital media; disseminating mass communications, using the City's property, to the Zoo's donors, members, and volunteers not for the benefit of the Zoo but instead for GLAZA's exclusive benefit; and by failing to cooperate and coordinate with the City to ensure a smooth transition of services based on the foregoing breaches. (*Id*. at ¶¶ 90-92, 97-99, 104-106.)  As a direct and proximate result of these breaches, the City has been injured in an amount to be proven at trial but no less than $48,887,762.51, which constitutes the sum of the unrestricted and

COMPLAINT

CASE:

restricted funds under GLAZA's management based on the information readily available and known to date. (*Id*. at ¶¶ 93, 100, 107.) GLAZA contends a forensic audit is necessary to determine the full scope of damages, and that GLAZA should be ordered to specifically perform certain duties and be enjoined from performing other acts in order to protect the City from further harm.  (*Id*. at ¶¶ 94, 101, 108.)

19.    The City asserts in its Fourth Cause of Action that GLAZA's refusal to relinquish its management and control over funds raised on the City's behalf for the benefit of the Zoo constitutes conversion. (*Id*. at ¶ 111.) As a direct and proximate result of this conversion, the City alleged it has been injured in an amount to be proven at trial but no less than $48,887,762.51, which constitutes the sum of the unrestricted and restricted funds under GLAZA's management based on the information readily available and known to date. (*Id*. at ¶ 111.) The City contends a forensic audit is necessary to determine the full scope of damages, and that GLAZA should be ordered to specifically perform certain duties and be enjoined from performing other acts in order to protect the City from further harm.  (*Id*. at ¶ 112.)

20.    By its Fifth Cause of Action for Declaratory Relief, the City seeks a judicial declaration that: the City is the sole owner and beneficiary of all of the financial assets under GLAZA's current management or control; GLAZA has no right to continue to exert control over the Zoo's endowment and other funds after the Interim Agreement expires; the City is the exclusive owner of all intellectual property originated or prepared by GLAZA, including but not limited to member, donor, volunteer, and sponsor data; and GLAZA has no right to use any work product GLAZA originated or prepared, including but not limited to member, donor, volunteer, and sponsor data, after the Interim Agreement expires. (*Id*. at ¶ 116.)

21.    Based on the forgoing, the City seeks compensatory damages; a judicial accounting of assets under GLAZA's current management or control; an order that GLAZA specifically perform various aspects of the Interim Agreement; a

- 16 -
COMPLAINT
CASE:

declaration of the parties' rights and obligations; and its costs. (*Id*. at Prayer for Relief, ¶¶ 1-7.)

22.    On or about March 18, 2025, RLI agreed to defend GLAZA in the Underlying Action under a full reservation of rights.

23.    Notwithstanding RLI's defense of the Underlying Action, which was extended under a full reservation of rights, the claims asserted therein are not covered or potentially covered under the Policy and thus RLI seeks a declaratory judgment to that effect herein.

## FIRST CLAIM FOR RELIEF

### (DECLARATORY RELIEF – NO DEFENSE DUTY)

24.    RLI realleges and incorporates Paragraphs 1-23, above, as though fully set forth herein.

25.    RLI has no duty to defend GLAZA in the Underlying Action under the RLI Policy by operation of the terms, definitions and exclusions in each insurance contract and the applicable law. While RLI reserves the right to raise additional defenses to coverage, all claims alleged against GLAZA in the City Complaint are excluded under the Management and Entity Liability Coverage Section of the Policy because one or more exclusions—including exclusion C.5. for "Professional Services" and D.3. for breach of contract, set forth above—applies. California law and public policy also bar coverage for any alleged conversion or disgorgement remedy.

26.    RLI is informed and believes and thereon alleges that GLAZA disputes these contentions, and instead contends that the Underlying Action gives rise to a potential for coverage and thus a contractual duty to defend it under the terms of the Policy.

27.    By virtue of the foregoing, there presents a justiciable controversy between RLI, on the one hand, and GLAZA on the other, concerning whether RLI

owes a contractual duty to defend the Underlying Action under the Policy.

28.     RLI seeks a judicial declaration, under 28 U.S.C. §§ 2201 *et seq.*, that the Underlying Action is not potentially covered under its contracts of insurance with GLAZA, by virtue of policy exclusions for "Professional Services", breach of contract, and/or other policy terms, limitations and exclusions, and hence RLI has no duty to defend GLAZA in that case.

**SECOND CLAIM FOR RELIEF**

**(DECLARATORY RELIEF – NO DUTY TO INDEMNIFY)**

29.     RLI realleges and incorporates Paragraphs 1-28, above, as though fully set forth herein.

30.     RLI has no duty to indemnify GLAZA under the RLI Policy for any liability that may be imposed upon it in the Underlying Action, by operation of the terms, definitions and exclusions in each insurance contract and the applicable law. While RLI reserves the right to raise additional defenses to coverage, all claims alleged against GLAZA in the City Complaint in the Underlying Action are excluded under the Management and Entity Liability Coverage Section of the Policy because one or more exclusions—including exclusion C.5. for "Professional Services" and D.3. for breach of contract, set forth above—applies. California law and public policy also bar coverage for any alleged conversion or disgorgement remedy.

31.     RLI is informed and believes and thereon alleges that GLAZA disputes these contentions, and instead contends that the Policy imposes on RLI a duty to indemnify GLAZA from and against liability it may sustain in the Underlying Action.

32.     By virtue of the foregoing, there presents a justiciable controversy between RLI, on the one hand, and GLAZA on the other, concerning whether RLI has a duty to indemnify GLAZA for liability it sustains in the Underlying Action under the RLI Policy and California law and public policy.

COMPLAINT

CASE:

33.    RLI seeks a judicial declaration, under 28 U.S.C. §§ 2201 *et seq.*, that the Underlying Action and claims are not covered under its contract of insurance with GLAZA and California law and public policy and, as a result, RLI owes GLAZA no duty to indemnify from or against liability GLAZA sustains in that case.

34.    In the event, and to the extent that, RLI were to pay any amounts for indemnity, RLI is also entitled to, and will seek, the recoupment of those sums also, in whole or in part, in an amount to be proven at trial.

## THIRD CLAIM FOR RELIEF

## (RECOUPMENT OF INSURER PAYMENTS)

35.    RLI realleges and incorporates Paragraphs 1-34, above, as though fully set forth herein.

36.    By virtue of the foregoing, RLI has incurred sums on the defense of GLAZA, will incur further sums on the defense, and may be called upon to pay sums in indemnification under the Policy.

37.    Sums incurred by RLI have been, and any future sums to be incurred by RLI will have been incurred with respect to claims that are in fact neither covered nor potentially covered under the terms of the Policy and California law.

38.    To the extent it has incurred or in the future incurs any further sums in defense or indemnity under the Policy, RLI reserves the right to recover such sums in this action under any and all available legal authority, including *Blue Ridge Insurance Company v. Jacobsen*, 25 Cal.4th 489 (2001) (payments toward settlements or judgments of uncovered claims); and/or *Buss v. Superior Court,* 16 Cal.4th 35 (1998) (payments toward defense or uncovered claims).

39.    RLI is entitled to a judgment reimbursing it for all sums incurred by it on uncovered claims, in an amount to be proven at trial.

/ / /

/ / /

- 19 -
COMPLAINT
CASE:

## **PRAYER FOR RELIEF**

WHEREFORE, RLI Insurance Company respectfully prays for relief as follows:

1.    On its First Claim for Relief, a declaratory judgment that RLI owes no duty to defend the Underlying Action;

2.    On its Second Claim for Relief, a declaratory judgment that RLI owes no duty to indemnify GLAZA for liability arising from the Underlying Action;

3.    On its Third Claim for Relief, for money damages, in an amount to be proven at trial;

4.    For costs of suit, to the extent permitted by law; and

5.    For such other and further relief as the Court may deem just and proper.

Dated: March 27, 2025                     PROUGH LAW, APC


                                          By: */s/ Michael D. Prough*
                                                Michael D. Prough

                                          Attorneys for RLI Insurance Company

- 20 -
COMPLAINT
CASE:

# Exhibit A

# CERTIFICATION

I, Scott R. Ostericher, do hereby certify that I am the AVP, Claim Operations of RLI Insurance Company, a corporation organized and existing under the laws of the State of Illinois, and that to the best of my knowledge the attached is a true and correct copy of Policy No. EPG0041373 (01/01/2024 – 07/01/2025) issued to Named Insured Greater Los Angeles Zoo Association.

Digitally signed by Scott R. Ostericher
Reason: To the best of my knowledge, this is a true and correct copy of this policy.
Date: 2025.02.12 11:47:21 -06'00'

Scott R. Ostericher, AVP, Claim Operations, Claims
RLI Insurance Company

# RLI
## DIFFERENT WORKS

RLI Insurance Company
9025 North Lindbergh Drive
Peoria, Illinois 61615
Phone: (309) 692-1000

A stock insurance company,
herein called the Company.

# Non-Profit Asset Protection Policy Declarations

**THE MANAGEMENT AND ENTITY LIABILITY, EMPLOYMENT PRACTICES AND THIRD PARTY DISCRIMINATION LIABILITY, FIDUCIARY LIABILITY, AND MISCELLANEOUS PROFESSIONAL LIABILITY COVERAGE SECTIONS (WHICHEVER ARE APPLICABLE) ARE ALL WRITTEN ON A CLAIMS MADE BASIS. EXCEPT AS OTHERWISE PROVIDED, THESE COVERAGE SECTIONS COVER ONLY CLAIMS FIRST MADE AGAINST THE INSURED DURING THE POLICY PERIOD. THE CRIME PROTECTION COVERAGE SECTION IS WRITTEN ON A DISCOVERY BASIS. THE DECLARATIONS, APPLICATION, GENERAL TERMS AND CONDITIONS, ANY PURCHASED COVERAGE SECTIONS, AND ANY ENDORSEMENTS OR RIDERS ATTACHED THERETO, CONSTITUTE THE ENTIRE AGREEMENT BETWEEN THE INSURER AND THE PARENT COMPANY. PLEASE READ CAREFULLY.**

Policy No:  EPG0041373

Item 1.  **Parent Company** (Name and Address):

Greater Los Angeles Zoo Association
5333 Zoo Drive
Los Angeles, CA 90027

Item 2.  **Policy Period**:  Inception Date:  01/01/2024          Expiration Date:  01/01/2025

Both days at 12:01 a.m. local time at the mailing address listed in Item 1. above.

Item 3.  Premium:                                                              $ 55,000

Item 4.  Combined Aggregate Limit of Liability:                    $ 11,000,000          All **Loss** under all **Liability Coverage Sections**, combined

Item 5.  Coverage Schedule:

This Policy includes only those Coverage Sections designated below by "X" as purchased. If a Coverage Section is not expressly designated as purchased or if Duty to Defend coverage is not expressly designated as purchased for a Coverage Section, this Policy does not include such Coverage Section or such Duty to Defend coverage.

AGTC-N 100 (04/18)                                                                              Page  1 of 6

Insured

| | Coverage Section | Purchased | Coverage Section Limit of Liability | Retention* | Pending or Prior Date | Duty to Defend |
|---|---|---|---|---|---|---|
| A. | Management and Entity Liability<br><br>1. Insuring Clause A. Insured Person Liability<br><br>2. Insuring Clause B. Entity Reimbursement<br><br>3. Insuring Clause C. Entity Liability | ☒ Yes<br>☐ No | $ 5,000,000 Aggregate Limit of Liability | $ 25,000 Each **Claim** | 08/28/1984 | ☒ Yes<br>☐ No |
| B. | Employment Practices and Third Party Discrimination Liability | ☒ Yes<br>☐ No | $ 5,000,000 Aggregate Limit of Liability | $ 75,000 Each **Claim** for **Wrongful Employment Act**<br><br>$ 75,000 Each **Claim** for **Third Party Wrongful Act**<br><br>$ Nil All **Workplace Violence Incidents** combined | 08/28/1984 | ☒ Yes<br>☐ No |
| C. | Fiduciary Liability | ☒ Yes<br>☐ No | $ 4,000,000 Aggregate Limit of Liability | $ Nil Each **Claim** | 08/28/1984 | ☒ Yes<br>☐ No |
| D. | Miscellaneous Professional Liability | ☐ Yes<br>☒ No | $ N/A Aggregate Limit of Liability | $ N/A Each **Claim** | N/A | ☐ Yes<br>☒ No |
| E. | Crime Protection | ☐ Yes<br>☒ No | See Item 9. below if the Crime Protection Coverage Section is purchased. | | None | N/A |

*Except as required by state law or as otherwise provided in this Policy, no Retention shall apply under any **Liability Coverage Section** to (i) **Loss** which is subject to a Sublimit of Liability, or (ii) **Non-Indemnifiable Loss** incurred by **Insured Persons**.

**Liability Coverage Sections** which share Limit of Liability:

☐ A.　Management and Entity Liability

☐ B.　Employment Practices and Third Party Discrimination Liability

☐ C.　Fiduciary Liability

☐ D.　Miscellaneous Professional Liability

☒ E.　None

Insured

Item 6.  Additional Limits of Liability:

| | Coverage Section | Coverage Extension | Coverage Extension Included | Additional Limit of Liability |
|---|---|---|---|---|
| A. | Management and Entity Liability | Additional Side A Limit for Insured Persons | ☒ Yes<br>☐ No | $ 1,000,000 |
| B. | Employment Practices and Third Party Discrimination Liability | Additional Defense Expenses Limit | ☐ Yes<br>☒ No | $ N/A |
| C. | Fiduciary Liability | Additional Defense Expenses Limit | ☐ Yes<br>☒ No | $ N/A |

Item 7.  Sublimits of Liability:

| | | Sublimit of Liability |
|---|---|---|
| A. | Management and Entity Liability | |
| | Reputational Protection Costs | $ 50,000 |
| | Asset Protection Costs | $ 50,000 |
| | Excess Benefit Tax | $ 50,000 |
| B. | Employment Practices and Third Party Discrimination Liability | |
| | Workplace Violence | $ 250,000 |
| C. | Fiduciary Liability | |
| | Voluntary Compliance Program | $ 250,000 |
| | HIPAA Privacy Penalties | $ 1,500,000 |
| | Section 4975 Penalties | $ 250,000 |
| | Section 502(c) Penalties | $ 250,000 |
| | Pension Protection Act Penalties | $ 250,000 |
| | Affordable Care Act Penalties | $ 250,000 |
| D. | Crime Protection | |
| | Forgery or Alteration Legal Expenses | $ N/A |

Item 8.  Miscellaneous Professional Liability Coverage Section, if purchased:

A. **Professional Services**:
N/A

AGTC-N 100 (04/18)

Page  3 of 6

Insured

B.  Retroactive Date:            N/A

C.  Prior Knowledge Date:        N/A

Item 9.  Crime Protection Coverage Section, if purchased:

| | Insuring Clauses | Purchased | Single Loss Limit of Liability | Single Loss Deductible |
|---|---|---|---|---|
| A. | Employee Theft Coverage | ☐ Yes<br>☒ No | $ N/A | $ N/A |
| B. | ERISA Theft Coverage | ☐ Yes<br>☒ No | $ N/A | $ N/A |
| | Name of Employee Benefit Plans:<br>N/A | | | |
| C. | Client Property Coverage | ☐ Yes<br>☒ No | $ N/A | $ N/A |
| D. | Forgery or Alteration Coverage | ☐ Yes<br>☒ No | $ N/A | $ N/A |
| E. | Inside the Premises Coverage | ☐ Yes<br>☒ No | $ N/A | $ N/A |
| F. | Outside the Premises Coverage | ☐ Yes<br>☒ No | $ N/A | $ N/A |
| G. | Computer Hacking Coverage | ☐ Yes<br>☒ No | $ N/A | $ N/A |
| H. | Funds Transfer Fraud Coverage | ☐ Yes<br>☒ No | $ N/A | $ N/A |
| I. | Money Orders and Counterfeit Paper Currency Coverage | ☐ Yes<br>☒ No | $ N/A | $ N/A |
| J. | Fraudulently Induced Transfers Coverage | ☐ Yes<br>☒ No | $ N/A | $ N/A |
| K. | Computer System Restoration Expense Coverage | ☐ Yes<br>☒ No | $ N/A | $ N/A |

Insured

| | | | | |
|---|---|---|---|---|
| L. | Credit, Debit or Charge Card Forgery Coverage | ☐ Yes<br>☒ No | $ N/A | $ N/A |
| M. | Claims Expense Coverage | ☐ Yes<br>☒ No | $ N/A | $ N/A |

Item 10. Discovery Period for all purchased Liability Coverage Sections:

Year(s)          Additional Premium %

1 year                100%

Item 11. Notice to Insurer of Claims, potential Claims or Coverage Events:

RLI Insurance Company
9025 North Lindbergh Drive
Peoria, Illinois 61615
Fax: (866) 692-6796
E-mail:  new.claim@rlicorp.com
Attention: Claims Department

Item 12. Termination of Prior Policy(ies):  N/A

Item 13. Endorsements:

Endorsements applicable to the General Terms and Conditions:

| | |
|---|---|
| RIL 2133C (01/15) | Notice - Terrorism Risk Insurance Act |
| RIL 110A (01/08) | Supplemental Declarations |
| EPG 900 (01/15) | Cap on Losses From Certified Acts of Terrorism |
| AGTC 618 (04/18) | Class Action Retention Endorsement |
| AGTC 619 (04/18) | Extend Time to Elect Discovery Period Endorsement |
| RIL 200 (10/00) | Attention Policyholder |
| UW 20313I (01/15) | Policyholder Disclosure Notice of Terrorism Insurance Coverage |
| UW 20334 (10/11) | State of California - Notice to Policyholder |
| UW 20342 (03/12) | Policyholder Notice - OFAC |
| ILF 0001C (04/16) | Signature Page - Commercial Lines |
| MNU-AGTC 020 (02/20) | Amend Section V. D., Defense And Settlement; Allocation Of Loss Endorsement |

Endorsements applicable to the Management and Entity Liability Coverage Section:

| | |
|---|---|
| ANDO 603 (04/18) | Sexual Misconduct Exclusion |
| MNU-ANDO 020 (11/20) | Network Security And Privacy Exclusion (III) |
| MNU-ANDO-008 (01/24) | Amend Section IV. Exclusions B 1. - Absolute BI/PD Exclusion |

Endorsements applicable to the Employment Practices and Third Party Discrimination Liability Coverage Section:

AGTC-N 100 (04/18)                                                              Page  5 of 6

Insured

AEPL 500 (04/18)              Value Added Legal Services Flyer
AEPL 600 (04/18)              Amend Definition Of Claim
AEPL 602 (04/18)              Amend Definition Of Wrongful Employment Act (II)
AEPL 605 (04/18)              Violation Of Employee Privacy Expenses Sublimit
AEPL 606 (04/18)              Immigration Claim Sublimit Endorsement
AEPL 607 (04/18)              Amend Definition Of Harassment - Workplace Bullying
MNU-AEPL 013 (11/20)          Network Security And Privacy Exclusion
MNU-AEPL-001 (01/24)          Sexual Abuse Exclusion with Allocation
MNU-AEPL-024 (01/24)          Amend Section III. Exclusions A. 1. - Absolute BI/PD Exclusion
MNU-AEPL-032 (01/24)          Amend Definition of Third-Party Wrongful Act

Endorsements applicable to the Fiduciary Liability Coverage Section:

MNU-AFLC 011 (11/20)          Network Security And Privacy Exclusion

*Christina G. Dean*

Date: 01/10/2024

Authorized Company Representative

# RLI®

# IMPORTANT NOTICE TO POLICYHOLDERS

## TERRORISM RISK INSURANCE ACT, AS AMENDED

Under the Terrorism Risk Insurance Act, as amended (the "**Act**"), we must make coverage for "**certified acts of terrorism**" available in the policies we offer. We notified you at the time of offer and purchase of the policy to which this Notice is attached that this coverage would be a part of your policy. The premium allocated for such coverage is shown on the Declarations page of the policy.

You should know that where coverage is provided by this policy for losses resulting from certified acts of terrorism, such losses may be partially reimbursed by the United States government under a formula established by federal law. Under this formula, the United States government generally reimburses 85% through 2015; 84% beginning on January 1, 2016; 83% beginning on January 1, 2017; 82% beginning January 1, 2018; 81% beginning January 1, 2019 and 80% beginning January 1, 2020 of covered terrorism losses exceeding the statutorily established deductible paid by the insurance company providing the coverage.

You should also know that the Act contains a $100 billion cap that limits U.S. Government reimbursement as well as insurers' liability for losses resulting from certified acts of terrorism when the amount of such losses in any one calendar year exceeds $100 billion. If the aggregate insured losses for all insurers exceed $100 billion, your coverage may be reduced.

Specific coverage terms for terrorism, including limitations and exclusions, are more fully described in endorsements attached to the policy. Your policy may contain an exclusion for losses that are not eligible for federal reinsurance under the Act.

Definitions:

"**Certified act of terrorism**," as defined in Section 102(1) of the Act, means an act that is certified by the Secretary of the Treasury – in consultation with the Secretary of Homeland Security, and the Attorney General of the United States – to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of a United States mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

RIL 2133C (01/15)                                                                                    Page 1 of 1

Insured

Policy Number: EPG0041373

## RLI Insurance Company
(herein called the "Insurer")

## ══ NON-PROFIT ASSET PROTECTION POLICY ══

## General Terms and Conditions

### I. TERMS AND CONDITIONS

Except for the General Terms and Conditions or unless stated to the contrary in any purchased coverage section listed in Item 5. of the Declarations, the terms and conditions of each coverage section of this Policy apply only to that section and shall not be construed to apply to any other coverage section of this Policy. In the event of any inconsistency between these General Terms and Conditions and the terms and conditions set forth in any coverage section of this Policy, the terms and conditions in such coverage section shall apply. Any defined term referenced in these General Terms and Conditions but defined in a coverage section shall, for purposes of coverage under that coverage section, have the meaning set forth in that coverage section. The General Terms and Conditions are attached to and incorporated with the purchased coverage sections listed in Item 5. of the Declarations.

### II. DEFINITIONS

When used in this Policy, the following terms, whether in the singular or plural, are defined below:

A.  "**Application**" means the signed, written application for this Policy or any coverage section of this Policy and for any policy or coverage section issued by the Insurer during the three (3) years immediately preceding this Policy of which this Policy or any coverage section of this Policy is a direct or indirect renewal or replacement, including all documents and materials attached to or submitted with or incorporated into such application(s). All such application(s), documents, materials and filings are deemed attached to and incorporated into this Coverage Section.

B.  "**Claim**" means, with respect to any **Liability Coverage Section**, those matters defined as a **Claim** in such coverage section.

C.  "**Coverage Event**" means, with respect to the Crime Protection Coverage Section, the event or loss which must occur or be sustained or discovered in order to invoke coverage under such coverage section.

D.  "**Defense Expenses**" means reasonable fees and expenses (including without limitation attorneys' fees and experts' fees) incurred in the investigation, defense or appeal of a **Claim**, or the opposition or revocation of an **Extradition** or any judicial ruling related thereto, after notice of such **Claim** is given to the Insurer pursuant to Section IV. NOTICE AND CLAIM REPORTING PROVISIONS, of these General Terms and Conditions, including premiums for any appeal bond, attachment bond or similar bond arising out of a covered judgment, but without any obligation to apply for or furnish any such bond. **Defense Expenses** shall not include the **Entity's** overhead expenses or any salaries, wages, fees or benefits of its directors, officers or **Employees**.

E.  "**Domestic Partner**" means any natural person qualifying as a domestic partner under the provisions of any applicable federal, state or local law or under the provisions of any formal program established by the **Entity**.

F.  "**Employee**" means the following:

1.  any natural persons who were, now are or shall be in the regular service of the **Entity** in the ordinary course of the **Entity's** business, regardless whether such natural person is in a supervisory, co-worker or subordinate position or otherwise, and whom the **Entity** has the right to govern and direct in the performance of such service, including any such natural persons who are leased, temporary, part-time or seasonal employees of the **Entity**;

AGTC-N 101 (04/18)                                                                Page 1 of 13

Insured

2.  any natural persons who were, now are or shall become independent contractors of the **Entity** who are treated under applicable law as employees of the **Entity**; and

3.  any volunteers, faculty or staff members, or interns of the **Entity**;

provided (i) any such natural person who is leased to the **Entity** or who is such an independent contractor of the **Entity** shall qualify as an **Employee** only if the **Entity** agrees to indemnify such natural person, and (ii) coverage for any such leased employees or independent contractors shall be specifically excess of any indemnification or insurance otherwise available to such leased employees or independent contractors from the applicable leasing company or any other source.

G.  "**Entity**" means, collectively, the **Parent Company** and its **Subsidiaries**, including any such organization as a debtor in possession under United States bankruptcy law or an equivalent status under the law of any other country.

H.  "**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended.

I.  "**Executive Officer**" means with respect to any **Entity** the natural persons who were, now are or shall become such **Entity's** chief executive officer, chief financial officer or in-house general counsel or the functional equivalent of any of the foregoing positions.

J.  "**Extradition**" means any formal process by which an **Insured Person** located in any country is or is sought to be surrendered to any other country for trial, or otherwise to answer any criminal accusation, for a **Wrongful Act**.

K.  "**Financial Impairment**" means the status of the **Entity** resulting from:

1.  the appointment of any receiver, conservator, liquidator, trustee, rehabilitator or similar official to control, supervise, manage or liquidate the **Entity**, or

2.  the **Entity** becoming a debtor in possession, as defined under U.S. Bankruptcy law or equivalent foreign law.

L.  "**Foreign Jurisdiction**" means any jurisdiction, other than the United States or any of its territories or possessions.

M.  "**Foreign Policy**" means the standard insurance policy (including all mandatory endorsements, if any) approved by the Insurer for use within a **Foreign Jurisdiction** that provides coverage substantially similar to the coverage afforded by a purchased coverage section under this Policy, but shall not include any commercial general liability, property or similar insurance policy.

N.  "**Insured Persons**" means with respect to each coverage section the natural persons defined as **Insured Persons** or **Insureds** in such coverage section.

O.  "**Insured Plans**" means the plans and programs defined as **Insured Plans** in the Fiduciary Liability Coverage Section, if purchased.

P.  "**Insureds**" means with respect to each coverage section the entities, plans and natural persons defined as **Insureds** in such coverage section.

Q.  "**Liability Coverage Sections**" means each of the purchased coverage sections listed in Item 5. of the Declarations, except the Crime Protection Coverage Section.

R.  "**Loss**" means with respect to any **Liability Coverage Section**, the amounts defined as **Loss** in such coverage section.

S.  "**Manager**" means any natural person who is a former, present or future manager, managing member, general partner, member of the board of managers or equivalent executive of an **Entity** that is a limited liability company or limited partnership.

T.  "**Non-Indemnifiable Loss**" means **Loss** incurred by an **Insured Person** for which the **Entity** is not permitted by common or statutory law to indemnify or is not financially able to indemnify by reason of **Financial Impairment**.

U.  "**Parent Company**" means the company named in Item 1. of the Declarations, including any such organization as a debtor in possession under the United States bankruptcy law or an equivalent status under the law of any other country.

V.  "**Policy Period**" means the period of time specified in Item 2. of the Declarations, subject to prior cancellation or termination in accordance with Section XV. CANCELLATION AND NONRENEWAL, of these General Terms and Conditions. If this period is less than or greater than one (1) year, then the **Policy Period** Limits of Liability and Sublimits of Liability specified in the Declarations shall be the Insurer's maximum liability under such coverage section for the entire period.

W.  "**Pollutants**" means any substance located anywhere in the world exhibiting any hazardous characteristics as defined by, or identified on a list of hazardous substances issued by, the United States Environmental Protection Agency or a state, county, municipality or locality counterpart thereof. **Pollutants** also means any other air emission, odor, waste water, oil or oil products, infectious or medical waste, asbestos or asbestos products, silica, noise, fungus (including mold, mildew and any mycotoxins, spores, scents or byproducts produced or released by fungi, but not any fungi intended by the **Insured** for consumption) and electric or magnetic or electromagnetic field. Such matters shall include, without limitation, solids, liquids, gaseous, thermal, biological, nuclear or radiological irritants, contaminants or smoke, soot, fumes, acids, alkalis, chemicals or waste materials.

X.  "**Related Claims**" means all **Claims** for **Wrongful Acts** that have as a common nexus any fact, circumstance, situation, event, transaction, cause or series of related facts, circumstances, situations, events, transactions or causes.

Y.  "**Subsidiary**" means:

1.  any non-profit organization in which more than fifty percent (50%) of the outstanding securities or voting rights representing the present right to vote for the election of directors or equivalent position is owned, in any combination, by one or more **Entities**;

2.  any non-profit organization in which one or more **Entities**, in any combination, have the right, pursuant to a written contract with or the by-laws, charter, operating agreement or similar document of such organization, to elect or appoint a majority of the directors or equivalent position of such organization;

3.  any foundation, charitable trust or political action committee controlled or exclusively sponsored by one or more **Entities**;

4.  any other not-for-profit organization exclusively sponsored by one or more **Entities**; and

5.  any for-profit organization specifically included as a **Subsidiary** by endorsement to this Policy;

provided that any coverage under this Policy for any **Subsidiary** and its **Insureds** shall only apply with respect to **Wrongful Acts** or **Coverage Events** occurring after the effective time such **Subsidiary** became a **Subsidiary** and prior to the effective time such **Subsidiary** ceased to be a **Subsidiary**.

Z.  "**Wrongful Acts**" means, with respect to any **Liability Coverage Section**, the acts, errors, omissions and other matters defined as **Wrongful Acts** in such coverage section.

AA. "**Wrongful Employment Act**" means, for purposes of any **Liability Coverage Section** other than the Employment Practices and Third Party Discrimination Liability Coverage Section, any actual or alleged: (i) wrongful dismissal, discharge or termination of employment; (ii) employment related misrepresentation; (iii) violation of any law, rule, regulation or public policy concerning employment; (iv) sexual or workplace harassment of any kind; (v) employment discrimination; (vi) wrongful failure to employ or promote; (vii) wrongful discipline; (viii) wrongful deprivation of career opportunity including a wrongful failure to hire or promote; (ix) failure to grant tenure; (x) negligent employment evaluation; (xi) breach of any oral, written or implied contract or quasi-employment contract concerning employment; or (xii) any other employment-related **Wrongful Act**.

## III. LIMITS OF LIABILITY, RETENTION AND SINGLE CLAIMS

A.  Limits of Liability for Liability Coverage Sections

1.  Combined Aggregate Limit of Liability

    The amount set forth in Item 4. of the Declarations shall be the Insurer's maximum aggregate liability for all **Loss** covered under all **Liability Coverage Sections**, combined.

2.  Each Liability Coverage Section Limit of Liability

    The respective Limit of Liability for each **Liability Coverage Section**, as set forth in Item 5. of the Declarations, shall be the Insurer's maximum aggregate liability for all **Loss** on account of all **Claims** under such **Liability Coverage Section**. The Limit of Liability for each **Liability Coverage Section** shall be part of and not in addition to the Combined Aggregate Limit of Liability as set forth in Item 4. of the Declarations.

3.  Shared Liability Coverage Section Limit of Liability

    The Insurer's maximum aggregate liability for all **Loss** covered under all **Liability Coverage Sections** which share a Limit of Liability, as designated at the end of Item 5. of the Declarations, combined, shall be the largest of such shared Limits of Liability. Such shared Limit of Liability shall be part of and not in addition to the Combined Aggregate Limit of Liability as set forth in Item 4. of the Declarations. This Paragraph further limits the Insurer's maximum liability under each such **Liability Coverage Section** and does not increase the respective separate Limit of Liability for each **Liability Coverage Section**.

4.  Additional Defense Expenses Limit of Liability

    If the Additional **Defense Expenses** Limit of Liability for the Employment Practices and Third Party Discrimination Liability Coverage Section or the Fiduciary Liability Coverage Section is purchased pursuant to Item 6. B. or 6. C. of the Declarations and if the Limit of Liability applicable to **Loss** covered under such respective coverage section is exhausted by payments by the Insurer, then the Insurer's liability for any **Defense Expenses** covered under such respective coverage section shall be subject to an additional Limit of Liability in an amount set forth in Item 6. B. or 6. C., respectively, of the Declarations. Such additional Limits of Liability shall be excess of any other valid and collectible insurance that is specifically excess of such respective coverage section and that covers such **Defense Expenses**.

5.  Sublimits of Liability

    The Sublimits of Liability set forth in Item 7. of the Declarations are part of and not in addition to any otherwise applicable Limit of Liability under this Policy. Except as otherwise expressly provided in this Policy, no Retention shall apply to any **Loss** which is subject to a Sublimit of Liability.

6. Defense Expenses Within Limit of Liability

**Defense Expenses** are part of and not in addition to the Limits of Liability applicable to the **Liability Coverage Sections**, and the payment by the Insurer of **Defense Expenses** reduces such Limits of Liability.

7. Limit of Liability Exhaustion and Payment

If with respect to any **Claim** the applicable Limit of Liability under this Policy is exhausted by payment of **Loss**, the Insurer's obligations, including without limitation any duty to defend, with respect to such **Claim** shall be completely fulfilled and extinguished. Subject to Section VI. of these General Terms and Conditions, the Insurer is entitled to pay **Loss** as it becomes due and payable by the **Insureds**, without consideration of other future payment obligations.

B. Retention for Liability Coverage Sections

The Insurer's liability under the **Liability Coverage Sections** with respect to **Loss** on account of each **Claim** shall apply only to that part of **Loss** which is excess of the applicable Retention set forth in Item 5. of the Declarations. If more than one Retention applies to a single **Claim**, the largest applicable Retention shall be the maximum combined Retention for such **Claim**.

If an **Entity** refuses or fails within sixty (60) days after an **Insured Person's** request to indemnify or advance covered **Loss** incurred by **Insured Persons** or if an **Entity** is unable to indemnify or advance covered **Loss** incurred by **Insured Persons** due to its **Financial Impairment**, the Insurer shall pay such covered **Loss** without applying the applicable Retention. If the Insurer pays under this Policy any **Loss** incurred by an **Insured Person** for which the **Entity** is legally permitted or required and is financially able to advance or indemnify, then the **Entity** shall reimburse the Insurer for such amounts up to the applicable Retention, and such amounts shall become due and payable as a direct obligation of the **Entity** to the Insurer.

C. Limits of Liability and Retentions for Crime Protection Coverage Section

The Insurer's maximum liability and the applicable Retention under the Crime Protection Coverage Section shall be the respective Limits of Liability and Retention amounts as set forth in Item 9. of the Declarations. Such Limits of Liability and Retention amounts will be applied as described in the Crime Protection Coverage Section.

D. Single Claims

All **Related Claims** under the **Liability Coverage Sections** shall be deemed one **Claim**, and such **Claim** shall be deemed to be first made on the date the earliest of such **Related Claims** is first made against any **Insured**, regardless of whether such date is before or during the **Policy Period**. In no event shall a single lawsuit or proceeding constitute more than one **Claim** subject to more than one Retention.

## IV. NOTICE AND CLAIM REPORTING PROVISIONS

A. Solely with respect to any Liability Coverage Section:

1. The **Insureds** shall give to the Insurer written notice of any **Claim** made against the **Insureds** as soon as practicable after any **Executive Officer** or risk manager of an **Entity** first learns of such **Claim**, but in no event later than (i) sixty (60) days after expiration of the **Policy Period**, if the Discovery Period is not purchased, or (ii) expiration of the Discovery Period, if purchased. The failure of the **Insureds** to provide notice of a **Claim** as soon as practicable as required by this Section IV. A. 1. shall not constitute a coverage defense with respect to such **Claim** unless the Insurer establishes it was materially prejudiced by such failure.

2. If, during the **Policy Period** or the Discovery Period (if purchased):

Insured

a. any **Executive Officer** or risk manager of an **Entity** first becomes aware of a **Wrongful Act** which may subsequently give rise to a **Claim**, and

b. the **Insureds** give the Insurer written notice of such **Wrongful Act**, including a description of the **Wrongful Act**, the identities of the potential claimants, the consequences which have resulted or may result from such **Wrongful Act** and the circumstances by which the **Executive Officer** or risk manager first became aware of such **Wrongful Act**, and

c. the **Insureds** request coverage under this Policy for any subsequent **Claim** arising from such **Wrongful Act**;

then the Insurer will treat any such subsequent **Claim** as if it had been first made during the **Policy Period**.

B. Solely with respect to the Crime Protection Coverage Section, the **Insureds** shall give to the Insurer written notice of any **Coverage Event** pursuant to the applicable notice provision in such Crime Protection Coverage Section.

C. All notices under any coverage section of this Policy shall be in writing and given by prepaid express courier, certified mail, e-mail, or fax. Notice to any **Insureds** may be given to the **Parent Company** at the address as shown in Item 1. of the Declarations. Notice to the Insurer of any **Claim**, potential **Claim** or **Coverage Event** shall be given to the Insurer at the address set forth in Item 11. of the Declarations. All other notices to the Insurer under this Policy shall be given to the same addressee but to the attention of the Underwriting Department. Notice given as described above shall be deemed to be received and effective upon actual receipt thereof by the addressee or one day following the date such notice is sent, whichever is earlier.

## V. DEFENSE AND SETTLEMENT; ALLOCATION OF LOSS

A. If Duty to Defend coverage is granted pursuant to Item 5. of the Declarations with respect to a purchased **Liability Coverage Section**, the Insurer shall have the right and duty to defend any **Claim** covered under such **Liability Coverage Section**, even if any of the allegations are groundless, false or fraudulent. The Insurer's duty to defend shall cease upon exhaustion of the applicable Limit of Liability.

B. If Duty to Defend coverage is not granted pursuant to Item 5. of the Declarations with respect to a purchased **Liability Coverage Section**, it shall be the duty of the **Insureds** and not the duty of the Insurer to defend any **Claims** covered under such **Liability Coverage Section**. The Insurer shall have the right and shall be given the opportunity to effectively associate with the **Insureds** in the investigation, defense, and settlement (including the negotiation of a settlement) of any **Claim** that appears reasonably likely to be covered in whole or in part by one or more purchased **Liability Coverage Sections**.

C. If Duty to Defend coverage is not granted pursuant to Item 5. of the Declarations, the Insurer shall, upon request, advance on a current basis covered **Defense Expenses** on behalf of the **Insureds** within sixty (60) days after the Insurer's receipt of itemized invoices for such **Defense Expenses**. The **Insureds** agree that any **Defense Expenses** advanced by the Insurer shall be repaid to the Insurer by the **Insureds** severally according to their respective interests if and to the extent it is finally determined that such **Defense Expenses** are not covered under any purchased **Liability Coverage Section**.

D. If in any **Claim** the **Insureds** who are afforded coverage for such **Claim** incur **Loss** covered by this Policy jointly with others (including **Insureds**) who are not afforded coverage for such **Claim**, or incur an amount consisting of both **Loss** covered by this Policy and loss not covered by this Policy because such **Claim** includes both covered and uncovered matters, then the **Insureds** and the Insurer shall allocate such amount between covered **Loss** and uncovered **Loss** based upon the relative legal exposures of all parties to covered and uncovered matters, provided that if Duty to Defend coverage is granted pursuant to Item 5. of the Declarations for such **Claim**, then one hundred percent (100%) of **Defense Expenses** covered in part under this Policy shall be allocated to covered **Loss**.

E.   The **Insureds** agree to provide the Insurer with all information, assistance and cooperation which the Insurer reasonably requests including without limitation attendance at hearings and trials, assistance in effecting settlements, obtaining and giving evidence and obtaining the attendance of witnesses, copies of records, investigations and pleadings, and agree that in the event of a **Claim** the **Insureds** will do nothing that shall prejudice the Insurer's position or its potential or actual rights of recovery; provided that the failure of any **Insured** to give the Insurer such information, assistance or cooperation shall not impair the rights of any other **Insured** under this Policy.

F.   The Insurer may make any investigation it deems necessary and may, with the written consent of the **Insureds**, make any settlement of a **Claim** it deems expedient. If the Insurer receives an offer to settle any **Claim**, it shall notify the **Insureds** in writing of said offer within ten (10) days of receiving such offer. If the Insurer accepts said offer and settles the **Claim** (with the **Insureds'** written consent), the Insurer will notify the **Insureds** in writing within thirty (30) days after the effective date of such settlement.

G.   The **Insureds** agree not to settle or offer to settle any **Claim**, incur any **Defense Expenses** or otherwise assume any contractual obligation or admit any liability with respect to any **Claim** without the Insurer's written consent, which shall not be unreasonably withheld. The Insurer shall not be liable for any settlement, **Defense Expenses**, assumed obligation or admission to which it has not consented.

## VI. ORDER OF PAYMENT

A.   If the amount of any covered **Loss** which is otherwise due and owing by the Insurer under a **Liability Coverage Section** exceeds the then-remaining Limit of Liability applicable to such **Loss**, the Insurer shall pay such **Loss** (subject to the applicable Limit of Liability or Sublimit of Liability) in the following priority:

1.   First, the Insurer shall pay any such **Loss** which is **Non-Indemnifiable Loss**;

2.   Second, only if and to the extent the payment under subparagraph 1. above does not exhaust the applicable Limit of Liability or Sublimit of Liability, the Insurer shall pay the remaining portion of such **Loss**.

B.   Subject to the foregoing, the Insurer shall, upon receipt of a written request from the **Parent Company**, delay any payment of covered **Loss** (other than **Non-Indemnifiable Loss**) due and owing under a **Liability Coverage Section** until such time as the **Parent Company** designates, provided the Insurer's liability with respect to any such delayed **Loss** payment shall not be increased, and shall not include any interest, on account of such delay.

## VII. CHANGE OF EXPOSURES

A.   New Subsidiaries or Insured Plans

If before or during the **Policy Period** an **Entity** acquires or creates a new **Subsidiary** or a new **Insured Plan** or acquires an entity by merger or consolidation, coverage under this Policy automatically shall apply to the new **Subsidiary** or **Insured Plan** and its **Insureds**, provided such coverage shall apply only with respect to **Claims** for **Wrongful Acts** (under a **Liability Coverage Section**) or a **Coverage Event** (under the Crime Protection Coverage Section) taking place after such acquisition or creation. This Paragraph does not apply to, and no coverage is afforded under, this Policy for any **Subsidiary** acquired during the **Policy Period** and its **Insureds** if such **Subsidiary** is a registered issuer of securities pursuant to the Securities Exchange Act of 1934, as amended, unless and to the extent the Insurer agrees by endorsement to this Policy to afford coverage for such **Subsidiary** and its **Insureds**.

B.   Acquisition of Parent Company

If, during the **Policy Period**:

Insured

1.  the **Parent Company** shall consolidate with or merge into, or sell all or substantially all of its assets to any other person or organization or group of persons or organizations acting in concert;

2.  any person or organization or group of persons or organizations acting in concert shall acquire securities of the **Parent Company** or voting rights which results in such person, organization or group having the right to elect, appoint or designate at least fifty percent (50%) of the directors, **Managers** or equivalent executives of the **Parent Company**; or

3.  the **Parent Company** shall change from not-for-profit to for-profit status;

(any of the above events herein referred to as the "Transaction")

then coverage under this Policy shall continue in full force and effect until termination of this Policy, but only with respect to **Claims** for **Wrongful Acts** (under a **Liability Coverage Section**) or a **Coverage Event** (under the Crime Protection Coverage Section) occurring prior to the effective time of the Transaction. There shall be no coverage under this Policy for any **Wrongful Act** or **Coverage Event** occurring after the effective time of the Transaction and the entire premium for this Policy shall be deemed fully earned as of such effective time. The **Parent Company** shall also then have the right to elect a Discovery Period described in Section VIII. of these General Terms and Conditions or a greater period as may be negotiated with the Insurer.

The **Parent Company** shall give the Insurer written notice of the Transaction as soon as practicable, but not later than thirty (30) days after the effective date of the Transaction.

C.  Cessation of Subsidiaries

If before or during the **Policy Period** an organization ceases to be a **Subsidiary**, coverage with respect to such **Subsidiary** and its **Insureds** shall continue until termination of this Policy, provided such coverage shall apply (i) with respect to any **Liability Coverage Sections**, only with respect to **Claims** for **Wrongful Acts** taking place prior to the date such organization ceased to be a **Subsidiary**, and (ii) with respect to the Crime Protection Coverage Section, only with respect to **Coverage Events** taking place prior to the date such organization ceased to be a **Subsidiary**.

D.  Cessation of Plans

If before or during the **Policy Period** an **Insured Plan** is terminated, coverage for such **Insured Plan** and its **Insureds** under the Fiduciary Liability Coverage Section, if purchased, shall continue until termination of such coverage section with respect to **Wrongful Acts** taking place before or after such termination.

## VIII. DISCOVERY PERIOD

A.  If:

1.  the **Parent Company** cancels any purchased coverage section listed in Item 5. of the Declarations; or

2.  either the Insurer or the **Parent Company** refuses or declines to renew any purchased coverage section listed in Item 5. of the Declarations for any reason; or

3.  a Transaction described in Section VII. CHANGE OF EXPOSURES, of these General Terms and Conditions occurs; and

within thirty (30) days after the end of the **Policy Period** the **Parent Company** elects to purchase the Discovery Period for all purchased **Liability Coverage Sections** and pays the additional premium set forth in Item 10. of the Declarations, then the coverage otherwise afforded by all purchased **Liability Coverage Sections** will be extended for the respective period set forth in Item 10. of the Declarations, but only for **Wrongful Acts** occurring before the end of the **Policy Period** or the date of any Transaction described in Section VII. CHANGE OF EXPOSURES, of these General Terms and Conditions, whichever is earlier. The Limit of Liability and any applicable Sublimit of Liability for the Discovery Period (if purchased) shall be part of, and not in addition to, any applicable Limit of Liability and Sublimit of Liability for the **Policy Period**.

B.  As a condition precedent to the right to exercise the Discovery Period, the total premium for the coverage section that the Discovery Period is applicable to must have been paid in full.

C.  If the Discovery Period is purchased, the entire premium for the Discovery Period shall be deemed fully earned at its commencement.

D.  Subject to the other terms, conditions and limitations in this Section VIII., the **Parent Company** may elect to purchase the Discovery Period for some but not all purchased **Liability Coverage Sections**. The Insurer shall promptly notify the **Parent Company** of the additional premium for such Discovery Period if the **Parent Company** requests such information.

## IX. REPRESENTATIONS, SEVERABILITY AND NON-RESCINDABLE COVERAGES

A.  Representations

The **Insureds** represent and acknowledge that the statements and information contained in the **Application** are true and complete, are the basis of this Policy and are to be considered as incorporated into and constituting a part of this Policy. This Policy is issued in reliance upon the truth and completeness of such representations.

B.  Severability

The **Application** shall be construed as a separate application for coverage by each of the **Insureds**. If with respect to any coverage section the **Application** contains any misrepresentation or omission which materially affects either the acceptance of the risk or the hazard assumed by the Insurer under such coverage section, then the Insurer shall not be liable under such coverage section to pay any **Loss** on account of, and shall not be obligated to defend, any **Claim** based upon, arising out of or attributable to the facts that were not accurately and completely disclosed in the **Application** to the extent such **Loss** is incurred by:

1.  any **Entity** as indemnification of an **Insured Person** who knew the facts that were not truthfully disclosed in the **Application**; or

2.  any **Entity** and its **Subsidiaries** and **Insured Plans** if an **Executive Officer** of such **Entity** knew the facts that were not truthfully disclosed in the **Application**;

whether or not such **Executive Officer** or **Insured Person** knew the **Application** contained such misrepresentation or omission. No knowledge of one **Insured Person** shall be imputed to any other **Insured Person** for purposes of this Section IX.

C.  Non-Rescindable Policy

The Insurer shall not have the right to rescind or void, in whole or in part, this Policy or any coverage section for any reason.

## X. BANKRUPTCY

Bankruptcy or insolvency of any **Insured** or of the estate of any **Insured** shall not relieve the Insurer of its obligations nor deprive the Insurer of its rights or defenses under this Policy.

In the event a liquidation or reorganization proceeding is commenced by or against an **Entity** pursuant to the United States Bankruptcy Code, as amended, or any similar foreign, state or local law, the **Entity** and the **Insureds** hereby (i) waive and release any automatic stay or injunction which may apply in such proceeding to this Policy or its proceeds under such bankruptcy law, and (ii) agree not to oppose or object to any efforts by the Insurer, the **Entity** or any **Insured** to obtain relief from any such stay or injunction.

## XI. PRIOR POLICY LIBERALIZATION

If any purchased **Liability Coverage Section** under this Policy is a direct or indirect renewal of a prior policy or coverage section purchased by the **Parent Company** from the Insurer or its affiliates and if such prior policy or coverage section was written on a standard policy form used by the Insurer prior to this Policy's policy form ("Prior Policy Form"), then to the extent **Loss** resulting from a **Claim** first made during the **Policy Period** is not covered under this Policy but would be covered if this Policy included the Prior Policy Form, then this Policy is amended to follow and be subject to the broader terms and conditions in the Prior Policy Form, provided this Section XI. shall not amend or apply to (i) any provision in this Policy addressing limits of liability, retentions or coverages specifically not purchased under this Policy, (ii) any provision in this Policy that excludes or limits coverage for specific events, litigation or matters; or (iii) the Crime Protection Coverage Section.

## XII. COMPLIANCE WITH APPLICABLE TRADE AND ECONOMIC SANCTION LAWS

This Policy does not provide coverage that would be in violation of any applicable laws or regulations concerning trade or economic sanctions, including, but not limited to, those administered and enforced by the U.S. Treasury's Office of Foreign Asset Control (OFAC). Payment of **Loss** under this Policy shall be made only if such payment is in full and complete compliance with all economic or trade sanction laws or regulations, including, but not limited to, sanctions, laws and regulations administered and enforced by OFAC.

## XIII. TERRITORY AND VALUATION

Coverage under this Policy shall extend to **Wrongful Acts** or **Coverage Events** taking place, **Loss** incurred, or **Claims** made anywhere in the world, to the extent legally permitted.

All premiums, limits, retentions, **Loss** and other amounts under this Policy are expressed and payable in the currency of the United States of America. If judgment is rendered, settlement is denominated or another element of **Loss** under this Policy is stated in a currency other than United States dollars, payment under this Policy shall be made in United States dollars at the rate of exchange published in *The Wall Street Journal* on the date the final judgment is reached, the amount of the settlement is agreed upon or the other element of **Loss** is due, respectively.

If permitted by applicable law, when determining coverage under this Policy for **Loss** from that portion of any **Claim** maintained in a **Foreign Jurisdiction** or to which the law of a **Foreign Jurisdiction** is applied, the Insurer shall apply to such **Claim** the terms and conditions of this Policy and, to the extent more favorable to the **Insureds**, the terms and conditions of the **Foreign Policy** in such **Foreign Jurisdiction**. However, this Paragraph shall not (i) apply to any provision of any **Foreign Policy** addressing limits of liability, retentions, other insurance, nonrenewal, duty to defend, defense within or without limits, or any claims-made provisions, and (ii) amend any provision in this Policy that excludes or limits coverage for specific events, litigation or matters.

Any **Loss** incurred by an **Entity** in a **Foreign Jurisdiction** shall be deemed, at the written direction of the **Parent Company**, a **Loss** of the **Parent Company** payable to the **Parent Company** at the address shown in Item 1. of the Declarations. Any such payment by the Insurer to the **Parent Company** pursuant to this paragraph shall fully discharge the Insurer's liability under this Policy for such **Loss**. Any **Loss** incurred by an **Insured Person** in a **Foreign Jurisdiction** and which is not indemnified or paid by an **Entity** shall, to the extent permissible under applicable law, be paid to such **Insured Person** in a jurisdiction mutually acceptable to such **Insured Person** and the Insurer.

## XIV. ACTION AGAINST THE INSURER

A.  No action shall lie against the Insurer unless, as a condition precedent thereto, there shall have been full compliance with all of the terms of this Policy, nor until the amount of the **Insureds'** obligation to pay shall have been finally determined either by judgment against the **Insureds** after actual trial or by written agreement of the **Insureds**, the claimant and the Insurer.

Insured

B.  No person or organization shall have any right under this Policy to join the Insurer as a party to any action against the **Insureds** to determine the **Insureds'** liability, nor shall the Insurer be impleaded by the **Insureds** or their legal representatives. Bankruptcy or insolvency of the **Insureds** or of the estate of an **Insured** shall not relieve the Insurer of any of its obligations hereunder.

C.  Only if requested by the **Insureds**, the Insurer shall submit any dispute, controversy or claim arising out of or relating to this Policy or the breach, termination or invalidity thereof to final and binding arbitration pursuant to such rules and procedures as the parties may agree. If the parties cannot so agree the arbitration shall be administered by the American Arbitration Association in accordance with its then prevailing commercial arbitration rules. The arbitration panel shall consist of one arbitrator selected by the **Insureds**, one arbitrator selected by the Insurer, and a third independent arbitrator selected by the first two arbitrators. In any such arbitration, each party will bear its own legal fees and expenses.

D.  In addition to the terms, conditions, and limitations in subparts A., B., and C., above, no action shall lie against the Insurer with respect to loss under the Crime Protection Coverage Section:

   1.  Until ninety (90) days after a sworn proof of loss is filed with the Insurer; and

   2.  Unless such action is brought within two (2) years from the date the loss was discovered.

## XV. CANCELLATION AND NONRENEWAL

A.  This Policy as a whole or any purchased coverage section listed in Item 5. of the Declarations shall terminate at the earliest of the following times:

   1.  the effective date of termination specified in a prior written notice by the **Parent Company** to the Insurer, provided neither this Policy nor any purchased coverage section listed in Item 5. of the Declarations may be terminated by the **Parent Company** if the **Policy Period** is more than eighteen (18) months;

   2.  ten (10) days after the receipt by the **Parent Company** of a written notice of termination from the Insurer based upon failure to pay premium due, unless such premium is received by the Insurer prior to such tenth (10th) day;

   3.  at such other time as may be agreed upon by the Insurer and the **Parent Company**; or

   4.  upon expiration of the **Policy Period** as set forth in Item 2. of the Declarations.

B.  The Insurer shall refund the unearned premium computed at customary pro-rata rates if this Policy is terminated by the **Parent Company**. Payment or tender of any unearned premium by the Insurer shall not be a condition precedent to the effectiveness of such termination, but such payment shall be made as soon as practicable. If the **Policy Period** is more than eighteen (18) months, the premium charged for this Policy shall be fully earned at inception of the **Policy Period**. The Insurer shall not be required to renew this Policy upon its expiration.

C.  If the Insurer decides not to renew this Policy, the Insurer will mail or deliver to the **Parent Company** written notice of nonrenewal at least sixty (60) days prior to the end of the **Policy Period**.

## XVI. OTHER INSURANCE

If any **Loss** is insured under any other valid and collectible policy(ies), prior or current, then this Policy shall cover such **Loss**, subject to its limitations, conditions, provisions and other terms, only to the extent that the amount of such **Loss** is in excess of the amount of payment from such other insurance whether such other insurance is stated to be primary, contributory, excess, contingent or otherwise, unless such other insurance is written only as specific excess insurance over this Policy. This Policy will not be subject to the terms of any other insurance. However, this Policy shall apply on a primary basis with respect to (i) any personal umbrella or other personal liability policy which covers an **Insured Person** but not any other **Insured**, or (ii) any private equity or venture capital liability, general partner liability or other similar management or professional liability insurance policy available to an **Insured Person**.

## XVII. ESTATES, LEGAL REPRESENTATIVES, SPOUSES AND DOMESTIC PARTNERS

The estates, heirs, legal representatives, assigns, spouses and **Domestic Partners** of **Insured Persons** shall be considered an **Insured Person** under the **Liability Coverage Sections** but only for a **Claim** arising solely out of their status as such and, in the case of a spouse or **Domestic Partner**, where such **Claim** seeks damages from marital community property, jointly held property or property transferred from the **Insured Person** to the spouse or **Domestic Partner**. No coverage is provided for any wrongful act or omission of an estate, heir, legal representative, assign, spouse or **Domestic Partner**. All provisions in these General Terms and Conditions and the respective **Liability Coverage Section** applicable to **Loss** incurred by the **Insured Person** shall also apply to covered loss incurred by such estates, heirs, legal representatives, assigns, spouses and **Domestic Partners**.

## XVIII. AUTHORIZATION CLAUSE

By acceptance of this Policy, the **Parent Company** agrees to act on behalf of the **Insureds** with respect to giving and receiving notices, paying premiums and receiving any return premiums that may become due under this Policy, and agreeing to endorsements. The **Insureds** agree that the **Parent Company** may act on their behalf with respect to such matters.

## XIX. ASSIGNMENT

This Policy and any and all rights hereunder are not assignable without the written consent of the Insurer.

## XX. TERMINATION OF PRIOR POLICIES

Any policies issued by the Insurer or its affiliates and specified in Item 12. of the Declarations shall terminate, if not already terminated, as of the inception date of this Policy.

## XXI. SUBROGATION

In the event of any payment under this Policy, the Insurer shall be subrogated to the extent of such payment to all of the **Insureds'** rights of recovery, including without limitation any right of recovery from an **Entity** for **Loss** incurred by **Insured Persons** which is indemnifiable by the **Entity**. The **Insured** shall execute and deliver all instruments and papers and do whatever else is necessary to secure and preserve such rights, including the execution of such documents necessary to enable the Insurer effectively to bring suit in the name of the **Insured**. In any subrogation claim against the **Entity** to enforce the **Insured Persons'** right of indemnification, the shareholder and board of director resolutions of the **Entity** shall be deemed to provide indemnification to the fullest extent permitted by law. The Insurer shall not exercise its right of subrogation against an **Insured Person** with respect to payments under any **Liability Coverage Section**.

Any such recoveries, less the cost of obtaining them, will be distributed as follows:

1.  to the **Insured** and the insurer of any other policy specifically excess of this Policy, until they are reimbursed for any **Loss** that they sustain that exceeds the sum of this Policy's applicable Limit of Liability and applicable Retention, if any;

2.  then to the Insurer, until the Insurer is reimbursed for the payment made under this Policy; and

3.  then to the **Insureds**, until they are reimbursed for their payment of any applicable Retention.

In the event the Insurer recovers amounts it paid under this Policy, the Insurer will reinstate the applicable Limit(s) of Liability and Sublimit(s) of Liability of this Policy to the extent of such recovery, less the Insurer's costs incurred in obtaining such recovery. The Insurer assumes no duty to seek a recovery of any amounts paid under this Policy.

AGTC-N 101 (04/18)                                                                      Page 12 of 13

Insured

## XXII. ALTERATION, ASSIGNMENT AND HEADINGS

By acceptance of this Policy, all **Insureds** and the Insurer agree that this Policy (including the Declarations, **Application**, all purchased coverage sections and any endorsements attached to this Policy) constitute the entire agreement between the parties. The terms, conditions and limitations of this Policy can be waived or changed only by endorsement hereto.

This Policy and any all rights hereunder are not assignable without the prior written consent of the Insurer, which consent shall be in the sole and absolute discretion of the Insurer.

The titles and headings to the various sections, subsections and endorsements of this Policy are included solely for ease of reference and do not in any way limit, expand or otherwise affect the provisions or existence of such sections, subsections or endorsements.

## XXIII. STATE AMENDATORY INCONSISTENCY

In consideration of the premium charged, it is hereby understood and agreed that in the event that there is an inconsistency between a state amendatory endorsement attached to this Policy and any term or condition of this Policy, then, where permitted by law, the Insurer shall apply those terms and conditions of either the amendatory endorsement or the Policy which are more favorable to the **Insured**.

**RLI Insurance Company**
9025 North Lindbergh Drive, Peoria, IL 61615

## SUPPLEMENTAL DECLARATIONS

Policy No:  EPG0041373

Named Insured and Mailing Address

Greater Los Angeles Zoo Association
5333 Zoo Drive
Los Angeles, CA 90027

Portion of premium attributable to coverage for Certified Acts of Terrorism     $0_____

RIL 110A (01/08)

Insured

Coverage: **General Terms and Conditions**                    Insurer: **RLI Insurance Company**

Effective date of                                         To be attached to and form part of
this endorsement: **01/01/2024**                          Policy No. **EPG0041373**

Issued to: **Greater Los Angeles Zoo Association**

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

With respect to any one or more certified acts of terrorism, we will not pay any amount for which we are not responsible under the terms of the Terrorism Risk Insurance Act, as amended ("Terrorism Risk Insurance Act"), due to the application of any clause which results in a cap on our liability for payments for terrorism losses.

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in  consultation with the Secretary of Homeland Security and the Attorney General of the United States, to be an act of terrorism pursuant to the Terrorism Risk Insurance Act. The Terrorism Risk Insurance Act includes the following criteria for a certified act of terrorism:

1.  The act resulted in aggregate losses in excess of $5 million; and

2.  The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

If aggregate insured losses attributable to certified acts of terrorism under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year (January 1 through December 31) and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to the pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

Under this formula, the United States government generally reimburses 85% through 2015; 84% beginning on January 1, 2016; 83% beginning on January 1, 2017; 82% beginning January 1, 2018; 81% beginning January 1, 2019 and 80% beginning January 1, 2020 of covered terrorism losses exceeding the statutorily established deductible paid by the insurance company providing the coverage.

We will have no liability for any certified act of terrorism should the Terrorism Risk Insurance Act be terminated, not renewed, allowed to expire, or otherwise discontinued. Regardless of when during the Policy Period such termination, nonrenewal, expiration, or discontinuation occurs, our liability for any certified act of terrorism will cease immediately at the date and time of such termination, nonrenewal, expiration, or discontinuation of the Terrorism Risk Insurance Act.

If the Terrorism Risk Insurance Act is terminated, not renewed, allowed to expire, or otherwise discontinued during the Policy Period and we have charged premium for coverage under the Terrorism Risk Insurance Act, we will reimburse the premium, if any, charged for coverage under the Terrorism Risk Insurance Act on a customary pro rata basis.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

EPG 900 (01/15)                                                            Page 1 of 1

Insured

# Asset Protection Policy

Coverage: **General Terms and Conditions**

Insurer:   **RLI Insurance Company**

Effective date of
this endorsement:   **01/01/2024**

To be attached to and form part of
Policy No.   **EPG0041373**

Issued to:   **Greater Los Angeles Zoo Association**

---

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## CLASS ACTION RETENTION ENDORSEMENT

It is hereby understood and agreed that:

1.  Item 5. B. of the Declarations, is amended by adding the following:

    "$ 500,000_____   each **Class Action Claim**"

2.  Section III. LIMITS OF LIABILITY, RETENTION AND SINGLE CLAIMS, of the General Terms and Conditions is amended by adding the following:

    "The Retention set forth in Item 5. B. of the Declarations will apply to all **Loss** resulting from each **Class Action Claim**."

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

AGTC 618 (04/18)

Page 1 of 1

Insured

# Asset Protection Policy

Coverage: **General Terms and Conditions**

Insurer: **RLI Insurance Company**

Effective date of
this endorsement: **01/01/2024**

To be attached to and form part of
Policy No. **EPG0041373**

Issued to: **Greater Los Angeles Zoo Association**

---

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## EXTEND TIME TO ELECT DISCOVERY PERIOD ENDORSEMENT

It is hereby understood and agreed that the phrase "thirty (30) days" in Section VIII. DISCOVERY PERIOD, is amended to read "_sixty_____ (_60_) days".

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

AGTC 619 (04/18)

Page 1 of 1

Insured

Policy Number:  EPG0041373



**RLI Insurance Company**
Peoria, Illinois 61615

# ATTENTION POLICYHOLDER:

## <u>KEEP THIS NOTICE WITH YOUR INSURANCE PAPERS</u>

Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false, incomplete, or misleading information, or conceals information concerning any material fact thereto, commits a fraudulent insurance act, which is a crime punishable by incarceration, and shall also be subject to civil penalties.

RIL 200 (10/00)                                                                                   Page 1 of 1

Insured



# POLICYHOLDER DISCLOSURE
# NOTICE OF
# TERRORISM INSURANCE COVERAGE

Coverage for "acts of terrorism" is included in your policy. You are hereby notified that under the Terrorism Risk Insurance Act, as amended (the "Act"), the definition of "act of terrorism" has changed. As defined in Section 102(1) of the Act, the term "act of terrorism" means any act that is certified by the Secretary of the Treasury - in consultation with the Secretary of Homeland Security, and the Attorney General of the United States - to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of a United States mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion. The "acts of terrorism" as defined in Section 102(1) of the Act shall be sometimes referred to herein as "certified acts of terrorism."

Under your coverage, any losses resulting from "certified acts of terrorism" may be partially reimbursed by the United States Government under a formula established by the Terrorism Risk Insurance Act, as amended. However, your policy may contain other exclusions which might affect your coverage, such as an exclusion for nuclear events. Under the formula, the United States Government generally reimburses 85% through 2015; 84% beginning on January 1, 2016; 83% beginning on January 1, 2017; 82% beginning January 1, 2018; 81% beginning January 1, 2019 and 80% beginning January 1, 2020 of covered terrorism losses exceeding the statutorily established deductible paid by the insurance company providing the coverage.

The Terrorism Risk Insurance Act, as amended, contains a $100 billion cap that limits the United States Government reimbursement as well as the insurers' liability for losses resulting from "certified acts of terrorism" when the amount of such losses exceeds $100 billion in any one calendar year. If the aggregate insured losses for all insurers exceed $100 billion, your coverage may be reduced.

The portion of your annual premium that is attributable to coverage for "certified acts of terrorism" is $ 0_____, and does not include any charges for the portion of losses covered by the United States Government under the Act.

UW 20313I (01/15)

Insured

Policy Number: EPG0041373



**RLI Insurance Company**
Peoria, Illinois 61615

# STATE OF CALIFORNIA

# NOTICE TO POLICYHOLDER

If you cancel the policy prior to the end of the policy period, the return premium may be calculated other than on a pro rata basis. The premium returned may be reduced by up to 10% of the pro rata return premium and will be calculated at the time of cancellation.

Policy Number:   EPG0041373



**RLI Insurance Company**
Peoria, Illinois 61615

# NOTICE TO POLICYHOLDERS

## REGARDING THE UNITED STATES TREASURY DEPARTMENT – OFFICE OF FOREIGN ASSETS CONTROL (OFAC)

This Policyholder Notice does not provide coverage nor can it be construed to replace any provisions of your policy. Please read your policy carefully to determine your rights, duties, and what is and what is not covered by your policy. This Notice should only be used to provide information concerning the possible impact of your insurance coverage as it relates to directives issued by OFAC.

**PLEASE READ THIS NOTICE CAREFULLY.**

OFAC administers and enforces economic and trade sanctions and places restrictions on certain transactions. OFAC acts pursuant to Executive Orders of the President of the United States and specific legislation. OFAC has identified and named numerous foreign agents, front organizations, terrorists, terrorist organizations, and narcotics traffickers, among others, as "Specially Designated Nationals and Blocked Persons." The complete list can be found on the United States Treasury website – http://www.treas.gov/ofac.

Various trade or economic sanctions and other laws or regulations prohibit us from providing insurance in certain circumstances. In accordance with OFAC regulations, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions law or is a Specially Designated National and Blocked Person, as identified by OFAC, this insurance contract is considered a blocked or frozen contract and will be considered null and void. When an insurance policy is considered to be a blocked or frozen contract, all provisions of this insurance will be immediately subject to OFAC, and neither payments nor premium refunds may be made without authorization from OFAC. Other limitations on the premiums and payments may also apply.

UW 20342 (03/12)                                                                                          Page 1 of 1

Insured

Policy Number:  EPG0041373                                                RLI Insurance Company

# SIGNATURE PAGE

In Witness Whereof, we have caused this policy to be executed and attested, and, if required by state law, this policy shall not be valid unless countersigned by our authorized representative.

Corporate Secretary                                    President & COO

ILF 0001C (04/16)

Insured

# Asset Protection Policy

Coverage: **General Terms and Conditions**

Insurer: **RLI Insurance Company**

Effective date of
this endorsement: **01/01/2024**

To be attached to and form part of
Policy No. **EPG0041373**

Issued to: **Greater Los Angeles Zoo Association**

---

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## AMEND SECTION V. D., DEFENSE AND SETTLEMENT; ALLOCATION OF LOSS ENDORSEMENT

It is hereby understood and agreed that Section V. D., DEFENSE AND SETTLEMENT; ALLOCATION OF LOSS, of this Policy is deleted in its entirety and replaced with the following:

D.  If in any **Claim** the **Insureds** who are afforded coverage for such **Claim** incur **Loss** covered by this Policy jointly with others (including **Insureds**) who are not afforded coverage for such **Claim**, or incur an amount consisting of both **Loss** covered by this Policy and loss not covered by this Policy because such **Claim** includes both covered and uncovered matters, then the **Insureds** and the Insurer shall allocate such amount between covered **Loss** and uncovered **Loss** based upon the relative legal exposures of all parties to covered and uncovered matters. If there can be an agreement on an allocation of **Defense Expenses**, the Insurer shall, upon request, advance on a current basis **Defense Expenses** allocated to covered **Loss**. If there can be no agreement on an allocation of **Defense Expenses**, the Insurer shall advance on a current basis **Defense Expenses** which the Insurer believes to be covered under any purchased **Liability Coverage Section** until a different allocation is negotiated or judicially determined.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

Insured

# ═ ASSET PROTECTION POLICY ═

## Fiduciary Liability
## Coverage Section

**In consideration of the payment of the premium, and in reliance upon the statements made to the Insurer in the Application forming a part hereof and its attachments and the material incorporated therein, RLI Insurance Company, herein called the "Insurer," and the Insureds agree as follows:**

## I. INSURING CLAUSES

A.  Fiduciary Liability Coverage

The Insurer will pay on behalf of the **Insureds**, **Loss** incurred by the **Insureds** as a result of **Claims** first made against the **Insureds** during the **Policy Period**, or during the Discovery Period (if purchased), for a **Wrongful Act** by the **Insureds** or by any natural person for whose **Wrongful Act** the **Insureds** are legally responsible.

B.  Voluntary Compliance Settlement Coverage

The Insurer will pay on behalf of the **Insureds**, any **Voluntary Compliance Settlement** and **Defense Expenses** incurred by the **Insureds** as a result of a **Voluntary Compliance Program Notice** first given to the Insurer during the **Policy Period**, provided such **Voluntary Compliance Settlement** and **Defense Expenses** are incurred after such **Voluntary Compliance Program Notice** is first given to the Insurer. The maximum aggregate liability of the Insurer for all **Voluntary Compliance Settlements** and **Defense Expenses** covered by this Insuring Clause B. shall be the **Voluntary Compliance Program** Sublimit amount stated in Item 7. C. of the Declarations. This sublimit further limits and does not increase any other applicable Limit of Liability under this Policy.

## II. DEFINITIONS

When used in this Coverage Section, the following terms, whether in the singular or plural, are defined below:

A.  "**Administration**" means one or more of the following administrative duties or activities, but only with respect to an **Insured Plan**:

1.  handling records or giving advice, counsel or interpretation to participants regarding an **Insured Plan**; or

2.  effecting enrollment, termination, or cancellation of participants under an **Insured Plan**; or

3.  preparing, distributing or filing required notices or documents regarding an **Insured Plan**.

B.  "**Affordable Care Act**" means the Patient Protection and Affordable Care Act and the Health Care and Education Reconciliation Act of 2010 and any amendments thereto.

C.  "**Claim**" means:

1.  a written demand for monetary, non-monetary or injunctive relief against any **Insured**; or

2.  a civil or criminal proceeding against any **Insured** commenced by the service of a complaint or similar pleading, or the return of an indictment, information, or similar charging document; or

AFLC 101 (04/18)                                                                 Page 1 of 7

Insured

3.  a formal administrative or regulatory proceeding against any **Insured** commenced by the filing of a notice of charges, the entry of a formal investigative order, or the receipt of a similar document; or

4.  a formal or informal civil, criminal, administrative or regulatory investigation against any **Insured** (including a fact-finding investigation by the United States Department of Labor, the Pension Benefit Guaranty Corporation or similar governmental authority) commenced by the service upon or other receipt by the **Insured** of a target letter, formal investigative order or similar document; or

5.  a written request received by an **Insured** to toll or waive a statute of limitations relating to a potential **Claim** described in 1. through 4. above; or

6.  any demand for arbitration or mediation received by any **Insured** relating to a **Wrongful Act** by an **Insured**; or

7.  an official request for **Extradition** of an **Insured Person**;

including any appeal related to any of the above.

Solely for purposes of Insuring Clause I. B., Voluntary Compliance Settlement Coverage, **Claim** means a **Voluntary Compliance Program Notice**.

D.  "**Clean Up Costs**" means expenses, including but not limited to legal and professional fees, incurred in testing for, monitoring, cleaning up, removing, containing, treating, neutralizing, detoxifying or assessing the effects of **Pollutants**.

E.  "**Employee Benefit Law**" means **ERISA** or any similar common or statutory law, as amended, anywhere in the world to which an **Insured Plan** is subject and any rules and regulations promulgated thereunder. Except with respect to any **Wrongful Act** described in subpart 3. of the definition of **Wrongful Act**, **Employee Benefit Law** shall not include any law concerning workers' compensation, unemployment insurance, Social Security, government-mandated disability benefits or similar law.

F.  "**ESOP**" means an employee stock ownership plan as defined by **ERISA**.

G.  "**Fiduciary**" means a fiduciary (as defined in an **Employee Benefit Law**) of an **Insured Plan**, or a person or organization who exercises discretionary control with respect to the management of an **Insured Plan** or the disposition of its assets.

H.  "**Healthcare Exchange**" means any public, private, or government-sponsored or controlled entity established to assist in the purchase of health insurance in accordance with the **Affordable Care Act**.

I.  "**Insured**" means:

1.  the **Entity**;

2.  the **Insured Plan(s)**;

3.  the **Insured Person(s)**; and

4.  any other organization, plan or natural person added as an **Insured** by specific written endorsement to this Coverage section.

J.  "**Insured Person**" means:

1.  any natural persons who were, now are, or shall become duly elected or appointed trustees (other than a bankruptcy or litigation trustee), directors, officers, in-house general counsel, governors, **Managers**, advisory directors, members of the advisory board, or **Employees** of the **Entity** or of any **Insured Plan**; and

AFLC 101 (04/18)                                                                                          Page 2 of 7

Insured

2.  any natural persons who were, now are or shall become a holder of a title, position or capacity comparable or equivalent to a position described in subpart 1. above of any **Entity**; and

3.  any other natural person who was, now is, or shall become a **Fiduciary** of an **Insured Plan** and is added as an **Insured Person** by specific written endorsement to this Coverage Section.

K.  "**Insured Plan**" means:

1.  any employee benefit plan, welfare benefit plan or pension benefit plan, as defined by an **Employee Benefit Law**, including any **VEBA** or **ESOP**, that is sponsored solely by the **Entity** or jointly by the **Entity** and a labor organization exclusively for the benefit of **Employees** of the **Entity**, if such plan existed as of the inception date of the **Policy Period** or is afforded coverage pursuant to Subsection VII. A. of the General Terms and Conditions;

2.  any other employee benefit plan or program, or fringe benefit or excess benefit plan, not subject to Title 1 of **ERISA** sponsored solely by the **Entity** for the benefit of **Employees** of the **Entity**, if such plan existed as of the inception date of the **Policy Period** or is afforded coverage pursuant to Subsection VII. A. of the General Terms and Conditions;

3.  any other plan or program otherwise described in subparts 1. or 2. above while such plan or program is being actively developed, formed or proposed by the **Entity** prior to the formal creation of such plan or program;

4.  any government-mandated insurance for workers' compensation, unemployment, Social Security or disability benefits for employees of the **Entity**, but solely for a **Wrongful Act** as defined in subpart 3. of the definition of **Wrongful Act**; or

5.  any other plan, fund, trust or program added as an **Insured Plan** by specific written endorsement to this Coverage Section;

provided, however, **Insured Plan** shall not include any multiemployer plan as defined in any **Employee Benefit Law**.

L.  "**Loss**" means monetary amounts the **Insureds** are legally obligated to pay as a result of a covered **Claim**, including but not limited to monetary damages, judgments, settlements, pre- and post-judgment interest with respect to covered damages, punitive, exemplary or the multiple portion of multiplied damages where insurable under applicable law, **Defense Expenses**, and claimant's attorney's fees and costs for which an **Insured** against whom the **Claim** is made is legally obligated to pay by reason of a court order or settlement agreement to which the Insurer consents. Solely for purposes of Insuring Clause B., Voluntary Compliance Settlement Coverage, **Loss** means **Voluntary Compliance Settlements** and **Defense Expenses** resulting from a **Voluntary Compliance Program Notice**.

The law of the applicable jurisdiction most favorable to the insurability of punitive, exemplary or multiple damages or fines or penalties shall control whether such amounts are insurable, provided such jurisdiction has a substantial relationship to the **Insured**, the **Entity**, or the **Claim** giving rise to such damages or fines or penalties.

**Loss** shall not include the following, other than covered **Defense Expenses** attributable thereto:

1.  civil or criminal fines or penalties imposed by law, except:

    a.  the five percent (5%) or less, or the twenty percent (20%) or less, civil penalties imposed upon an **Insured** as a **Fiduciary** under Section 502(i) or (l), respectively, of **ERISA**;

    b.  civil penalties imposed by the Pension Ombudsman appointed by the United Kingdom Secretary of State for Social Services or by the United Kingdom Occupational Pensions Regulatory Authority, pursuant to the English Pension Scheme Act 1993, the English Pensions Act 1995, all as amended, or rules or regulations thereunder; provided any coverage for such civil penalties applies only if the funds or assets of the subject **Insured Plan** are not used to fund, pay or reimburse the premium for this Coverage Section;

   c.   civil money penalties imposed upon an **Insured** for violation of the privacy provisions of the Health Insurance Portability and Accountability Act, as amended ("HIPAA"); provided the Insurer's maximum aggregate liability under this Coverage Section for all such HIPAA civil money penalties on account of all **Claims** first made during the **Policy Period** for this Coverage Section shall be the HIPAA Privacy Penalty Sublimit of Liability as stated in Item 7. C. of the Declarations, which further limits and does not increase any other applicable Limit of Liability under this Policy;

   d.   the fifteen percent (15%) or less tax penalty imposed upon an **Insured** under Section 4975 of the Internal Revenue Code of 1986, as amended, for an inadvertent prohibited transaction, provided the Insurer's maximum aggregate liability under this Coverage Section for all such tax penalties shall be the Section 4975 Penalties Sublimit of Liability as stated in Item 7. C. of the Declarations, which further limits and does not increase any other applicable Limit of Liability under this Policy;

   e.   civil penalties imposed upon an **Insured** as a **Fiduciary** pursuant to Section 502(c) of **ERISA**; provided the Insurer's maximum aggregate limit under this Coverage Section for all such civil penalties shall be the Section 502(c) Penalties Sublimit of Liability as stated in Item 7. C. of the Declarations which further limits and does not increase any other applicable Limit of Liability under this Policy;

   f.   civil penalties imposed upon an **Insured** under the Pension Protection Act of 2006, as amended, provided that the Insurer's maximum aggregate liability under this Coverage Section for all such civil penalties shall be the Pension Protection Act Penalties Sublimit of Liability as stated in Item 7. C. of the Declarations, which further limits and does not increase any other applicable Limit of Liability under the Policy; or

   g.   civil penalties imposed upon an **Insured** under the Patient Protection and Affordable Care Act and the Health Care and Education Reconciliation Act of 2010, as amended, provided that the Insurer's maximum aggregate liability under this Coverage Section for all such civil penalties shall be the **Affordable Care Act** Penalties Sublimit of Liability as stated in Item 7. C. of the Declarations, which further limits and does not increase any other applicable Limit of Liability under this Policy.

2.   taxes;

3.   costs incurred by an **Insured** to comply with any injunctive or other non-monetary relief or any agreement to provide any such relief;

4.   any amount for which the **Insureds** are absolved from payment;

5.   **Clean Up Costs**;

6.   matters uninsurable under the law pursuant to which this Policy shall be construed, except as otherwise provided above; or

7.   an amount that constitutes or is substantially equivalent to:

   a.   benefits due or to become due under an **Insured Plan**, or

   b.   benefits which would be due under any **Insured Plan** if such **Insured Plan** complied with all applicable laws, or

   c.   any plaintiff attorneys' fees based upon a percentage of such benefits or payable from a common fund established to pay such benefits,

      except to the extent that:

      (1)  such amount is payable by an **Insured Person** as a personal obligation, and recovery of such amount is based upon a covered **Wrongful Act**; or

(2) such amount is attributable to **Wrongful Acts** which actually or allegedly cause or contribute to a reduction or loss in the value of an **Insured Plan's** assets or a participant's account in the **Insured Plan** due to investment losses, lost investment opportunities, excessive costs or failure to comply with the participant's investment directions, even if the amounts sought or recovered by the plaintiff in the **Claim** are described by plaintiffs as "benefits" or determined by a court to be "benefits."

M.  "**VEBA**" means Voluntary Employees' Beneficiary Associations as set forth in Section 501(c)(9) of the Internal Revenue Code of 1986, as amended. Such Associations may offer the following benefits for voluntary members who are **Employees** of an **Entity**, their dependents or beneficiaries: life insurance, accident insurance, sick leave pay, supplemental unemployment or other benefits.

N.  "**Voluntary Compliance Program**" means any voluntary compliance program or similar voluntary settlement program administered by the United States Internal Revenue Service, United States Department of Labor or any other domestic or foreign governmental authority. Such programs include, without limitation, the Employee Plans Compliance Resolution System, Audit Closing Agreement Program, Voluntary Compliance Resolution Program, Walk-in Closing Agreement Program, Administrative Policy Regarding Self-Correction, Tax Sheltered Annuity Voluntary Correspondence Program, Delinquent Filer Voluntary Compliance Program, and Voluntary Fiduciary Correction Program.

O.  "**Voluntary Compliance Program Notice**" means prior written notice to the Insurer by any **Insured** of the **Insured's** intent to enter a **Voluntary Compliance Program** with respect to an **Insured Plan**.

P.  "**Voluntary Compliance Settlement**" means any fees, fines, penalties or sanctions paid or agreed to be paid by an **Insured** to a governmental authority pursuant to a **Voluntary Compliance Program** for the actual or alleged inadvertent non-compliance by an **Insured Plan** with any statute, rule or regulation; provided **Voluntary Compliance Settlement** shall not include (i) any costs to correct the non-compliance, or any other charges, expenses, taxes or damages; or (ii) any fees, fines, penalties or sanctions relating to an **Insured Plan** which, as of the earlier of the inception date of this Coverage Section or the inception date of the first policy in an uninterrupted series of policies issued by the Insurer of which this Coverage Section is a direct or indirect renewal or replacement, any **Insured Person** knew to be actually or allegedly non-compliant.

Q.  "**Wrongful Act**" means:

1.  any actual or alleged breach of the responsibilities, obligations or duties imposed upon **Fiduciaries** of any **Insured Plan** by any **Employee Benefit Law** or by the common or statutory law of the United States or any state or other jurisdiction anywhere in the world;

2.  any other matter claimed against any **Insured** solely by reason of his, her or its status as a **Fiduciary** of an **Insured Plan**;

3.  any negligent act, error or omission actually or allegedly committed or attempted in the **Administration** of any **Insured Plan**;

4.  solely with respect to an **Insured Person**, any matter claimed against him or her arising out of his or her service as a **Fiduciary** of, or in the **Administration** of, any multiemployer plan as defined in an **Employee Benefit Law**, but only if (i) such service is at the specific written request or direction of the **Entity**, (ii) a written endorsement to this Coverage Section specifically identifies such multiemployer plan for purposes of this coverage, and (iii) the **Insured** pays any premium for such coverage as required by the Insurer; provided that in no event shall coverage under this Coverage Section extend to a **Claim** against a multiemployer plan itself, its contributing employer(s), or any other fiduciaries or administrators of such plan, other than an **Insured Person**;

5.  any actual or alleged act, error or omission by an **Insured** in connection with insurance actually or attempted to be purchased through a **Healthcare Exchange**; or

6.  any negligent act, error or omission actually or allegedly committed or attempted by an **Insured** in such **Insured's** settlor capacity with respect to establishing, amending, terminating or funding any **Insured Plan**.

## III. EXCLUSIONS

A. The Insurer shall not be liable for **Loss** on account of that portion of any **Claim** made against any **Insured**:

   1. for the actual or alleged failure to collect contributions owed to an **Insured Plan**; however, this Exclusion shall not apply to **Defense Expenses** or to the extent such failure is attributable solely to the **Insured's** negligence;

   2. for any actual or alleged bodily injury, sickness, disease or death of any person, or damage to or destruction of any tangible property, including the loss of use thereof; provided, however, that this Exclusion shall not apply to any **Loss** resulting from the selection of any medical or health services provider or the denial or delay of any benefit under a health care plan;

   3. for an actual or alleged violation of any obligation of any **Insured** under any law governing workers compensation, unemployment insurance, social security, disability benefits or similar law, except the Consolidated Omnibus Budget Reconciliation Act of 1985 or the Health Insurance Portability and Accountability Act of 1996, all as amended; or

   4. for liability of others assumed by the **Insureds** under any contract or agreement; however, this Exclusion shall not apply: (i) to **Defense Expenses**; (ii) to the extent that liability would have attached to the **Insured** in the absence of such contract or agreement, or (iii) to the extent the liability was assumed in accordance with or under the **Insured Plan's** declaration of trust or equivalent document pursuant to which the **Insured Plan** was established.

B. The Insurer shall not be liable to make any payment for **Loss** on account of that portion of any **Claim** made against any **Insured** based upon, arising out of, directly or indirectly resulting from, or in consequence of:

   1. any fact, circumstance, situation, transaction, event or **Wrongful Act** which was the subject of any notice given and accepted under any prior policy or coverage section for fiduciary liability or other similar insurance;

   2. any litigation or administrative or regulatory proceeding or investigation against any **Insured** pending on or before the Pending or Prior Date for this Coverage Section set forth in Item 5. of the Declarations, or the same or substantially the same fact, circumstance, situation, transaction, event or **Wrongful Act** underlying or alleged therein;

   3. any **Wrongful Act** committed or allegedly committed by any **Insured** with respect to an **Insured Plan**, if when such **Wrongful Act** occurred no **Entity** sponsored, was a **Fiduciary** of or was responsible for the **Administration** of, the **Insured Plan**;

   4. such **Insured** gaining any profit, remuneration or financial advantage to which such **Insured** is not legally entitled, if a non-appealable judgement or final adjudication in the underlying proceeding adverse to such **Insured** establishes that such **Insured** gained such profit, remuneration or advantage; or

   5. any deliberately fraudulent or deliberately criminal **Wrongful Act** or any willful violation of any statute or regulation by such **Insured**, if a final and non-appealable adjudication in the underlying proceeding or action adverse to such **Insured** establishes that such **Insured** committed such deliberately fraudulent or deliberately criminal **Wrongful Act** or willful violation.

   To determine the applicability of the foregoing Exclusions:

   • no **Wrongful Act** of any **Insured Person** will be imputed to any other **Insured Person**;

   • only **Wrongful Acts** of an **Executive Officer** will be imputed to the **Entity**; and

   • only **Wrongful Acts** of any past, present or future trustee or equivalent executive of an **Insured Plan** will be imputed to the **Insured Plan**.

Insured

## IV. RECOURSE/WAIVER

If this Coverage Section is purchased by an **Insured Plan** and if the Insurer pays **Loss** under this Coverage Section, then the Insurer shall have a right of recourse for such **Loss** against any **Insured**, other than an **Insured Plan**, that caused or contributed to such **Loss**. However, if this Coverage Section is purchased by an **Insured** other than an **Insured Plan**, the Insurer shall have no right of recourse against an **Insured**.

## Asset Protection Policy

Coverage: **Fiduciary Practices Liability**

Insurer:   **RLI Insurance Company**

Effective date of
this endorsement:   **01/01/2024**

To be attached to and form part of
Policy No.   **EPG0041373**

Issued to:   **Greater Los Angeles Zoo Association**

---

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## NETWORK SECURITY AND PRIVACY EXCLUSION

It is hereby understood and agreed:

1.  Section II., DEFINITIONS, of this coverage section is amended to include the following:

    "**Breach Notice Law**" means any federal, state, local or foreign privacy legislation, regulation, or their functional equivalent that requires an **Entity** to provide notice to affected natural persons of any actual or potential unauthorized access to, acquisition of or misuse of their **Confidential Records**.

    "**Computer**" means a device or group of hardware devices on which software, applications, firmware, script, code and other computer programs containing **Data** can be operated and viewed.

    "**Confidential Record**" means:

    1.  non-public personally identifiable information, as defined in any applicable federal, state, local or foreign legislation or regulations including, but not limited to:

        a.  a social security number, driver's license number or other personal identification number (including an employee identification number or student identification number);

        b.  individually identifiable information considered nonpublic personal information pursuant to the Gramm-Leach Bliley Act of 1999, as amended and its implementing regulations; or

        c.  individually identifiable information considered protected health information pursuant to the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), as amended, and its implementing regulations, including but not limited to the Health Information Technology for Economic and Clinical Health Act ("HITECH Act") part of the American Recovery and Reinvestment Act of 2009 ("ARRA");

    2.  financial account number (including a bank account number, retirement account number or healthcare spending account number);

    3.  credit, debit or payment card numbers or information, including any required security code, access code, username or password that would permit access to an individual's credit, debit or payment account; or

    4.  information related to employment by an **Insured**;

    which is owned or possessed by an **Insured** or a third party for which an **Insured** is legally liable and is intended by an **Insured** to be accessible only by natural persons or entities that have been specifically authorized by the **Insured** to have such access.

MNU-AFLC 011 (11/20)

Page 1 of 3

Insured

"**Consumer Data**" means information that identifies, relates to, describes, is capable of being associated with, or could reasonably be linked, directly or indirectly, with a particular consumer or household. This includes, but is not limited to, biometric information.

"**Consumer Data Privacy Claim**" shall mean any **Claim** based upon, arising out of, directly or indirectly resulting from, or in consequence of, in whole or in part, any actual or alleged violation of:

1.  The Illinois' Biometric Information Privacy Act (740 ILCS 14/1 et seq.) ("BIPA") or any amendments thereto or any rules or regulations promulgated thereunder;

2.  The Texas Business and Commerce Code - BUS & COM 503.001 Capture or Use of Biometric Identifier or any amendments thereto or any rules or regulations promulgated thereunder;

3.  California Consumer Privacy Act of 2018 ("CCPA") or any amendments thereto or any rules or regulations promulgated thereunder; or

4.  Any other law, ordinance, regulation, statute or common law relating to the improper collection, storage, or destruction of **Consumer Data**.

"**Cyber Attack**" means the transmission of fraudulent or unauthorized **Data** initiated by any individual or entity, including but not limited to, criminal enterprises, terrorist organizations or sovereign nations, that is intended to and successfully modifies, alters, encrypts, damages, destroys, deletes, records, transmits, acquires or consumes information within a **System**, including **Data** that is self-replicating or self-propagating, and which causes the disruption of the normal operation of a **System**.

"**Data**" means any machine-readable information, including, but not limited to, ready-for-use programs, applications, account information, customer information, health and medical information, or other electronic information, irrespective of the way it is used and rendered.

"**Media**" means electronic applications, hardware, cloud networks, software, scripts and programs on which **Data** is stored so that it can be collected, read, retrieved, or processed by a **Computer**. **Media** does not mean paper, or other tangible property, money, debt, equity, instruments, accounts, bonds, bills, records, abstracts, deeds or manuscripts.

"**System**" means any **Computer**, **Media**, website, and all input, output, processing storage and communication devices controlled, supervised or accessed by the operation systems that are owned by, proprietary to, licensed to, leased to, or operated by or on behalf of an **Insured**.

2.  Section III., EXCLUSIONS, of this coverage section is amended to include the following:

The Insurer shall not be liable for **Loss** on account of any **Consumer Data Privacy Claim**;

The Insurer shall not be liable for **Loss** on account of any **Claim** made against any **Insured** based upon, arising out of, directly or indirectly resulting from or in consequence of any:

1.  failure or violation of the security of a **System**, including, but not limited to, impaired or denial of access, phishing or other social engineering attack, a **Cyber Attack**, or any act or failure to act of an **Insured** or employee of an **Insured** that results in the failure or violation of the security of a **System**;

2.  actual or alleged reliance by any person, entity, or **Insured** upon a deceptive misrepresentation which induces any party to transfer, pay, or deliver money, securities or virtual currency.

3.  failure to protect **Confidential Records** or other confidential information, trade secrets, processing methods, customer lists, or other proprietary information;

4.  theft, loss, disclosure, or misappropriation of hardware, **Media**, or **System** output or other documents on which **Data** is stored or recorded, that is controlled by or on behalf of an **Insured**;

Insured

5. violation of an **Insured's** policies or procedure in connection with any event referenced in 1. through 4. above;

6. failure to disclose an event referenced in 1. through 4. above in violation of any **Breach Notice Law**;

7. violation of any other federal, state, foreign or local statute or regulation in connection with any event referenced in 1. through 4. above, including:

   a. any consumer protection, privacy, or unfair and deceptive trade practice law, rule, or regulation promulgated or enforced by state Attorneys General or the Federal Trade Commission, including but not limited to Section 5(a) of the Federal Trade Commission Act, 15. U.S.C § 45 (a), as amended;

   b. any laws, rules, or regulations promulgated or enforced by the U.S. Department of the Treasury's Office of Foreign Assets Control;

   c. any laws, rules, or regulations enforced by the U.S. Department of the Treasury's Office of the Comptroller of the Currency or the Board of Governors of the U.S. Federal Reserve System, including the Federal Deposit Insurance Act, as amended;

   d. any laws, rules, or regulations promulgated or enforced by the U.S. Department of Health and Human Services Office for Civil Rights, including the Health Insurance Portability and Accountability Act of 1996, as amended; or

   e. any similar laws, rules, or regulations promulgated or enforced by any foreign governmental bodies or agencies, including the European Union's General Data Protection Regulation, as amended.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

Policy Number: EPG0041373                                    RLI Insurance Company

## NON-PROFIT ASSET PROTECTION POLICY

### Management and Entity Liability
### Coverage Section

**In consideration of the payment of the premium, and in reliance upon the statements made to the Insurer in the Application forming a part hereof and its attachments and the material incorporated therein, RLI Insurance Company, herein called the "Insurer," and the Insureds agree as follows:**

## I. INSURING CLAUSES

A.  Insured Person Liability Coverage

The Insurer will pay on behalf of the **Insured Persons**, **Loss** incurred by the **Insured Persons** as a result of **Claims** first made against the **Insured Persons** during the **Policy Period**, or during the Discovery Period (if purchased), for **Wrongful Acts**, except for **Loss** which the **Entity** pays to or on behalf of the **Insured Persons** as indemnification.

B.  Entity Reimbursement Coverage

The Insurer will pay on behalf of the **Entity**, **Loss** incurred by the **Insured Persons** as a result of **Claims** first made against the **Insured Persons** during the **Policy Period**, or during the Discovery Period (if purchased), for **Wrongful Acts**, if the **Entity** grants indemnification to or on behalf of the **Insured Persons** for such **Loss**.

C.  Entity Liability Coverage

The Insurer will pay on behalf of the **Entity**, **Loss** incurred by the **Entity** as a result of **Claims** first made against the **Entity** during the **Policy Period**, or during the Discovery Period (if purchased), for **Wrongful Acts**.

## II. ADDITIONAL COVERAGES

A.  Pre-Claim Inquiry Coverage

The Insurer will pay under Insuring Clauses A. and B. **Defense Expenses** incurred by the **Insured Persons** for a **Pre-Claim Inquiry** if (i) such **Pre-Claim Inquiry** is first made during the **Policy Period**, (ii) the **Insureds** in their sole discretion give written notice of the **Pre-Claim Inquiry** to the Insurer, and (iii) such **Defense Expenses** are incurred after the date such written notice is given to the Insurer.

B.  Additional Side A Limit of Liability for Insured Persons

If the Additional Side A Limit for **Insured Persons** is purchased pursuant to Item 6. A. of the Declarations and if the applicable Limit of Liability under this Coverage Section is exhausted, an Additional Limit of Liability in the amount stated in Item 6. A. of the Declarations shall apply solely for **Loss** covered under Insuring Clause A., **Insured Person** Liability Coverage; provided such Additional Side A Limit of Liability shall not apply with respect to any **Claim** for a **Wrongful Employment Act**. Such Additional Limit of Liability is in addition to and not part of any other applicable Limit of Liability under this Policy, and shall be excess of any amounts payable under all other insurance policies that are specifically excess of this Coverage Section. Liability under such Additional Side A Limit of Liability shall attach to the Insurer only after such excess insurers, the **Insureds**, and/or any other source shall have paid in legal currency as **Loss** the full amount of the excess policies' limits of liability.

ANDO 101 (04/18)                                              Page 1 of 6

Insured

C.  Executive Protection Coverage

1.  The Insurer shall pay on behalf of a **Protected Executive** all reasonable fees and expenses incurred by the **Protected Executive** in connection with using a public relations firm to mitigate the adverse effects to the reputation of the **Protected Executive** from a **Claim** against the **Protected Executive** which is covered under this Coverage Section, including without limitation from any negative public statement regarding the **Protected Executive** by a **Regulatory Body** relating to such **Claim** or the **Wrongful Acts** alleged therein; provided (i) the Insurer's maximum liability for all such fees and expenses incurred by all **Protected Executives** combined shall be the Reputational Protection Costs Sublimit of Liability set forth in Item 7. A. of the Declarations, and (ii)  this Paragraph only applies to the extent such fees and expenses are not otherwise covered under this Coverage Section.

2.  The Insurer shall pay on behalf of a **Protected Executive** all reasonable fees and expenses incurred by the **Protected Executive** to oppose any efforts by a claimant in a **Claim** to seize or otherwise enjoin the personal assets or real property of the **Protected Executive** in connection with a **Claim** covered under this Coverage Section, or to revoke, overturn or set aside a court order in connection with a **Claim** covered under this Coverage Section which impairs the use of such assets or property; provided (i) the Insurer's maximum liability for all such fees and expenses incurred by all **Protected Executives** combined shall be the Asset Protection Costs Sublimit of Liability set forth in Item 7. A of the Declarations, and (ii)  this Paragraph only applies to the extent such fees and expenses are not otherwise covered under this Coverage Section.

## III. DEFINITIONS

When used in this Coverage Section, the following terms, whether in the singular or plural, are defined below:

A.  "**Anti-Trust Violation**" means an actual or alleged violation of the Sherman Anti-Trust Act, the Clayton Act, the Federal Trade Commission Act, or any other federal, state, local, common or foreign laws involving anti-trust, monopoly, price fixing, price discrimination, predatory pricing, restraint of trade or unfair trade practices, as amended.

B.  "**Claim**" means:

1.  a written demand for monetary, non-monetary or injunctive relief against any **Insured**; or

2.  a civil or criminal proceeding against any **Insured** commenced by the service of a complaint or similar pleading or the return of an indictment, information or similar charging document; or

3.  a formal administrative or regulatory proceeding against any **Insured Person**, or against the **Entity** but only while such proceeding is also pending against an **Insured Person**, commenced by the filing of a notice of charges, formal investigative order or similar document; or

4.  a formal or informal civil, criminal, administrative or regulatory investigation against any **Insured Person** commenced by the service upon or other receipt by the **Insured Person** of a written notice or subpoena from the investigating authority identifying such **Insured Person** as an individual against whom a formal proceeding may be commenced, including without limitation a Wells notice or target letter (subject to Title 9, §11.151 of the U.S. Attorney's Manual); or

5.  a written request received by an **Insured** to toll or waive a statute of limitations relating to a **Wrongful Act** by an **Insured**; or

6.  an official request for **Extradition** of any **Insured Person** or the execution of a warrant for the arrest of an **Insured Person** where such execution is an element of **Extradition**; or

7.  any demand for arbitration or mediation received by any **Insured** relating to a **Wrongful Act** by an **Insured**; or

Insured

8. solely with respect to coverage under Section II. A., a **Pre-Claim Inquiry**,

including any appeal related to any of the above.

C. "**Excess Benefit Tax**" means any excise tax imposed by the Internal Revenue Service on an **Insured Person** who is an "organizational manager," as defined in Section 4958 of the Internal Revenue Code of 1986, as amended, as a result of such **Insured Person's** participation in an "excess benefit transaction," as defined in such Section 4958; provided **Excess Benefit Tax** does not include the twenty-five percent (25%) excise tax assessed against a "disqualified person" as defined in such Section 4958 or the two hundred percent (200%) tax assessed for failure to correct such an excess benefit transaction, pursuant to such Section 4958.

D. "**Insured**" means the **Entity** and **Insured Person** collectively or individually.

E. "**Insured Person**" means any natural person who has been, now is or shall become (i) a duly elected or appointed director (including a de facto director and shadow director), trustee (other than a bankruptcy or litigation trustee), governor, regent, officer, **Manager**, advisory director or member of the advisory board of the **Entity**, in-house counsel, risk manager, controller, or their functional equivalent, and (ii) an **Employee** who is not described in subpart (i) above, provided such **Employee** shall not be considered an **Insured Person** for purposes of the definition of **Outside Position** or Exclusion 4. in Section IV. B. below.

F. "**Loss**" means monetary amounts the **Insureds** are legally obligated to pay as a result of a covered **Claim**, including but not limited to monetary damages, judgments, settlements, pre- and post-judgment interest with respect to covered damages, punitive, exemplary or the multiple portion of multiplied damages where insurable under applicable law, **Defense Expenses**, claimant's attorney's fees and costs for which an **Insured** against whom the **Claim** is made is legally obligated to pay by reason of a court order or settlement agreement to which the Insurer consents, taxes imposed on an **Entity** for which an **Insured Person** is legally obligated to pay solely by reason of the **Entity's Financial Impairment**, civil fines or penalties assessed against an **Insured Person** for an unintentional or non-willful violation of any federal, state, local or foreign law, including without limitation any such violation of the Foreign Corrupt Practices Act (FCPA), and any **Excess Benefit Tax** that an **Insured Person** is obligated to pay as a result of a **Claim**, provided the maximum aggregate liability of the Insurer under this Coverage Section for all **Excess Benefit Taxes** shall be the respective Sublimit of Liability as stated in Item 7. of the Declarations which further limits and does not increase any other applicable Limit of Liability under this Policy.

Solely with respect to coverage pursuant to Section II. C. of this Coverage Section, **Loss** means Reputational Protection Costs and Asset Protection Costs, as described therein.

The law of the applicable jurisdiction most favorable to the insurability of punitive, exemplary or multiple damages or such taxes, fines or penalties shall control whether such amounts are insurable, provided such jurisdiction has a substantial relationship to the **Insured**, the **Entity**, or the **Claim** giving rise to such damages.

**Loss** shall not include taxes, civil or criminal fines or penalties imposed by law other than the taxes, civil fines or penalties described above, any amount for which the **Insureds** are absolved from payment, any amount allocated to uncovered loss pursuant to Section V. of the General Terms and Conditions, the cost to comply with any injunctive or other non-monetary relief or any agreement to provide such relief, any amount which represents or is substantially equivalent to an increase in the consideration paid or proposed to be paid by the **Entity** in connection with the purchase of any securities or assets except to the extent the **Insured Persons** are legally liable for such amount and the **Entity** is not legally permitted or is not financially able to indemnify the **Insured Persons** for such amount, or matters which are uninsurable under the law pursuant to which this Policy shall be construed, except as otherwise provided above.

G. "**Outside Entity**" means:

1. any not-for-profit entity that is exempt from federal taxation under the Internal Revenue Code of 1986, as amended; or

2. any other entity that is specifically scheduled as an **Outside Entity** by endorsement to this Coverage Section.

ANDO 101 (04/18)    Page 3 of 6

Insured

H.  "**Outside Position**" means service by an **Insured Person** as a director, officer, trustee, regent or governor of an **Outside Entity**, but only while such service is rendered with the knowledge and consent of or as part of the duties regularly assigned to the **Insured Person** by the **Entity**.

I.  "**Personal Injury**" means any actual or alleged false arrest, wrongful detention or imprisonment, malicious prosecution, defamation including libel and slander, invasion of privacy or wrongful entry or eviction.

J.  "**Pre-Claim Inquiry**" means (1) any request, demand or subpoena by a **Regulatory Body** to interview or depose an **Insured Person** or for production of documents by an **Insured Person**, in his or her capacity as such; or (2) any request, demand or subpoena by the **Entity** (including its board of directors or any committee of the board of directors) to interview or depose an **Insured Person** or for production of documents by an **Insured Person**, but only if such request, demand or subpoena by the **Entity** arises out of an inquiry or investigation by a **Regulatory Body**; provided that such **Pre-Claim Inquiry** shall be deemed to have been made when the **Insured Person** first receives such request, demand or subpoena. The Insurer shall not be liable for any **Defense Expenses** as a result of any such **Pre-Claim Inquiry** which are incurred (a) prior to the date the **Insured** gives notice of such **Pre-Claim Inquiry** to the Insurer pursuant to Section IV. NOTICE AND CLAIM REPORTING PROVISIONS, of the General Terms and Conditions, or (b) in connection with any routine or regularly scheduled oversight, compliance, audit or inspection activities by a **Regulatory Body** or the **Entity**.

K.  "**Professional Services**" means services which are performed by or on behalf of an **Insured** for others in connection with the **Entity's** business, regardless of whether or not such services are compensated or uncompensated.

L.  "**Protected Executive**" means any natural person who has been, now is or shall become a duly elected or appointed director (including a de facto director and shadow director), trustee (other than a bankruptcy or litigation trustee), governor, regent officer, **Manager**, advisory director or member of the advisory board of the **Entity**, in-house counsel, risk manager, controller, or their functional equivalent.

M.  "**Publishers Wrongdoing**" means any actual or alleged infringement of copyright or trademark, unauthorized use of title, plagiarism or misappropriation of ideas.

N.  "**Regulatory Body**" means any federal, state or local law enforcement or government authority (including but not limited to the U.S. Department of Justice, U.S. Securities and Exchange Commission, and any federal or state attorney general) or the enforcement unit of any securities exchange or similar self-regulatory organization.

O.  "**Wrongful Act**" means:

1.  any actual or alleged error, omission, act, misstatement, misleading statement, or breach of duty by the **Entity** or an **Insured Person** individually or otherwise, in his or her capacity as such or in an **Outside Position**; or

2.  any matter claimed against an **Insured Person** solely by reason of his or her status as an **Insured Person**;

including without limitation an **Anti-Trust Violation**, **Publishers Wrongdoing** and **Personal Injury** by any **Insureds** in their capacity as such.

## IV. EXCLUSIONS

A.  The Insurer shall not be liable for **Loss** (except for **Defense Expenses**) on account of that portion of any **Claim** made against any **Insured** based upon, arising out of, directly or indirectly resulting from or in consequence of:

1.  such **Insured** gaining any profit, remuneration, or financial advantage to which such **Insured** is not legally entitled if a non-appealable judgment or final adjudication in the underlying proceeding adverse to such **Insured** establishes that such **Insured** gained such profit, remuneration or advantage; or

2.  such **Insured** committing any deliberately fraudulent **Wrongful Act** or any willful violation of law if a non-appealable judgment or final adjudication in the underlying proceeding adverse to such **Insured** establishes that such **Insured** committed such **Wrongful Act** or willful violation.

B. The Insurer shall not be liable for **Loss** on account of that portion of any **Claim** made against any **Insured**:

1. for any actual or alleged bodily injury, mental anguish, emotional distress, sickness, disease or death of any person, or for damage to or destruction of any tangible property including loss of use of damaged or destroyed tangible property; however, this Exclusion will not apply to mental anguish or emotional distress in a **Claim** against **Insured Persons** for **Personal Injury**;

2. for any actual or alleged violation of **ERISA**;

3. for any actual, alleged or threatened discharge, dispersal, seepage, migration, release, escape or disposal of **Pollutants** into or on real or personal property, water or the atmosphere; or any direction or request that the **Insured** test for, monitor, clean up, remove, contain, treat, detoxify or neutralize **Pollutants**, or any voluntary decision to do so; including but not limited to any **Claim** for financial loss to the **Entity** based upon, arising out of, directly or indirectly resulting from or in consequence of the matters described in this Exclusion; however, this Exclusion will not apply to any **Claim** against any **Insured Person** for **Loss** covered under Insuring Clause A. Insured Person Liability Coverage;

4. by or on behalf of, or in the name or right of, any **Entity** or, with respect to **Outside Position** coverage, the **Outside Entity**, or any director, trustee, governor, regent, officer or **Manager** of the **Entity** or the **Outside Entity** in any capacity; however, this Exclusion will not apply to any **Claim**:

   a. that is a derivative action brought and maintained on behalf of, or in the name or right of, the **Entity** or **Outside Entity** without any active assistance or participation of, or solicitation by, any **Insured Person** (other than assistance, participation or solicitation for which Section 806 of the Sarbanes-Oxley Act of 2002, or any similar "whistleblower" protection provision of an applicable federal, state, local or foreign law, affords protection to such **Insured Person**);

   b. in the form of a cross-claim, third party claim or other claim for contribution or indemnity by an **Insured Person** which is part of or results directly from a **Claim** which is not otherwise excluded by the terms of this Coverage Section;

   c. brought or maintained on behalf of the **Entity** or **Outside Entity** by any receiver, conservator, liquidator, trustee, examiner, rehabilitator, creditors committee or similar official appointed to take control of, supervise, manage, or liquidate the **Entity** or **Outside Entity**, or any assignee of any such receiver, conservator, liquidator, trustee, examiner, rehabilitator, creditors committee or similar official;

   d. brought or maintained by a director, trustee, governor, regent, officer or **Manager** of the **Entity** or **Outside Entity** who has not served in such capacity for a period of at least one (1) year prior to the date such **Claim** was first made and who brings and maintains such **Claim** independently of, and without the active assistance, participation, or solicitation of the **Entity** or **Outside Entity** or any other director, trustee, governor, officer or **Manager** who is serving or has served as a director, trustee, governor, officer or **Manager** of the **Entity** or **Outside Entity** within such one (1) year period; or

   e. brought and maintained outside of the United States, Canada or any other common law country (including any territories thereof); or

5. for any **Wrongful Employment Act**, or any actual or alleged violation of any social security, worker's compensation, disability benefits, or unemployment compensation law, the Fair Labor Standards Act, the National Labor Relations Act, the Worker Adjustment and Retraining Notification Act, the Consolidated Omnibus Budget Reconciliation Act of 1985, the Occupational Safety and Health Act, rules or regulations promulgated under and amendments to any such law, or similar provisions of any federal, state or local statutory law or common law.

C. The Insurer shall not be liable for **Loss** on account of that portion of any **Claim** made against any **Insured** based upon, arising out of, directly or indirectly resulting from, or in consequence of:

1.  the service by any **Insured Person** as a director, officer or employee of any organization other than the **Entity** or an **Outside Entity**, even if directed or requested by the **Entity** to serve as a director, officer or employee of such other organization;

2.  any litigation, investigation, or administrative or regulatory proceeding against any **Insured** pending on or before the respective Pending or Prior Date for this Coverage Section set forth in Item 5. of the Declarations, or the same or substantially the same actual or alleged fact, circumstance, situation, transaction, event or **Wrongful Act** underlying or alleged therein;

3.  any fact, circumstance, situation, transaction, event or **Wrongful Act** which was the subject of any notice given and accepted under any prior policy or coverage section for directors and officers liability or other similar professional liability insurance;

4.  any actual, attempted or proposed offering, solicitation, sale, purchase, distribution, or issuance of debt or equity securities by or on behalf of the **Entity** (including tax exempt bonds) or any actual or alleged violation of the Securities Act of 1933, the Securities Exchange Act of 1934, any rules or regulations of the Securities and Exchange Commission promulgated thereunder, any other federal, state, local or provincial statute or common law relating to securities, or any rules or regulations promulgated thereunder, all as amended; however this Exclusion C. 4. shall not apply with respect to an offering, solicitation, sale, distribution, or issuance of securities in a transaction that is exempt from registration under the Securities Act of 1933, as amended (other than an exemption pursuant to Title IV of the Jumpstart Our Business Startups Act ("JOBS Act"), or any applicable similar foreign law that regulates the purchase, sale or offering of securities; or

5.  the rendering of, or actual or alleged failure to render, any **Professional Services**, provided that this Exclusion C. 5. shall not apply to **Claims** brought by a securityholder of the **Entity** in their capacity as such without any active assistance or participation of, or solicitation by, any **Insured**.

D.  The Insurer shall not be liable under Insuring Clause C. Entity Liability Coverage, for **Loss** on account of that portion of any **Claim** made against any **Entity** based upon, arising out of, directly or indirectly resulting from or in consequence of:

1.  any actual or alleged infringement, piracy, misappropriation, disclosure or slander of title of any actual, alleged or prospective copyright, patent, service mark, trade name, trademark, licensing right, ideas or trade secrets;

2.  any actual or alleged obligation of such **Entity** pursuant to any workers' compensation, unemployment insurance, social security, disability benefits, or similar law; or

3.  any actual or alleged obligation under or breach of any written, oral, express, or implied contract or agreement except to the extent that such **Entity** would have been liable in the absence of such contract or agreement.

To determine the applicability of any Exclusions in Sections IV. A., B., C. or D. above: (i) no **Wrongful Act** of any **Insured Person** will be imputed to any other **Insured Person**, and (ii) only **Wrongful Acts** of an **Executive Officer** will be imputed to the **Entity**.

## V. OUTSIDE POSITION COVERAGE

All coverage under this Coverage Section for **Loss** from **Claims** against **Insured Persons** for **Wrongful Acts** in their **Outside Positions** will be specifically excess of any indemnification or other valid and collectible insurance provided to such **Insured Person** by the **Outside Entity** for which the **Insured Person** serves in his or her **Outside Position**.

# Non-Profit Asset Protection Policy

Coverage: **Management and Entity Liability**                    Insurer:   **RLI Insurance Company**

Effective date of                                               To be attached to and form part of
this endorsement:  **01/01/2024**                              Policy No.  **EPG0041373**

Issued to:  **Greater Los Angeles Zoo Association**

---

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## SEXUAL MISCONDUCT EXCLUSION

It is hereby understood and agreed that:

1.   Section III. DEFINITIONS, is amended by adding the following:

"**Sexual Misconduct**" means any licentious, immoral or sexual behavior, sexual abuse, sexual assault, sexual molestation, or non-consensual sexual contact achieved through force, threat of force or coercion, including, but not limited to, allegations of sexual assault and battery.

2.   Section IV. EXCLUSIONS C., is amended by adding the following:

"      any actual , alleged, or threatened acts of **Sexual Misconduct**, child abuse, or unwanted advances, committed by or on behalf of an **Insured Person**, of anyone in the care, custody, or control of an **Insured Person**; or failure to report such acts."

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

ANDO 603 (04/18)                                                                              Page 1 of 1

Insured

## Asset Protection Policy

Coverage: **Management and Entity Liability**

Insurer:   **RLI Insurance Company**

Effective date of
this endorsement:   **01/01/2024**

To be attached to and form part of
Policy No.   **EPG0041373**

Issued to:   **Greater Los Angeles Zoo Association**

---

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### NETWORK SECURITY AND PRIVACY EXCLUSION (III)

It is hereby understood and agreed:

1.   Section III., DEFINITIONS, of this coverage section is amended to include the following:

"**Breach Notice Law**" means any federal, state, local or foreign privacy legislation, regulation, or their functional equivalent that requires an **Entity** to provide notice to affected natural persons of any actual or potential unauthorized access to, acquisition of or misuse of their **Confidential Records**.

"**Computer**" means a device or group of hardware devices on which software, applications, firmware, script, code and other computer programs containing **Data** can be operated and viewed.

"**Confidential Record**" means:

1.   non-public personally identifiable information, as defined in any applicable federal, state, local or foreign legislation or regulations including, but not limited to:

   a.   a social security number, driver's license number or other personal identification number (including an employee identification number or student identification number);

   b.   individually identifiable information considered nonpublic personal information pursuant to the Gramm-Leach Bliley Act of 1999, as amended and its implementing regulations; or

   c.   individually identifiable information considered protected health information pursuant to the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), as amended, and its implementing regulations, including but not limited to the Health Information Technology for Economic and Clinical Health Act ("HITECH Act") part of the American Recovery and Reinvestment Act of 2009 ("ARRA");

2.   financial account number (including a bank account number, retirement account number or healthcare spending account number);

3.   credit, debit or payment card numbers or information, including any required security code, access code, username or password that would permit access to an individual's credit, debit or payment account; or

4.   information related to employment by an **Insured**;

which is owned or possessed by an **Insured** or a third party for which an **Insured** is legally liable and is intended by an **Insured** to be accessible only by natural persons or entities that have been specifically authorized by the **Insured** to have such access.

MNU-ANDO 020 (11/20)

Page 1 of 3

"**Consumer Data**" means information that identifies, relates to, describes, is capable of being associated with, or could reasonably be linked, directly or indirectly, with a particular consumer or household. This includes, but is not limited to, biometric information.

"**Consumer Data Privacy Claim**" shall mean any **Claim** based upon, arising out of, directly or indirectly resulting from, or in consequence of, in whole or in part, any actual or alleged violation of:

1.  The Illinois' Biometric Information Privacy Act (740 ILCS 14/1 et seq.) ("BIPA") or any amendments thereto or any rules or regulations promulgated thereunder;

2.  The Texas Business and Commerce Code - BUS & COM 503.001 Capture or Use of Biometric Identifier or any amendments thereto or any rules or regulations promulgated thereunder;

3.  California Consumer Privacy Act of 2018 ("CCPA") or any amendments thereto or any rules or regulations promulgated thereunder; or

4.  Any other law, ordinance, regulation, statute or common law relating to the improper collection, storage, or destruction of **Consumer Data**.

"**Cyber Attack**" means the transmission of fraudulent or unauthorized **Data** initiated by any individual or entity, including but not limited to, criminal enterprises, terrorist organizations or sovereign nations, that is intended to and successfully modifies, alters, encrypts, damages, destroys, deletes, records, transmits, acquires or consumes information within a **System**, including **Data** that is self-replicating or self-propagating, and which causes the disruption of the normal operation of a **System**.

"**Data**" means any machine-readable information, including, but not limited to, ready-for-use programs, applications, account information, customer information, health and medical information, or other electronic information, irrespective of the way it is used and rendered.

"**Media**" means electronic applications, hardware, cloud networks, software, scripts and programs on which **Data** is stored so that it can be collected, read, retrieved, or processed by a **Computer**. **Media** does not mean paper, or other tangible property, money, debt, equity, instruments, accounts, bonds, bills, records, abstracts, deeds or manuscripts.

"System" means any **Computer**, **Media**, website, and all input, output, processing storage and communication devices controlled, supervised or accessed by the operation systems that are owned by, proprietary to, licensed to, leased to, or operated by or on behalf of an **Insured**.

2.  Section IV., EXCLUSIONS, of this coverage section is amended to include the following:

The Insurer shall not be liable for **Loss** on account of any **Consumer Data Privacy Claim**;

The Insurer shall not be liable for **Loss** on account of any **Claim** made against any **Insured** based upon, arising out of, directly or indirectly resulting from or in consequence of any:

1.  failure or violation of the security of a **System**, including, but not limited to, impaired or denial of access, phishing or other social engineering attack, a **Cyber Attack**, or any act or failure to act of an **Insured** or employee of an **Insured** that results in the failure or violation of the security of a **System**;

2.  actual or alleged reliance by any person, entity, or **Insured** upon a deceptive misrepresentation which induces any party to transfer, pay, or deliver money, securities or virtual currency.

3.  failure to protect **Confidential Records** or other confidential information, trade secrets, processing methods, customer lists, or other proprietary information;

4.  theft, loss, disclosure, or misappropriation of hardware, **Media**, or **System** output or other documents on which **Data** is stored or recorded, that is controlled by or on behalf of an **Insured**;

5.    violation of an **Insured's** policies or procedure in connection with any event referenced in 1. through 4. above;

6.    failure to disclose an event referenced in 1. through 4. above in violation of any **Breach Notice Law**;

7.    violation of any other federal, state, foreign or local statute or regulation in connection with any event referenced in 1. through 4. above, including:

   a.    any consumer protection, privacy, or unfair and deceptive trade practice law, rule, or regulation promulgated or enforced by state Attorneys General or the Federal Trade Commission, including but not limited to Section 5(a) of the Federal Trade Commission Act, 15. U.S.C § 45 (a), as amended;

   b.    any laws, rules, or regulations promulgated or enforced by the U.S. Department of the Treasury's Office of Foreign Assets Control;

   c.    any laws, rules, or regulations enforced by the U.S. Department of the Treasury's Office of the Comptroller of the Currency or the Board of Governors of the U.S. Federal Reserve System, including the Federal Deposit Insurance Act, as amended;

   d.    any laws, rules, or regulations promulgated or enforced by the U.S. Department of Health and Human Services Office for Civil Rights, including the Health Insurance Portability and Accountability Act of 1996, as amended; or

   e.    any similar laws, rules, or regulations promulgated or enforced by any foreign governmental bodies or agencies, including the European Union's General Data Protection Regulation, as amended.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

MNU-ANDO 020 (11/20)                                                                                      Page 3 of 3

Insured

# Asset Protection Policy

Coverage: **Management and Entity Liability
        Coverage Section**

Insurer: **RLI Insurance Company**

Effective date of
this endorsement: **01/01/2024**

To be attached to and form part of
Policy No.: **EPG0041373**

Issued to: **Greater Los Angeles Zoo Association**

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY

**AMEND SECTION IV. EXCLUSIONS B. 1. – ABSOLUTE BI/PD EXCLUSION**

It is hereby understood and agreed that Section IV. B., 1., EXCLUSIONS**,** is deleted in its entirety and replaced with the following:

1.  based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged bodily injury, mental anguish, emotional distress, sickness, disease, death, disability, shock, mental injury, false arrest, false imprisonment, wrongful eviction, wrongful entry, wrongful detention, malicious prosecution, libel, slander, defamation, humiliation, invasion of privacy, or damage to or destruction of any tangible property, including loss of use thereof.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

MNU-ANDO-008 (01/24)                        Insured                        Page 1 of 1

# RLI® VALUE ADDED LEGAL SERVICES*

## RLI INSUREDS GAIN ACCESS TO GORDON & REES EMPLOYMENT LAW GROUP

**The Employment Law Group of Gordon & Rees consists of nearly 300 attorneys nationwide with the expertise to handle and consult on virtually any employment law issue.**

### INSUREDS HAVE ACCESS TO LEGAL EXPERTISE IN:

- Recognizing and Preventing Unlawful Harassment, Discrimination, and Retaliation
- Best Practices to Interview, Hire, Discipline & Fire
- Conducting Effective Performance Evaluations
- Addressing and Protecting Employee Privacy Concerns
- Conducting Workplace Investigations
- Leave Laws: FMLA, ADA, and More
- Diversity in the Workplace/ Affirmative Action
- ADR: Arbitration, Mediation, and More
- Terminations and Reductions in Force
- How to Improve the Workplace Environment and Morale
- Social Media Issues

### NATIONAL EMPLOYMENT ISSUE COUNSELING HOTLINE

RLI has arranged for the Employment Law Group of Gordon & Rees, which consists of nearly 300 attorneys nationwide, to provide a National Employment Issue Online Counseling Helpline — free of charge. Insureds gain access to an experienced team of employment lawyers with expertise in all facets of employment law. RLI Insureds have legal counsel available to answer questions and guide them through issues in real time. Consultation regarding pre-claim investigations, employee issues/concerns, wage & hour issues, and any employment law related issue is just an email away.



**Have an employment related question?**
Contact a Gordon & Rees attorney at RLIEPL@grsm.com.
You may expect a response within one business day.

### POLICY/HANDBOOK/WAGE & HOUR AUDITS

RLI Insureds gain access to audits of Insured's employment policies, handbooks, and wage & hour practices — free of charge. Gordon & Rees provides RLI Insureds up to 5 hours of comprehensive audits free of charge each calendar year. If Insureds need additional auditing and corporate consulting, Insureds gain access to RLI's preferred attorney rates with Gordon & Rees.

### NATIONAL EMPLOYMENT LAW WEBINAR SERIES PRESENTATIONS

RLI Insureds gain access to the National Gordon & Rees Webinar Series, with monthly presentations that focus on key issues and trends facing managers and human resources. RLI Insureds can even request a Webinar focus on a specific issue.

MONTHLY EMPLOYMENT WEBINARS
http://employmentwebinars.gordonrees.com

Each webinar is designed for those who need to make well-informed employment decisions on a day-to-day basis including human resources specialists, generalists, payroll managers, upper

WEBINAR ARCHIVE
http://employmentwebinars.gordonrees.com/archive

level managers, in-house counsel, insurance carriers, and upper management individuals. The webinars focus not only on the law, but also on practical tips for individuals to more effectively manage their employment relationships. The webinars are also archived to enable access to individuals who could not participate in the live program.

### COUNSELING AND TRAINING

RLI Insureds also gain access to Gordon & Rees's Counseling and Training Programs, which counsel clients on compliance with laws in the areas of hiring, promotion, discipline, termination, compensation, harassment, substance abuse, wage and hour, and affirmative action and independent contractor arrangements.



*The value added services are not insurance and are only available for insureds under RLI's Asset Protection Policy. RLI does not provide legal services and is not responsible and assumes no liability for any information or services provided by Gordon & Rees. RLI reserves the right to discontinue any of the services at any time.



**VALUE ADDED LEGAL SERVICES**

## NATIONAL EMPLOYMENT PLATFORM

### OFFICE LOCATIONS

**ALABAMA**
Birmingham

**ARIZONA**
Phoenix

**CALIFORNIA**
Carlsbad
Los Angeles
Oakland
Orange County
Sacramento
San Diego
San Francisco

**COLORADO**
Denver

**DELAWARE**
Wilmington

**CONNECTICUT**
Hartford

**FLORIDA**
Miami
Tampa

**GEORGIA**
Atlanta

**ILLINOIS**
Chicago

**KENTUCKY**
Louisville

**MARYLAND**
Baltimore

**MASSACHUSETTS**
Boston

**MICHIGAN**
Detroit

**MISSOURI**
St. Louis

**MONTANA**
Missoula

**NEBRASKA**
Lincoln
Omaha

**NEVADA**
Las Vegas

**NEW JERSEY**
Florham Park

**NEW YORK**
Long Island
New York
Westchester

**NORTH CAROLINA**
Raleigh

**OHIO**
Cincinnati
Cleveland
Columbus

**OKLAHOMA**
Oklahoma City

**OREGON**
Portland

**RHODE ISLAND**
Providence

**PENNSYLVANIA**
Harrisburg
Philadelphia
Pittsburgh

**SOUTH CAROLINA**
Charleston

**SOUTH DAKOTA**
Rapid City

**TEXAS**
Austin
Dallas
Houston

**VIRGINIA**
Tysons Corner

**UTAH**
Salt Lake City

**WASHINGTON**
Seattle

**WASHINGTON, D.C.**

**WEST VIRGINIA**
Wheeling

**WISCONSIN**
Milwaukee



● Gordon & Rees office locations

▇ States in which Gordon & Rees attorneys are admitted to practice
Attorneys are also admitted in Mexico, Canada, and Hong Kong

### GORDON & REES ATTORNEYS ADMITTED TO PRACTICE:

- Alabama
- Arizona
- California
- Colorado
- Connecticut
- Delaware
- District of Columbia
- Florida
- Georgia
- Hawaii
- Idaho

- Illinois
- Indiana
- Iowa
- Kansas
- Kentucky
- Maine
- Maryland
- Massachusetts
- Michigan
- Minnesota
- Mississippi
- Missouri

- Montana
- Nebraska
- Nevada
- New Hampshire
- New Jersey
- New Mexico
- New York
- North Carolina
- Ohio
- Oklahoma
- Oregon
- Pennsylvania

- Rhode Island
- South Carolina
- South Dakota
- Tennessee
- Texas
- Utah
- Virginia
- Washington
- West Virginia
- Wisconsin
- Wyoming

Gordon Rees Scully Mansukhani (Gordon & Rees) is a national litigation and business transactions firm with more than 800 lawyers in 50 offices across the United States. Founded in 1974, Gordon & Rees is recognized among the fastest growing and 40 largest law firms in the country.

www.grsm.com

**GORDON&REES**
**SCULLY MANSUKHANI**

Policy Number: EPG0041373                                              RLI Insurance Company

# NON-PROFIT ASSET PROTECTION POLICY

## Employment Practices and Third Party Discrimination Liability Coverage Section

In consideration of the payment of the premium, and in reliance upon the statements made to the Insurer in the Application forming a part hereof and its attachments and the material incorporated therein, RLI Insurance Company, herein called the "Insurer," and the Insureds agree as follows:

## I. INSURING CLAUSES

A.  Employment Practices Liability Coverage

The Insurer will pay on behalf of the **Insureds**, **Loss** incurred by the **Insureds** as a result of **Claims** first made against the **Insureds** during the **Policy Period**, or during the Discovery Period (if purchased), by or on behalf of a past, present, prospective or alleged **Employee** for a **Wrongful Employment Act**.

B.  Third Party Discrimination Liability Coverage

The Insurer will pay on behalf of the **Insureds**, **Loss** incurred by the **Insureds** as a result of **Claims** first made against the **Insureds** during the **Policy Period**, or during the Discovery Period (if purchased), by or on behalf of a **Third Party** for a **Third Party Wrongful Act**.

C.  Continuity Coverage

If a **Claim** for a **Wrongful Employment Act** is first made against the **Insureds** during a prior employment practices liability policy or coverage section, if any, issued by the Insurer to the **Entity** for the policy period immediately preceding this Coverage Section's **Policy Period** ("Prior Policy") and if such prior **Claim** ("Prior Claim") is not covered under the Prior Policy solely because notice of the Prior Claim was not timely given to the Insurer under such Prior Policy, then such Prior Claim and any other **Claim** made during this Coverage Section's **Policy Period** which is a single **Claim** with such Prior Claim shall be considered a **Claim** first made during this Coverage Section's **Policy Period**, subject to the following conditions:

1.  no **Executive Officer** or risk manager of the **Entity** was aware of such Prior Claim prior to the expiration of the time to give notice of such Prior Claim under the Prior Policy;

2.  such Prior Claim would have been covered under the Prior Policy had notice of such Prior Claim been timely given under the Prior Policy; and

3.  written notice of such Prior Claim is given under this Policy to the Insurer no later than sixty (60) days after the earlier of: (i) the date that any **Executive Officer** or risk manager of the **Entity** became aware of such Prior Claim; or (ii) the end of the **Policy Period**.

Coverage under this Coverage Section for any Prior Claim pursuant to this Section I. C. shall only apply to **Loss** incurred after the date the Prior Claim is first noticed to the Insurer under this Coverage Section.

The maximum coverage available under this Coverage Section for any such Prior Claim and all other **Claims** which are treated as a single **Claim** with such Prior Claim shall be the lesser of the coverage then available under the Prior Policy or this Coverage Section for such **Claims**, taking into account all of the terms, conditions and exclusions of the Prior Policy and this Coverage Section, including without limitation the applicable retention and applicable limit of liability under each policy as reduced by payments of **Loss**.

AEPL-N 101 (04/18)                                                      Page 1 of 6

Insured

D.  Workplace Violence Coverage

    1.  The Insurer shall pay on behalf of the **Entity** any **Workplace Violence Expenses** incurred by the **Entity** as a result of a **Workplace Violence Incident** first occurring during the **Policy Period**, subject to (i) the respective Sublimit of Liability set forth in Item 7. B. of the Declarations, which further limits and does not increase any other applicable Limit of Liability under this Policy, and (ii) the retention amount for all **Workplace Violence Incidents** combined as set forth in Item 5. of the Declarations; provided that the Insurer shall not be liable to make any payment pursuant to this Section I. D. for:

        a.  any **Workplace Violence Expenses** incurred in connection with any **Workplace Violence Incident** based upon, arising out of, directly or indirectly resulting from, or in consequence of (i) declared or undeclared war, civil war, insurrection, riot, rebellion, revolution, governmental intervention, expropriation or nationalization, or (ii) use or threat of force or violence occurring on the **Premises** for the purpose of demanding money, securities or property;

        b.  any **Workplace Violence Expenses** incurred in connection with any **Workplace Violence Incident** which occurs at any location other than the **Premises**; or

        c.  any **Workplace Violence Expenses** incurred as a result of any demand, litigation or proceeding against any **Entity** based upon, arising out of, directly or indirectly resulting from, or in consequence of a **Workplace Violence Incident**.

    2.  The **Insureds** shall, as a condition precedent to coverage provided by this Section I. D., give the Insurer notice in writing of any **Workplace Violence Incident** as soon as practicable after an **Executive Officer** or risk manager of the **Entity** first learns of such **Workplace Violence Incident** but in no event later than thirty (30) days after the **Workplace Violence Incident** occurs.

## II. DEFINITIONS

When used in this Coverage Section, the following terms, whether in the singular or plural, are defined below:

A.  "**Benefits**" means perquisites, fringe benefits, deferred compensation, payments for time off, or leave of absence, including but not limited to any payment (including insurance premiums) in connection with an employee benefit plan. **Benefits** also includes any other payment to or for the benefit of an **Employee** arising out of the employment relationship but shall not include salary, wages, commissions, bonuses, non-deferred cash incentive compensation or **Stock Benefits**.

B.  "**Claim**" means:

    1.  a written demand for monetary, non-monetary or injunctive relief against any **Insured**, or

    2.  a civil or criminal proceeding against any **Insured** commenced by the service of a complaint or similar pleading or the return of an indictment, information or similar charging document, or

    3.  a demand for arbitration or mediation received by any **Insured** relating to a **Wrongful Act** by the **Insured**, or

    4.  an administrative or regulatory proceeding against any **Insured**, including a proceeding by or before the Equal Employment Opportunity Commission or a similar state or local governmental body or by the Office of Federal Contract Compliance Programs, commenced by the service upon or other receipt by the **Insured** of a notice of charges or similar document, or

    5.  an administrative or regulatory investigation of any **Insured** commenced by the service upon or other receipt by the **Insured** of a target letter, formal investigation order or similar document, or

AEPL-N 101 (04/18)                                                                                                                     Page 2 of 6

Insured

6.  a written request received by an **Insured** to toll or waive a statute of limitations relating to a **Wrongful Act** by the **Insured**;

including any appeal related to any of the above.

**Claim** shall not include (i) any labor or grievance proceeding pursuant to a collective bargaining agreement, or (ii) an audit by the Office of Federal Contract Compliance Programs unless and until the **Insured** receives a Notice of Violation or Order to Show Cause or a written demand as described above in connection with such audit.

C.  "**Class Action**" means a civil proceeding against any **Insured** by or on behalf of a putative or certified class of past, present, prospective or alleged **Employees** for **Wrongful Employment Acts** or by or on behalf of **Third Parties** for **Third Party Wrongful Acts**, pursuant to Rule 23, Federal Rules of Civil Procedure, or a similar state rule of civil procedure.

D.  "**Discrimination**" means the failure to hire an applicant, the failure to promote, the denial of tenure, the demotion of, the segregation or classification of, or the employment related defamation of any **Employee** because of race, color, creed, religion, age, national origin, sex, sexual orientation or preference, gender, disability, handicap, pregnancy, obesity, marital status, veteran status, genetic information, HIV status or other protected class or characteristic established under any applicable federal, state or local statute or ordinance.

E.  "**Harassment**" means:

1.  unwelcome sexual advances, requests for sexual favors, or other verbal, visual or physical conduct of a sexual nature that is made either explicitly or implicitly a term or condition of employment with the **Entity**, is used as a basis for employment decisions with the **Entity**, or creates a work environment that interferes with an **Employee's** performance or that is otherwise intimidating, hostile, or offensive; or

2.  conduct of a non-sexual nature which creates a work environment that interferes with an **Employee's** performance or that is otherwise intimidating, hostile, or offensive.

F.  "**Insured**" means any past, present, or future **Employee**, the **Entity** and all its past, present and future directors, advisory directors, members of the advisory board, trustees (other than a bankruptcy or litigation trustee), governors, **Managers**, officers and their functional equivalent.

G.  "**Loss**" means monetary amounts the **Insureds** are legally obligated to pay as a result of a covered **Claim**, including but not limited to monetary damages, judgments, settlements, pre- and post-judgment interest with respect to covered damages, punitive, exemplary and noncontractual liquidated damages if insurable as provided below, back pay, front pay, damages for mental anguish or emotional distress, claimant's attorney fees and costs for which an **Insured** against whom the **Claim** is made is legally obligated to pay by reason of a court order or settlement agreement to which the Insurer consents, the multiple portion of any multiplied damage award, and civil fines or penalties assessed against a natural person **Insured** for an unintentional or non-willful violation of law.

The law of the applicable jurisdiction most favorable to the insurability of punitive, exemplary or multiple damages or such fines or penalties shall control whether such amounts are insurable, provided such jurisdiction has a substantial relationship to the **Insured**, the **Entity**, or the **Claim** giving rise to such damages.

**Loss** shall not include: (i) taxes or civil or criminal fines or penalties imposed by law, other than civil fines or penalties expressly referenced above; (ii) severance pay or damages determined to be owing under an express contract of employment or an express obligation to make such payments in the event of the termination of employment, including but not limited to payments for **Stock Benefits**; (iii) **Benefits** due or that are to become due, or the equivalent value of such **Benefits**, except with respect to any **Claim** for **Wrongful Termination** of an **Employee**; (iv) the cost to provide any reasonable accommodation for any disabled person pursuant to the Americans with Disabilities Act or any similar federal, state or local law; (v) the cost to comply with any injunctive or other nonmonetary relief or any agreement to provide any such relief; (vi) salary, wages, commissions, bonuses, non-deferred cash incentive compensation, **Stock Benefits** or other compensation if actually or allegedly earned by the claimant in the course of employment, other than back pay, front pay or any additional

compensation allegedly due as a result of a **Wrongful Employment Act**; (vii) future salary, wages, commissions or **Benefits** of a claimant who has been hired, promoted or reinstated to employment, or shall be hired, promoted or reinstated to employment, pursuant to a settlement, order or other resolution of any **Claim**; (viii) any amount for which the **Insureds** are absolved from payment; or (ix) other matters uninsurable pursuant to the law under which this Coverage Section shall be construed, except as otherwise provided above.

H.  "**Premises**" means all properties and buildings which the **Entity** regularly occupies in conducting its business.

I.  "**Retaliation**" means unlawful or abusive retaliatory treatment against an **Employee** which results from an **Employee's** (i) exercise or attempted exercise of his or her rights under law, (ii) refusal to violate any law, (iii) opposition to any unlawful practice, (iv) disclosure or threatened disclosure to a superior or governmental authority of an alleged violation of law, (v) assisting, testifying for, or cooperating with an enforcement or governmental authority or an actual or potential claimant regarding an **Insured's** alleged or potential violation of law, or (vi) other activity which is protected by a whistleblower statute or law.

J.  "**Stock Benefits**" means:

1.  any offering, plan or agreement between an **Entity** and any **Employee** which grants stock, stock options, warrants, or shares of the **Entity** to such **Employee**, including grants of stock options, restricted stock, stock warrants, performance stock shares, membership shares, or any other incentive or compensation granted in the form of securities of the **Entity**; or

2.  any instrument or payment whereby the value or amount of such instrument or payment is derived from the value of the **Entity's** securities, including a phantom stock plan or arrangement, or stock appreciation rights.

K.  "**Third Party**" means any natural person, other than an **Employee** or an applicant for employment with the **Entity**.

L.  "**Third Party Wrongful Act**" means actual or alleged:

1.  discrimination by an **Insured** against a **Third Party** based on such person's race, color, creed, religion, age, national origin, sex, sexual orientation or preference, gender, disability, handicap, pregnancy or other protected class or characteristic established under any applicable federal, state or local statute or ordinance; or

2.  harassment by an **Insured** against a **Third Party**, including, but not limited to, hostile work environment, unwelcome sexual advances, requests for sexual favors, or other verbal, visual or physical conduct of a sexual nature;

    provided such **Third Party Wrongful Act** is committed by an **Insured** in his or her capacity as such.

M.  "**Wage and Hour Law**" means: (i) the Fair Labor Standards Act (except the Equal Pay Act) or any similar law; and (ii) the Wage Payment and Collection Act or any other federal, state or local law, rule or regulation concerning wage and hour practices, off-the-clock work, overtime compensation, on-call time compensation, compensation for waiting time and dressing time, minimum wage compensation, timely payment of wages, reimbursement of expenses, classification of employees for the purposes of determining eligibility for overtime, on-call and minimum wage compensation, meal and rest periods, and maintenance of accurate employment records.

N.  "**Workplace Violence Expenses**" means reasonable fees and expenses incurred by the **Entity** with the Insurer's prior written consent, such consent not to be unreasonably withheld, to hire:

1.  an independent public relations or security consultant or forensic analyst for ninety (90) days;

2.  an independent consultant to provide counseling for **Employees**; or

3.  an independent security guard to provide security services for fifteen (15) days;

    immediately following the **Workplace Violence Incident**.

O.  "**Workplace Violence Incident**" means any unlawful and intentional actual or threatened use of deadly force involving the display of a lethal weapon which occurs in or on the **Premises** and which did or could reasonably result in the death or bodily injury of any **Insured Person**.

P.  "**Wrongful Act**" means:

1.  solely with respect to coverage under Insuring Clause A. Employment Practices Liability Coverage, a **Wrongful Employment Act**, and

2.  solely with respect to coverage under Insuring Clause B. Third Party Liability Coverage, a **Third Party Wrongful Act**.

Q.  "**Wrongful Employment Act**" means actual or alleged:

1.  **Wrongful Termination** of an **Employee** by an **Insured**; or

2.  **Discrimination** against an **Employee** or an applicant who has sought and been refused employment with the **Entity** by an **Insured**; or

3.  **Harassment** against an **Employee** or an applicant who has sought and been refused employment with the **Entity** by an **Insured**; or

4.  **Retaliation** against an **Employee** by an **Insured**; or

5.  any other violation of any federal, state or local laws concerning employment, including without limitation any failure to adopt adequate workplace or employment policies and procedures;

provided, such **Wrongful Employment Act** is committed by an **Insured** in his or her capacity as such.

R.  "**Wrongful Termination**" means the actual or constructive termination of an employment relationship in a manner which constitutes a violation of any law, a breach of an implied agreement to continue employment, or a retaliatory discharge.

## III. EXCLUSIONS

A.  The Insurer shall not be liable for **Loss** on account of that portion of any **Claim** made against any **Insured**:

1.  for any actual or alleged bodily injury (other than mental anguish or emotional distress), sickness, disease or death of any person or for damage to or destruction of any tangible property including loss of use of any damaged or destroyed tangible property; or

2.  for any actual or alleged violation of the responsibilities, obligations or duties imposed by **ERISA**, any Social Security, worker's compensation, disability benefits, or unemployment compensation law, any **Wage and Hour Law**, the National Labor Relations Act, the Worker Adjustment and Retraining Notification Act, the Consolidated Omnibus Budget Reconciliation Act of 1985, the Occupational Safety and Health Act, rules or regulations promulgated under and amendments to any such law, or similar provisions of any federal, state or local statutory law or common law; however, this Exclusion shall not apply to any **Claim** for actual or alleged **Wrongful Termination** or **Retaliation** on account of the claimant's exercise of rights pursuant to any such law, rule or regulation.

B.  The Insurer shall not be liable for **Loss** on account of that portion of any **Claim** made against any **Insured** based upon, arising out of, directly or indirectly resulting from, or in consequence of:

1.  a lockout, strike, picket line, replacement or any similar actions in connection with labor disputes or labor negotiations; or

Insured

2.   any litigation, proceeding or investigation against any **Insured** pending on or before the Pending or Prior Date for this Coverage Section set forth in Item 5. of the Declarations, or the same or substantially the same fact, circumstance, situation, event or **Wrongful Act** underlying or alleged therein; or

3.   any **Wrongful Act**, fact, circumstance, situation, transaction, event or **Wrongful Act** which was the subject of any notice given and accepted under any prior policy or coverage section for employment practices or similar insurance.

No **Wrongful Act** of any natural person **Insured** will be imputed to any other natural person **Insured** to determine the applicability of the foregoing Exclusions.

# Asset Protection Policy

Coverage: **Employment Practices Liability**

Insurer: **RLI Insurance Company**

Effective date of
this endorsement: **01/01/2024**

To be attached to and form part of
Policy No. **EPG0041373**

Issued to: **Greater Los Angeles Zoo Association**

---

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## AMEND DEFINITION OF CLAIM

It is hereby understood and agreed that the definition of "**Claim**" in Section II. DEFINITIONS, of this Coverage Section is deleted in its entirety and replaced with the following:

"**Claim**" means:

1. a written demand for monetary, non-monetary or injunctive relief against any **Insured**, or

2. a civil or criminal proceeding against any **Insured** commenced by the service of a complaint or similar pleading or the return of an indictment, information or similar charging document, or

3. an arbitration, mediation or other alternative dispute resolution (ADR) proceeding, commenced by a demand for such arbitration, mediation or ADR proceeding, or

4. an administrative, regulatory proceeding against any **Insured**, including a proceeding by or before the Equal Employment Opportunity Commission or a similar state or local governmental body or by the Office of Federal Contract Compliance Programs, commenced by the service upon or other receipt by the **Insured** of a notice of charges or similar document, or

5. an administrative or regulatory investigation of any **Insured** commenced by the service upon or other receipt by the **Insured** of a target letter, formal investigation order or similar document, or

6. a written request received by an **Insured** to toll or waive a statute of limitations relating to a **Wrongful Act** by the **Insured**;

including any appeal related to any of the above.

**Claim** shall not include (i) any labor or grievance proceeding pursuant to a collective bargaining agreement, or (ii) an audit by the Office of Federal Contract Compliance Programs unless and until the **Insured** receives a Notice of Violation or Order to Show Cause or a written demand as described above in connection with such audit.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

## Asset Protection Policy

Coverage: **Employment Practices Liability**

Insurer:  **RLI Insurance Company**

Effective date of
this endorsement:  **01/01/2024**

To be attached to and form part of
Policy No.  **EPG0041373**

Issued to:  **Greater Los Angeles Zoo Association**

---

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## AMEND DEFINITION OF WRONGFUL EMPLOYMENT ACT (II)

It is hereby understood and agreed that the definition of "**Wrongful Employment Act**" in Section II. DEFINITIONS, of this Coverage Section is deleted in its entirety and replaced with the following:

"**Wrongful Employment Act**" means actual or alleged:

1.  **Wrongful Termination** of an **Employee** by an **Insured**; or

2.  **Discrimination** against an **Employee** or an applicant who has sought and been refused employment with the **Entity** by an **Insured**; or

3.  **Harassment** against an **Employee** or an applicant who has sought and been refused employment with the **Entity** by an **Insured**; or

4.  **Retaliation** against an **Employee** by an **Insured**; or

5.  any other violation of any federal, state or local laws concerning employment, including without limitation any failure to adopt adequate workplace or employment policies and procedures; or

6.  negligent evaluation and wrongful deprivation of career opportunity; or

7.  wrongful discipline, failure to grant tenure, employment related misrepresentation, negligent employee evaluation, invasion of privacy, violation of the Family Medical Leave Act, or employment related defamation, libel or slander;

provided, such **Wrongful Employment Act** is committed by an **Insured** in his or her capacity as such.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

AEPL 602 (04/18)

Page 1 of 1

Insured

## Asset Protection Policy

Coverage: **Employment Practices Liability**

Insurer: **RLI Insurance Company**

Effective date of
this endorsement: **01/01/2024**

To be attached to and form part of
Policy No.  **EPG0041373**

Issued to:  **Greater Los Angeles Zoo Association**

---

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## VIOLATION OF EMPLOYEE PRIVACY EXPENSES SUBLIMIT

It is hereby understood and agreed that:

1. The Insurer will reimburse the **Entity** for **Violation of Employee Privacy Expenses** incurred by the **Entity** in connection with a **Violation of Employee Privacy** that takes place during the **Policy Period**.

2. Section II., DEFINITIONS, of this Coverage Section is amended to add the following:

"**Record**" means an **Employee's** first name or first initial, and last name, in combination with:

1. their social security number, driver's license number or other personal identification number (including an employee identification number or student identification number);

2. their financial account number (including a bank account number, retirement account number, or healthcare spending account number);

3. their credit, debit or other payment card number; or

4. any individually identifiable health information, as described in the Health Insurance Portability and Accountability Act of 1996, held by the **Entity** to the extent any such information is intended by the **Entity** to be accessible only by persons or organizations specifically authorized by the **Entity** to have access to such information.

"**Violation of Employee Privacy**" means an **Entity's** actual or alleged failure to:

1. secure a **Record** from actual or potential unauthorized access by another person or organization which results in injury to such **Employee**; or

2. provide notice, as required by any state, federal or local statutory law or common law anywhere in the world, to an **Employee** whose **Record** was accessed or may have been accessed by an unauthorized person or organization.

"**Violation of Employee Privacy Expense**" means the reasonable and necessary fees and expenses (including without limitation attorneys' fees and experts' fees) incurred by the **Entity** in connection with a **Violation of Employee Privacy**.

**Violation of Employee Privacy Expense** shall not include the **Entity's** overhead expenses or any salaries, wages, fees or benefits of its directors, trustees, officers or **Employees**.

3. The Insurer's maximum liability for all **Violation of Employee Privacy Expenses** shall be $ 50,000            , which amount shall be part of, and not in addition to, the Insurer's Aggregate Limit of Liability as stated in Item 5. B. of the Declarations Page.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

AEPL 605 (04/18)

Page 1 of 1

Insured

## Asset Protection Policy

Coverage: **Employment Practices Liability**

Insurer:   **RLI Insurance Company**

Effective date of
this endorsement:  **01/01/2024**

To be attached to and form part of
Policy No.   **EPG0041373**

Issued to:   **Greater Los Angeles Zoo Association**

---

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### IMMIGRATION CLAIM SUBLIMIT ENDORSEMENT

It is hereby understood and agreed that:

1.  Section I. INSURING CLAUSES, of this Coverage Section is amended to add the following:

    "The Insurer will pay on behalf of the **Insureds**, **Loss** which the **Insureds** are legally obligated to pay as a result of an **Immigration Claim** first made against the **Insureds** during the **Policy Period**, or during the Discovery Period (if purchased), against an **Insured** by or on behalf of a past, present or prospective **Employee** for an **Immigration Wrongful Act**."

2.  Section II. DEFINITIONS, of this Coverage Section is amended to add the following:

    "**Immigration Claim**" means any criminal investigation of any of the **Insureds** by any governmental agency for actually or allegedly hiring or harboring illegal aliens.

    "**Immigration Wrongful Act**" means any actual or alleged violation(s) of the Immigration Control Act of 1986 or any other similar federal or state laws or regulations.

3.  The Insurer's maximum liability for all **Immigration Claims** shall be $ 100,000            , which amount shall be part of, and not in addition to, the Insurer's Aggregate Limit of Liability as stated in Item 5. B. of the Declarations Page.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

AEPL 606 (04/18)

Page 1 of 1

Insured

## Asset Protection Policy

Coverage:  **Employment Practices Liability**

Insurer:   **RLI Insurance Company**

Effective date of
this endorsement:  **01/01/2024**

To be attached to and form part of
Policy No.   **EPG0041373**

Issued to:   **Greater Los Angeles Zoo Association**

---

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### AMEND DEFINITION OF HARASSMENT – WORKPLACE BULLYING

It is hereby understood and agreed that the definition of "**Harassment**" in Section II. DEFINITIONS, of this Coverage Section is deleted in its entirety and replaced with the following:

"**Harassment**" means:

1.  unwelcome sexual advances, requests for sexual favors, or other verbal, visual or physical conduct of a sexual nature, including workplace bullying, that is made either explicitly or implicitly a term or condition of employment with the **Entity**, is used as a basis for employment decisions with the **Entity**, or creates a work environment that interferes with an **Employee's** performance or that is otherwise intimidating, hostile, or offensive; or

2.  conduct of a non-sexual nature, including workplace bullying, which creates a work environment that interferes with an **Employee's** performance or that is otherwise intimidating, hostile, or offensive.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

AEPL 607 (04/18)

Page 1 of 1

Insured

## Asset Protection Policy

Coverage:  **Employment Practices Liability**

Insurer:  **RLI Insurance Company**

Effective date of
this endorsement:  **01/01/2024**

To be attached to and form part of
Policy No.  **EPG0041373**

Issued to:  **Greater Los Angeles Zoo Association**

---

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## NETWORK SECURITY AND PRIVACY EXCLUSION

It is hereby understood and agreed:

1.  Section II., DEFINITIONS, of this coverage section is amended to include the following:

**"Breach Notice Law"** means any federal, state, local or foreign privacy legislation, regulation, or their functional equivalent that requires an **Entity** to provide notice to affected natural persons of any actual or potential unauthorized access to, acquisition of or misuse of their **Confidential Records**.

**"Computer"** means a device or group of hardware devices on which software, applications, firmware, script, code and other computer programs containing **Data** can be operated and viewed.

**"Confidential Record"** means:

1.  non-public personally identifiable information, as defined in any applicable federal, state, local or foreign legislation or regulations including, but not limited to:

    a.  a social security number, driver's license number or other personal identification number (including an employee identification number or student identification number);

    b.  individually identifiable information considered nonpublic personal information pursuant to the Gramm-Leach Bliley Act of 1999, as amended and its implementing regulations; or

    c.  individually identifiable information considered protected health information pursuant to the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), as amended, and its implementing regulations, including but not limited to the Health Information Technology for Economic and Clinical Health Act ("HITECH Act") part of the American Recovery and Reinvestment Act of 2009 ("ARRA");

2.  financial account number (including a bank account number, retirement account number or healthcare spending account number);

3.  credit, debit or payment card numbers or information, including any required security code, access code, username or password that would permit access to an individual's credit, debit or payment account; or

4.  information related to employment by an **Insured**;

which is owned or possessed by an **Insured** or a third party for which an **Insured** is legally liable and is intended by an **Insured** to be accessible only by natural persons or entities that have been specifically authorized by the **Insured** to have such access.

MNU-AEPL 013 (11/20)

Page 1 of 3

Insured

"**Consumer Data**" means information that identifies, relates to, describes, is capable of being associated with, or could reasonably be linked, directly or indirectly, with a particular consumer or household. This includes, but is not limited to, biometric information.

"**Consumer Data Privacy Claim**" shall mean any **Claim** based upon, arising out of, directly or indirectly resulting from, or in consequence of, in whole or in part, any actual or alleged violation of:

1.  The Illinois' Biometric Information Privacy Act (740 ILCS 14/1 et seq.) ("BIPA") or any amendments thereto or any rules or regulations promulgated thereunder;

2.  The Texas Business and Commerce Code - BUS & COM 503.001 Capture or Use of Biometric Identifier or any amendments thereto or any rules or regulations promulgated thereunder;

3.  California Consumer Privacy Act of 2018 ("CCPA") or any amendments thereto or any rules or regulations promulgated thereunder; or

4.  Any other law, ordinance, regulation, statute or common law relating to the improper collection, storage, or destruction of **Consumer Data**.

"**Cyber Attack**" means the transmission of fraudulent or unauthorized **Data** initiated by any individual or entity, including but not limited to, criminal enterprises, terrorist organizations or sovereign nations, that is intended to and successfully modifies, alters, encrypts, damages, destroys, deletes, records, transmits, acquires or consumes information within a **System**, including **Data** that is self-replicating or self-propagating, and which causes the disruption of the normal operation of a **System**.

"**Data**" means any machine-readable information, including, but not limited to, ready-for-use programs, applications, account information, customer information, health and medical information, or other electronic information, irrespective of the way it is used and rendered.

"**Media**" means electronic applications, hardware, cloud networks, software, scripts and programs on which **Data** is stored so that it can be collected, read, retrieved, or processed by a **Computer**. **Media** does not mean paper, or other tangible property, money, debt, equity, instruments, accounts, bonds, bills, records, abstracts, deeds or manuscripts.

"**System**" means any **Computer**, **Media**, website, and all input, output, processing storage and communication devices controlled, supervised or accessed by the operation systems that are owned by, proprietary to, licensed to, leased to, or operated by or on behalf of an **Insured**.

2.  Section III., EXCLUSIONS, of this coverage section is amended to include the following:

The Insurer shall not be liable for **Loss** on account of any **Consumer Data Privacy Claim**;

The Insurer shall not be liable for **Loss** on account of any **Claim** made against any **Insured** based upon, arising out of, directly or indirectly resulting from or in consequence of any:

1.  failure or violation of the security of a **System**, including, but not limited to, impaired or denial of access, phishing or other social engineering attack, a **Cyber Attack**, or any act or failure to act of an **Insured** or employee of an **Insured** that results in the failure or violation of the security of a **System**;

2.  actual or alleged reliance by any person, entity, or **Insured** upon a deceptive misrepresentation which induces any party to transfer, pay, or deliver money, securities or virtual currency.

3.  failure to protect **Confidential Records** or other confidential information, trade secrets, processing methods, customer lists, or other proprietary information;

4.  theft, loss, disclosure, or misappropriation of hardware, **Media**, or **System** output or other documents on which **Data** is stored or recorded, that is controlled by or on behalf of an **Insured**;

5.   violation of an **Insured's** policies or procedure in connection with any event referenced in 1. through 4. above;

6.   failure to disclose an event referenced in 1. through 4. above in violation of any **Breach Notice Law**;

7.   violation of any other federal, state, foreign or local statute or regulation in connection with any event referenced in 1. through 4. above, including:

    a.   any consumer protection, privacy, or unfair and deceptive trade practice law, rule, or regulation promulgated or enforced by state Attorneys General or the Federal Trade Commission, including but not limited to Section 5(a) of the Federal Trade Commission Act, 15. U.S.C § 45 (a), as amended;

    b.   any laws, rules, or regulations promulgated or enforced by the U.S. Department of the Treasury's Office of Foreign Assets Control;

    c.   any laws, rules, or regulations enforced by the U.S. Department of the Treasury's Office of the Comptroller of the Currency or the Board of Governors of the U.S. Federal Reserve System, including the Federal Deposit Insurance Act, as amended;

    d.   any laws, rules, or regulations promulgated or enforced by the U.S. Department of Health and Human Services Office for Civil Rights, including the Health Insurance Portability and Accountability Act of 1996, as amended; or

    e.   any similar laws, rules, or regulations promulgated or enforced by any foreign governmental bodies or agencies, including the European Union's General Data Protection Regulation, as amended.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

# Asset Protection Policy

Coverage: **Employment Practices Liability**                    Insurer: **RLI Insurance Company**

Effective date of                                              To be attached to and form part of
this endorsement: **01/01/2024**                               Policy No.: **EPG0041373**

Issued to: **Greater Los Angeles Zoo Association**

---

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### SEXUAL ABUSE EXCLUSION WITH ALLOCATION

It is hereby understood and agreed that:

The **Insurer** shall not be liable for **Loss** on account of any **Claim** based upon, arising out of, directly or indirectly resulting from, in consequence of, attributable to, or in any way involving, in whole or in part, any actual or **Sexual Behavior**; provided that, regardless of any other terms or conditions in this Policy, including any endorsements, the covered and uncovered portions of **Loss** arising from any such **Claim** shall be allocated in accordance with this Policy's allocation provision.

For purposes of this endorsement, the term "**Sexual Behavior**" means any verbal or non-verbal act, communication, contact or other conduct involving:

1. Any actual or alleged:

    a. Physical abuse (including child abuse or neglect), attack, assault, battery, molestation, or intimidation;

    b. Sexual abuse, attack, assault, battery, touching, molestation, intimidation, or indecent exposure (including rape or lewdness);

    c. Sexting or transmitting of any sexual images or content by any electronic, digital or telecommunication means; or

    d. any employment, investigation, supervision, training, or retention of a person who commits conduct described above.

2. Any actual or alleged undue influence or coercion in connection with any conduct described in paragraph 1.a. through d. above.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

# Asset Protection Policy

Coverage: **Employee Practices and Third Party Discrimination Liability Coverage Section**

Insurer: **RLI Insurance Company**

Effective date of
this endorsement: **01/01/2024**

To be attached to and form part of
Policy No.: **EPG0041373**

Issued to: **Greater Los Angeles Zoo Association**

---

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY

**AMEND SECTION III. EXCLUSIONS A. 1. – ABSOLUTE BI/PD EXCLUSION**

It is hereby understood and agreed that Section III. A., 1., EXCLUSIONS**,** is deleted in its entirety and replaced with the following:

A.   The Insurer shall not be liable for **Loss** for any **Claim** made against any **Insured** based upon, arising out of, directly or indirectly resulting from, or in consequence of or in any way involving:

1.   any actual or alleged bodily injury, mental anguish, emotional distress, sickness, disease, death, disability, shock, mental injury, false arrest, false imprisonment, wrongful eviction, wrongful entry, wrongful detention, malicious prosecution, libel, slander, defamation, humiliation, invasion of privacy, or damage to or destruction of any tangible property, including loss of use thereof.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

MNU-AEPL-024 (01/24)                    Insured                    Page 1 of 1

# Asset Protection Policy

Coverage: **Employment Practices and Third Party Discrimination Liability**

Insurer: **RLI Insurance Company**

Effective date of
this endorsement: **01/01/2024**

To be attached to and form part of
Policy No.: **EPG0041373**

Issued to: **Greater Los Angeles Zoo Association**

---

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**AMEND DEFINITION OF THIRD-PARTY WRONGFUL ACT**

It is hereby understood and agreed that Section II., DEFINITIONS, L. of this Coverage Section is deleted in its entirety and replaced with the following:

"**Third Party Wrongful Act**" means actual or alleged discrimination by an Insured against a Third Party based on such person's race, color, creed, religion, age, national origin, sex, sexual orientation or preference, gender, disability, handicap, pregnancy or other protected class or characteristic established under any applicable federal, state or local statute or ordinance; provided such **Third Party Wrongful Act** is committed by an **Insured** in his or her capacity as such.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

# Asset Protection Policy

Coverage: **General Terms and Conditions**

Insurer:  **RLI Insurance Company**

Effective date of
this endorsement:  **1/1/2025**

To be attached to and form part of
Policy No.  **EPG0041373**

Issued to:  **Greater Los Angeles Zoo Association**

---

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## CHANGE ENDORSEMENT

☒ Additional Premium  $ ▮
☐ Return Premium  $ 0
☐ No Premium Change  _____
Total  $ ▮

It is understood and agreed that:

| | | |
|---|---|---|
| ☐ 1. Premium | ☐ 7. Coverage | ☐ 13. Coverage is cancelled |
| ☐ 2. Advance Premium | ☐ 8. Inception Date | ☐ Short Rate |
| ☐ 3. Minimum Premium | ☒ 9. Expiration Date | ☐ Pro Rate |
| ☐ 4. Rate | ☐ 10. Terms | ☐ Minimum Premium Applies |
| ☐ 5. Installment | ☐ 11. Name of Parent Company | ☐ 14. Additional Insured but only as respects the operations of the Parent Company |
| ☐ 6. Audit | ☐ 12. Address of Parent Company | |
| ☐ Is charged for the period: | ☒ Is amended to read as follows: | |

Item 2. Policy Period of the Declarations is amended to read as follows:

Inception Date:  01/01/2024    Expiration Date:  07/01/2025
Both days at 12:01 a.m. local time at the mailing address listed in Item 1. above.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

# Exhibit B

Electronically FILED by
Superior Court of California,
County of Los Angeles
12/20/2024 3:05 PM
David W. Slayton,
Executive Officer/Clerk of Court,
By S. Ruiz, Deputy Clerk

HYDEE FELDSTEIN SOTO, City Attorney (SBN 106866)
MICHAEL J. BOSTROM, Sr. Asst. City Attorney (SBN 211778)
LIORA FORMAN-ECHOLS, Asst. City Attorney (SBN 184135)
STEVEN S. SON, Deputy City Attorney (SBN 265921)
CHRISTOPHER S. MUNSEY, Deputy City Attorney (SBN 267061)
JENNIFER A. LAM, Deputy City Attorney (SBN 253728)
**OFFICE OF THE LOS ANGELES CITY ATTORNEY**
201 N. Figueroa Street, Suite 1300
Los Angeles, California 90012
Telephone (213) 978-1863 / Facsimile (213) 482-9549
E-mail: steven.son@lacity.org

Attorneys for Plaintiff,
THE CITY OF LOS ANGELES                    [NO FEE – CAL. GOV. CODE § 6103]

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF LOS ANGELES, CENTRAL DISTRICT

| | |
|---|---|
| THE CITY OF LOS ANGELES,<br><br>Plaintiff,<br><br>v.<br><br>GREATER LOS ANGELES ZOO ASSOCIATION, a California nonprofit corporation, and DOES 1-50, inclusive,<br><br>Defendants. | Case No.: 24STCV33753<br><br>COMPLAINT FOR:<br><br>(1) BREACH OF CONTRACT;<br>(2) BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING;<br>(3) BREACH OF FIDUCIARY DUTY;<br>(4) CONVERSION; AND<br>(5) DECLARATORY RELIEF.<br><br>[Verified Answer Required Under Cal. Code Civ. Proc. § 446(a)] |

COMPLAINT FOR BREACH OF CONTRACT, BREACH OF THE IMPLIED COVENANT OF GOOD FAITH
AND FAIR DEALING, BREACH OF FIDUCIARY DUTY, CONVERSION, AND DECLARATORY RELIEF

<u>INTRODUCTION</u>

1.      The City of Los Angeles ("City") owns and operates the Los Angeles Zoo and Botanical Gardens ("Zoo").  The Zoo, which opened its doors in November 1966, now hosts over 1.5 million visitors annually who come to see over 1,700 animals representing more than 270 species over 133 acres on City grounds.  Not only does the Zoo connect our residents and visitors to the natural world, the Zoo is actively engaged in wildlife conservation.

2.      The Greater Los Angeles Zoo Association ("GLAZA") was formed in 1963 for the exclusive purpose of assisting and aiding the City in establishing, developing, operating, caring for, and maintaining the Zoo.  Given that GLAZA's sole purpose was to work for the exclusive benefit of the Zoo, the City, over the years, permitted GLAZA to locate its offices on City property free of charge, paid GLAZA's administrative expenses, and allowed GLAZA to use City facilities, equipment, intellectual property, and other resources to assist with the performance of its duties.

3.      For decades, GLAZA's core mission and primary responsibility has been, "on behalf of the City," to seek and provide financial support to the Zoo and to fund its capital improvements, to offset the amount of taxpayer money required to meet the public's needs.  The City has also, by contract, delegated other duties to GLAZA relating to Zoo business over the years.  For example, the City tasked GLAZA to oversee the Zoo's many and indispensable volunteers.  The City also assigned GLAZA to manage the Zoo's membership program and social media.  From the very beginning of the parties' relationship and for sixty years thereafter, GLAZA's sole reason for existence was to perform, on behalf of the City, specified functions pursuant to contract for the benefit of the Zoo.

4.      Pursuant to its contractual and fiduciary obligations, GLAZA has raised millions of dollars "on behalf of the City" "for the benefit of the Zoo."  In fact, in addition to the

COMPLAINT FOR BREACH OF CONTRACT, BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, BREACH OF FIDUCIARY DUTY, CONVERSION, AND DECLARATORY RELIEF

fundraising proceeds GLAZA transfers annually to the Zoo, at least $48,887,762.51 in assets are on deposit in an endowment and other funds GLAZA presently administers based on the information readily available and known to date, consisting of monies raised on the City's behalf for the benefit of the Zoo.

5.      During the parties' most recent contract negotiations, the City informed GLAZA that, in order to promote fairness, transparency, and to ensure that the City (and therefore taxpayers) are receiving services on the best possible terms, the City would publicly solicit proposals for the services that GLAZA provides, as is customary and expressly preferred under the City's Charter.  *See* CITY OF LOS ANGELES CHARTER § 372 (titled "Competitive Proposals Preferred" and stating "in all cases where bids are not required by the Charter, competitive proposals or bids shall be obtained as far as reasonably practicable and compatible with the City's interests").[1]  GLAZA was, of course, permitted and in fact encouraged to participate in the City's Request for Proposals ("RFP") process by submitting its own bid(s).

6.      Under this backdrop, GLAZA and the City executed the Interim Agreement for Zoo Support Programs and Related Services ("Interim Agreement") on May 29 & 30, 2024, respectively.  The Interim Agreement, which runs through June 30, 2025, was designed to ensure the continuity of critical programs and services while the City completes the RFP process for the long-term management of the Zoo.

7.      The Interim Agreement provides, as had always effectively been the case throughout their history, that (i) GLAZA's "mission [is] to support the Zoo and to assist the City in establishing, developing, beautifying, and improving the Zoo[,]" (ii) "[i]n collecting and

---

[1]      *See also* https://controller.lacity.gov/audits/greater-transparency-accountability-at-l-a-zoo (recommending greater accountability and transparency regarding GLAZA's role of supporting the Zoo and its vision and mission).

COMPLAINT FOR BREACH OF CONTRACT, BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, BREACH OF FIDUCIARY DUTY, CONVERSION, AND DECLARATORY RELIEF

managing funds for the Zoo on behalf of the City, GLAZA shall act as the City's fiduciary and fiscal agent[,]" and (iii) GLAZA shall manage and perform all of its fundraising, membership, and other specified duties "for the benefit of the Zoo[.]"  Interim Agreement p. 1 & §§ 2 at p. 2, 5(C).[2]  The Interim Agreement also provides that (i) all of GLAZA's work product constitutes the City's exclusive property, (ii) GLAZA shall maintain all records relating to the performance of its duties, which the City may inspect and audit, and (iii) GLAZA must cooperate with the City to ensure a smooth transition of services if GLAZA is not the contractor selected from the competitive bidding process.  *Id.* at §§ 5(C), 11, 15; Standard Provisions at PSC-16, 21.

8. On May 5, 2024, however, just weeks before signing the Interim Agreement and without any notice to the City, GLAZA amended its articles of incorporation, contradicting six decades of precedent.  Through its amended articles, GLAZA divided its loyalties, for the very first time, by reserving the right to serve organizations other than the Zoo.  GLAZA's articles also now, unlike for decades since its inception, reserve the right to distribute assets to organizations other than the Zoo if GLAZA winds down or dissolves—even though GLAZA was effectively only ever permitted to raise funds "on behalf of the City" "for the benefit of the Zoo."

9. On May 29, 2024, the same date GLAZA signed the Interim Agreement, GLAZA sent a letter to the City.  In that letter, GLAZA appeared to claim some exclusive interest over the Zoo's endowment.  GLAZA specifically asserted, among other things, that "[i]f anyone from the City believes that the City maintains any authority over the allocation of *GLAZA's* endowment, they are grossly mistaken" and that "[t]he City cannot and does not maintain any control over GLAZA's fiduciary responsibilities, as a matter of law."  (Emphasis added.)

---

[2]   A true and correct copy of the Interim Agreement is attached hereto as Exhibit 1.  A true and correct copy of the City's Standard Provisions for City Contracts (Rev. 9/22) [v. 1] ("Standard Provisions") is attached hereto as Exhibit 2.  *See* Interim Agreement § 15 (the Standard Provisions "are incorporated into and made a part of this Agreement by reference").

COMPLAINT FOR BREACH OF CONTRACT, BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, BREACH OF FIDUCIARY DUTY, CONVERSION, AND DECLARATORY RELIEF

10. On July 31, 2024, the City, in part based upon the changes GLAZA had recently made to its articles, responded to GLAZA's letter. The City reminded GLAZA that its very formation was for the exclusive purpose of assisting and aiding the City to benefit the Zoo, all of GLAZA's fundraising efforts were always (pursuant to its articles and its contracts with the City) to be conducted "on behalf of the City" and for the Zoo's benefit, not on GLAZA's own behalf or benefit, and therefore all of the Zoo's assets under GLAZA's current management must (naturally) be returned to the City to use for the benefit of the Zoo if GLAZA's duties come to an end. The City also asked if, despite the City's legal status as the beneficiary and owner of the endowment, GLAZA claimed some exclusive interest over the Zoo's endowment or other assets. And if so, for GLAZA to explain when, how, and under what authority GLAZA raised funds other than on behalf of the City for the Zoo's benefit, the amount of such purported funds, and if (and how) these supposed separate funds have been segregated.

11. GLAZA, however, never responded to the City's letter. Instead, GLAZA communicated its displeasure with the RFPs—which contemplated a different model moving forward, requiring greater transparency and accountability regarding programs and services provided to the Zoo than what GLAZA provided and enjoyed in years past.[3] On October 17, 2024, GLAZA advised the City that it would not participate in the RFP process, that the parties' relationship would come to an end on June 30, 2025, and that GLAZA would continue to exist in some capacity separate from the City after the Interim Agreement expires. GLAZA also engaged in a rapid succession of acts in breach of its contractual, good faith, and fiduciary obligations to the detriment of the City and the Zoo.

---

[3] Some of the updated terms in the RFPs, which sought a new transparency and accountability model, were a direct result of the City Controller's critiques. *See* https://controller.lacity.gov/audits/greater-transparency-accountability-at-l-a-zoo.

4

COMPLAINT FOR BREACH OF CONTRACT, BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, BREACH OF FIDUCIARY DUTY, CONVERSION, AND DECLARATORY RELIEF

12.     GLAZA seemingly began to devote resources to engage in fundraising efforts for purposes other than for the benefit of the Zoo.

13.     GLAZA created a new "GLAZA Restricted" account and began to fund it with hundreds of thousands of dollars seemingly for its own exclusive benefit, while withholding material information from the Zoo in connection with that account.

14.     GLAZA unilaterally canceled the 2025 Beastly Ball, the Zoo's largest and most important annual fundraising event, which GLAZA is under contract to stage.

15.     GLAZA unilaterally suspended an incoming docent class[4] without any notice to or input from the Zoo.

16.     GLAZA disseminated mass communications, using the City's own intellectual and other property, to criticize the City and the Zoo.

17.     GLAZA refused multiple requests from the Zoo to promptly transfer the ownership, access, and control of the Zoo's digital media.

18.     GLAZA failed to timely provide the Zoo with information relating to the Zoo's sponsors, delaying the Zoo's ability to answer questions received from prospective bidders during the RFP process.[5]

19.     Given this cascade of alarming developments, the City issued a letter to GLAZA on November 8, 2024.  The City directed GLAZA to designate the City as the sole owner of all assets under GLAZA's management, confirm it will not use any donor list (or any of the City's

---

[4]     A "docent" is a volunteer educator and guide at the Zoo who engages with visitors, sharing insights about the Zoo and the natural world.  Through extensive training, the Zoo's docents develop a deep understanding of the flora and fauna at the Zoo and learn skills to effectively connect with guests.  Docents also provide support for Zoo events and assist with the Zoo's animal care program, preparing and delivering food to the Zoo's many animals.

[5]     GLAZA only later provided this information to the Zoo after the City, through counsel, made a formal demand.

5

COMPLAINT FOR BREACH OF CONTRACT, BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, BREACH OF FIDUCIARY DUTY, CONVERSION, AND DECLARATORY RELIEF

other assets) for any fundraising purposes that are not for the Zoo's exclusive benefit, and provide its availability to meet regarding an inspection of its books and records. The City also directed GLAZA to provide the Zoo with member, donor, volunteer, and other information and to promptly transfer the ownership, access, and control of the Zoo's digital media. The City further instructed GLAZA to refrain from circulating mass communications, using the City's property, relating to the parties' separation without first obtaining the Zoo's approval.

20. In response, however, GLAZA incredibly contended that it would continue to exert control over the Zoo's endowment even after the Interim Agreement expires, all the while conceding that all of these assets must be used to benefit the Zoo. GLAZA also refused to provide member, donor, volunteer, and other data, even though the City is the exclusive owner of all of this information under the Interim Agreement. GLAZA further claimed it "does not need permission" to speak with the Zoo's donors and asserted it would continue to communicate with them as it pleases, potentially interfering with the Zoo's goodwill and future economic interests. Finally, GLAZA refused to promptly transfer the ownership, access, and control of the Zoo's digital media, despite the fact GLAZA was required to do so many months ago, claiming it may take until January 31, 2025 because the transfer is "complicated."

21. Under the circumstances, a forensic audit is necessary to identify all of the assets under GLAZA's current control and to uncover why, as GLAZA quizzically suggests, donors supposedly expect GLAZA to continue to control funds (and to continue to extract sums therefrom for administrative expenses) even after GLAZA separates from and potentially operates in competition with the Zoo—particularly since GLAZA has only been permitted to raise funds on behalf of the City, never on its own exclusive behalf. A judicial accounting is likewise necessary to account for which funds, if any, GLAZA may continue to control after the parties separate (pursuant to a (very) short-term defined plan) and which funds GLAZA must

6

COMPLAINT FOR BREACH OF CONTRACT, BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, BREACH OF FIDUCIARY DUTY, CONVERSION, AND DECLARATORY RELIEF

relinquish to the City during the transition so that the City can use those funds for the Zoo's benefit.[6]  A judicial declaration of the parties' rights is also warranted concerning the Zoo's endowment and other funds and regarding the City's intellectual property and intangible assets.

22.    To be clear, the City needs the money now, not later, for Zoo repairs, capital improvements, and programs and services.  Accordingly, although GLAZA will undoubtedly seek to stay in control of Zoo funds after the parties legally separate, those funds must be distributed to the City in very short order so that GLAZA does not continue to extract, in perpetuity, substantial sums for its administrative overhead and to pay its executives.  To put things into perspective, in the same year (2020) that GLAZA failed to spend a single dollar of the Zoo's endowment to cover the Zoo's losses due to closures arising from the COVID-19 pandemic, GLAZA used $582,231 of the Zoo's endowment funds to cover its administrative expenses.  GLAZA also paid its executives $1,913,395 in salary and benefits during that year. This cannot continue.

23.    GLAZA must stand on its own two feet moving forward, without money it raised on the City's behalf and without the benefit of the City's other assets.  And, an expeditious resolution of this litigation is needed to ensure a smooth transition so that City residents and visitors from far and wide can continue to enjoy all that the Zoo has to offer in spite of GLAZA's unfortunate disregard of its obligations.[7] [8]

---

[6]    Stating the obvious, the City commits to using all of the funds to benefit the Zoo and for no other purpose, consistent with the donors' intent.

[7]    The City intends to file a motion for preference, pursuant to section 1062.3(b) of the California Code of Civil Procedure, so that this matter may be set for trial at the earliest possible date.  For all of the reasons discussed herein, this action requires a speedy trial because the City must recover all of its financial assets and intangible property right away to ensure a smooth transition of services, well before the parties go their separate ways on July 1, 2025.

[8]    GLAZA must satisfy its obligations throughout the entire term of the Interim Agreement, irrespective of this litigation.  To the extent GLAZA engages in any additional breaches, *e.g.*,

COMPLAINT FOR BREACH OF CONTRACT, BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, BREACH OF FIDUCIARY DUTY, CONVERSION, AND DECLARATORY RELIEF

PARTIES

24.     The City is a municipal corporation and a charter city organized pursuant to the California Constitution.  The City owns the Zoo, located in Griffith Park at 5333 Zoo Drive, Los Angeles, California 90027.  The City operates the Zoo by and through the Department of the Zoo, which is headed by the Zoo Director.

25.     GLAZA is a California nonprofit corporation organized under 26 U.S.C. § 501(c)(3).  GLAZA's principal place of business is located on Zoo grounds at 5333 Zoo Drive, Los Angeles, California 90027.

26.     The true names and capacities of the defendants sued herein as Does 1 through 50, inclusive, are presently unknown to the City, and the City therefore sues these defendants by such fictitious names.  When the true names and capacities of these Doe defendants have been ascertained, the City will seek leave to amend this Complaint to insert in lieu of such fictitious names the true names and capacities of the fictitiously-named defendants.[9]

27.     All of the acts and omissions described in this Complaint were duly performed by and attributable to GLAZA and all of the Doe defendants (collectively "Defendants"), each acting as the agent, employee, fiduciary, trustee, alter ego, and/or under the direction and control of the others, and such acts and omissions are within the scope of such agency, employment, fiduciary, trust, alter ego, and/or direction and control.

_____

failing to secure a state grant for or otherwise appropriately fund the Angela Collier Garden project, the City may seek leave to amend this Complaint.

[9]     This may include GLAZA's leadership and management, who may be individually liable to the City for the conduct complained of herein.  The City may also seek leave to add other causes of action against GLAZA and/or individuals based on information obtained through discovery or material developments.

8

COMPLAINT FOR BREACH OF CONTRACT, BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, BREACH OF FIDUCIARY DUTY, CONVERSION, AND DECLARATORY RELIEF

28. Each of the Defendants sued herein also (or in the alternative) aided and abetted all of the other Defendants in violating the letter of, and public policy embodied in, the applicable laws set forth in this Complaint.

## JURISDICTION AND VENUE

29. The Superior Court has original jurisdiction over this action pursuant to Article VI, section 10 of the California Constitution, which grants the Superior Court original jurisdiction in all causes other than those specifically enumerated therein.

30. The Superior Court has personal jurisdiction over GLAZA because (i) GLAZA is a California corporation, (ii) GLAZA is headquartered and maintains its principal place of business in California, and (iii) GLAZA conducts activities and business in California.

31. Venue is proper in the Los Angeles County Superior Court ("Court"), pursuant to California Code of Civil Procedure sections 395(a) and 395.5,[10] because (i) GLAZA is a resident of and maintains its principal place of business in Los Angeles County, (ii) the contract between the City and GLAZA was made in and is to be performed in Los Angeles County, and (iii) GLAZA's duties, obligations, breaches, and liability arose or occurred in Los Angeles County.

## GLAZA DIVIDES ITS LOYALTIES FOR THE VERY FIRST TIME DURING THE PARTIES' RECENT CONTRACT NEGOTIATIONS WITHOUT INFORMING THE CITY

32. From the beginning of the parties' relationship, and for decades thereafter, GLAZA's sole reason for existence was to benefit the Zoo by performing specified functions pursuant to contract on behalf of the City.

33. From November 1963 to May 2024, GLAZA's corporate governance documents established GLAZA's undivided loyalty to the Zoo. *See* 11/18/63 Articles of Inc. art. VIII

---

[10] All further references are to California codes.

9

COMPLAINT FOR BREACH OF CONTRACT, BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, BREACH OF FIDUCIARY DUTY, CONVERSION, AND DECLARATORY RELIEF

(GLAZA's very formation, under its original articles, was to serve "as a means of assisting and aiding the City [] in establishing, developing, operating, caring for and maintaining the [] Zoo"); 9/15/64 By-Laws art. I § 2 (effectively the same under original bylaws); 6/9/16 Articles of Inc. art. II ⊩ B (reaffirming GLAZA's longstanding, undivided loyalty to the Zoo by stating: "The specific purpose of this corporation is to support the mission of the [] Zoo [].");  6/9/16 Am. and Restated Bylaws art. II ⊩ 2 (same).

34.     Over the same period, GLAZA's governance documents also (consistent with GLAZA's singular purpose) acknowledged that all assets maintained by GLAZA ultimately belong to the City for Zoo purposes.  *See* 11/18/63 Articles of Inc. art. X (all of GLAZA's net assets "shall" be transferred to the City "for use for any public purpose, but preferably for zoological purposes" if GLAZA winds down or dissolves); 6/9/16 Articles of Inc. art. V ⊩ D (all net assets "shall be transferred in full to the City [] to be placed in the Zoo Enterprise Trust Fund and used exclusively for [] Zoo [] purposes approved by the City" consistent with the donation (or other approved) purpose if GLAZA winds down or dissolves).[11]

35.     GLAZA's undivided loyalty to the Zoo, and the City's complete ownership over all assets generated and developed by GLAZA, was also confirmed by contract for decades.  *See*, *e.g.*, 2/26/65 Master Concession Agreement pp. 1, 4-5, 7 (acknowledging under the parties' first contract, for concessions only, that GLAZA was "formed for the purpose of assisting in the establishing, developing, beautifying and improving of [the Zoo]" and that GLAZA's net assets "shall be paid over in full to [the City]" if GLAZA dissolves); 11/18/66 Operating Agreement

---

[11]     Of note, GLAZA apparently intends to continue to use its name even after the parties legally separate.  However, the Zoo is contemplated within GLAZA's very name, *i.e.*, the Greater *Los Angeles Zoo* Association.  Thus, GLAZA would be competing with the Zoo's own wildlife conservation fundraising efforts while simultaneously using the Zoo's name.  Such a scenario is untenable.

COMPLAINT FOR BREACH OF CONTRACT, BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, BREACH OF FIDUCIARY DUTY, CONVERSION, AND DECLARATORY RELIEF

pp. 1, 7-8 (effectively the same in a more expansive contract, under which the City delegated additional duties); 7/1/97 Operating Agreement p. 1 & §§ V, X (effectively the same for 25-year contract, under which GLAZA's primary responsibility was to seek and provide financial support to the Zoo and to fund the Zoo's capital improvements).

36.    On May 5, 2024, however, just weeks before executing the Interim Agreement and without any prior notice to the City, GLAZA amended and restated its articles of incorporation, contradicting six decades of precedent.[12]

37.    In these articles, GLAZA now states, for the very first time, that its specific purpose "is to support the mission of the [] Zoo [] *and/or other organizations* in the greater Los Angeles area whose primary mission is to protect and support wildlife conservation and habitats."  5/5/24 Am. and Restated Articles of Inc. § II (emphasis added).

38.    GLAZA's articles now, unlike for decades past, also state "[u]pon the dissolution or winding up of [GLAZA], its assets remaining after [payments of debts and liabilities] shall be distributed exclusively for charitable purposes to *one or more organizations* which are then described in Section 501(c)(3) of the [Internal Revenue] Code, as determined by [GLAZA's] Board of Directors[.]"  5/5/24 Am. and Restated Articles of Inc. § VI (emphasis added).

<u>THE INTERIM AGREEMENT ESTABLISHES THAT</u>

<u>GLAZA IS THE CITY'S "FIDUCIARY AND FISCAL AGENT" AND</u>

<u>MUST PERFORM ALL DUTIES EXCLUSIVELY "FOR THE BENEFIT OF THE ZOO"</u>

39.    On May 29, 2024, following months of negotiations, GLAZA signed the Interim Agreement.  The City executed the contract the next day.  The Interim Agreement governs GLAZA's contractual duties (retroactively) from October 1, 2023 through June 30, 2025.

---

[12]    GLAZA never notified the City that it amended its articles.  Instead, the City later (independently) discovered the changes.

11

COMPLAINT FOR BREACH OF CONTRACT, BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, BREACH OF FIDUCIARY DUTY, CONVERSION, AND DECLARATORY RELIEF

40. The Interim Agreement was designed to ensure the continuity of critical support programs and related services for the Zoo while the City completes the RFP process for the long-term management of the Zoo, in order to promote fairness, transparency, and to ensure that the City (and therefore taxpayers) are receiving services on the best possible terms. *See* CITY OF LOS ANGELES CHARTER § 372 (competitive bidding process strongly preferred). The Interim Agreement also provided the City with the opportunity to pursue a different model moving forward, one requiring greater transparency and accountability regarding programs and services provided to the Zoo than what GLAZA provided and enjoyed in years past, as recommended by the City's Controller.[13]

41. The Interim Agreement provides, as had always effectively been the case, that (i) GLAZA's "mission [is] to support the Zoo and to assist the City in establishing, developing, beautifying, and improving the Zoo[,]" (ii) "[i]n collecting and managing funds for the Zoo on behalf of the City, GLAZA shall act as the City's fiduciary and fiscal agent[,]" (iii) GLAZA shall manage and perform all of its fundraising, membership, and other specified duties "for the benefit of the Zoo[,]" and (iv) GLAZA may only raise funds effectively "on behalf of the City" and "for the benefit of the Zoo," regardless of the purpose of the solicitation or the form of the donation.[14] Interim Agreement p. 1 & §§ 2 at p. 2 & (A), 5(C).

42. The Interim Agreement also provides that (i) "all finished and unfinished works, tangible or not" originated or prepared by GLAZA constitute "the exclusive property of [the City] for its use in any manner [the City] deems appropriate[,]" (ii) GLAZA shall maintain all

---

[13]   *See* https://controller.lacity.gov/audits/greater-transparency-accountability-at-l-a-zoo.
[14]   For fundraising solicitations, GLAZA must "disclose that it is raising funds on behalf of the City for the Zoo, and that a portion of the donated funds will be used for GLAZA's administrative costs." Interim Agreement § 2(A)(2). To the extent GLAZA solicited funds on its own exclusive behalf and/or solicited funds without providing these disclosures, GLAZA would be liable for yet additional breaches.

12

records pertaining to the performance of its duties, which the City may inspect and audit, and (iii) if GLAZA is not the contractor selected from the competitive bidding process, "GLAZA shall cooperate and coordinate with the City and the newly selected contractor to ensure a smooth transition of services" which "shall include providing information and records reasonably related to the services GLAZA has provided for the City[.]"  *Id.* at §§ 5(C), 11, 15; Standard Provisions at PSC-16, 21.

43.     The Interim Agreement further provides that "[GLAZA] agrees that a monetary remedy for breach of [the Interim Agreement] may be inadequate, impracticable, or difficult to prove and that a breach may cause [the City] irreparable harm[,]" and the City may therefore seek "injunctive relief and specific performance, without any necessity of showing actual damage or irreparable harm."  Interim Agreement § 15; Standard Provisions at PSC-21.

44.     Finally, the Interim Agreement provides that, in the event of GLAZA's dissolution, "all [net] monies remaining in GLAZA funds and accounts for the specific benefit of the Zoo shall be paid over in full to the City, subject to all applicable laws and regulations."[15] Interim Agreement § 13.[16]

## GLAZA BEGINS TO CLAIM SOME EXCLUSIVE INTEREST OVER THE ZOO'S ENDOWMENT AND UNEQUIVOCALLY INITIATES A COMPLETE SEPARATION FROM THE CITY

45.     On May 29, 2024, the same date that GLAZA signed the Interim Agreement, GLAZA also sent a letter to the City.

---

[15]     GLAZA has effectively only been permitted to raise funds "on behalf of the City" and "for the benefit of the Zoo."  As such, all of the funds that GLAZA presently manages are for the Zoo's specific benefit and the City plainly owns all of these funds under the law.  To the extent GLAZA ever raised funds on its own exclusive behalf and/or for some purpose other than the benefit of the Zoo, GLAZA would be liable for yet additional breaches for those acts.

[16]     Where relevant, the City cites to other parts of the Interim Agreement in this Complaint.

13

COMPLAINT FOR BREACH OF CONTRACT, BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, BREACH OF FIDUCIARY DUTY, CONVERSION, AND DECLARATORY RELIEF

46.     In that letter, GLAZA (i) informed the City "that under no circumstances will this Board vote to extend this agreement[,]" (ii) stated that "GLAZA will not bother to bid" on any RFP containing terms similar to those in the Interim Agreement, and that GLAZA was "prepared to walk away" from the City, (iii) characterized the Zoo's endowment as "*its* endowment" that is "GLAZA's responsibility to maintain and allocate appropriately under the terms of its non-profit by-laws[,]" (iv) claimed that "[i]f anyone from the City believes that the City maintains any authority over the allocation of *GLAZA's* endowment, they are grossly mistaken[,]" and (v) asserted that "[t]he City cannot and does not maintain any control over GLAZA's fiduciary responsibilities, as a matter of law."  (Emphasis added.)

47.     On July 31, 2024, the City responded to GLAZA's May 29th letter.  In this letter, the City first advised that it was pleased GLAZA approved the Interim Agreement, which would prevent the disruption of services the Zoo provides to City residents and visitors from around the world.  The City also stated, among other things, that the Interim Agreement would allow for a smooth transition of services, in the event GLAZA declines to participate in the upcoming RFP process or if another contractor is ultimately selected.

48.     Given GLAZA's troubling statements, however—and then aware that GLAZA had amended and restated its articles, reserving the right (for the very first time) to serve organizations other than and potentially in competition with the Zoo—the City also reminded GLAZA that:

a.      GLAZA's very formation was for the exclusive purpose of assisting and aiding the City, in establishing, developing, caring for, and maintaining the Zoo;

b.      To serve this purpose, GLAZA's primary responsibility, for decades, has been to seek and provide financial support to the Zoo and to fund its capital improvements;

14

COMPLAINT FOR BREACH OF CONTRACT, BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, BREACH OF FIDUCIARY DUTY, CONVERSION, AND DECLARATORY RELIEF

c.    All fundraising efforts were to be conducted "on behalf of the City" and for the Zoo's (not GLAZA's) benefit;

d.    The City's authorization for payment of GLAZA's administrative costs was premised on the fundamental understanding that the sole purpose for GLAZA's existence, and the need for GLAZA to incur any administrative costs at all, was to benefit the Zoo by carrying out specified duties;

e.    If GLAZA's duties come to an end, all funds (after payment of authorized outstanding expenses) must be returned to the City to use for the benefit of the Zoo; and

f.    The Interim Agreement provides, as had always been clear from the parties' relationship, that in collecting and managing funds for the Zoo on behalf of the City, GLAZA is acting as the City's fiduciary and fiscal agent.

49.    In its July 31st letter, the City also asked if, despite these facts, GLAZA claims some ownership or beneficial interest in the Zoo's endowment or in any other funds.  And if so, for GLAZA to explain (i) when, how, and under what authority GLAZA raised funds other than "on behalf of the City" and for a purpose unrelated to the Zoo, (ii) the amount of such purported separate funds, (iii) if (and how) these supposed separate funds have been segregated within the endowment or other accounts, and (iv) if any of GLAZA's fundraising efforts (unrelated to the Zoo) were targeted to raise funds for the Zoo's endowment.

50.    However, GLAZA never responded to the City's July 31st letter.  Instead, on October 17, 2024, GLAZA sent the City a letter, communicating its displeasure with the RFPs— which contemplated a different model moving forward, requiring greater transparency and accountability regarding programs and services provided to the Zoo than what GLAZA provided and enjoyed in years past.

15

COMPLAINT FOR BREACH OF CONTRACT, BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, BREACH OF FIDUCIARY DUTY, CONVERSION, AND DECLARATORY RELIEF

51.     In its October 17th letter, GLAZA advised the City that it "will not be submitting any proposals" to the RFPs issued by the City on September 10, 2024, that the parties' relationship will "be ending effective June 30, 2025[,]" and that GLAZA will "move forward separately" after the Interim Agreement expires.  Additionally, GLAZA once again asserted that "[t]he City cannot and does not maintain any direct control over GLAZA's operations or fiduciary responsibilities, as a matter of law."

<u>GLAZA ENGAGES IN A SERIES OF ACTS IN BREACH OF ITS</u>

<u>CONTRACTUAL, GOOD FAITH, AND FIDUCIARY OBLIGATIONS</u>

52.     After amending its articles of incorporation, GLAZA began to serially breach its contractual, good faith, and fiduciary obligations to the detriment of the City and the Zoo.

<u>GLAZA Expends a Significant Amount of Money for Its Exclusive Benefit</u>

<u>While Withholding Material Information Relating to the Specific Circumstances of Those Funds</u>

53.     In May 2024, according to monthly financial reports reflecting the activity for the restricted funds[17] GLAZA presently manages, GLAZA suddenly and without explanation created a new "GLAZA Restricted" account and made a lump-sum deposit of $675,000 to this account.

54.     GLAZA continues to generate revenue for and pay expenses from this newly-created GLAZA Restricted account.  From May 1, 2024 through September 30, 2024 alone, GLAZA (apart from the initial deposit of $675,000) generated $384,144.61 in revenue for and paid $357,424.47 in expenses from this account.  As of September 30, 2024, the account maintained a $701,720.14 positive balance.

---

[17]     "Restricted funds" are those "donated for the benefit of the Zoo for a specific or limited purpose."  Interim Agreement § 2(A)(3)(a).  For example, a donor might place a restriction on the use of the funds donated to rehabilitate a giraffe exhibit, and those funds could only be used for such purpose.  In contrast, "unrestricted funds" are those "donated without a restricted or limited purpose."  *Id.* at 2(A)(4)(a).

16

COMPLAINT FOR BREACH OF CONTRACT, BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, BREACH OF FIDUCIARY DUTY, CONVERSION, AND DECLARATORY RELIEF

55. Naturally concerned about this inexplicable account and significant expenditures, the Zoo asked GLAZA (more than once) to explain the purpose of this new GLAZA Restricted account and to specify the restricted uses associated with that account.

56. In response, however, GLAZA merely and evasively stated that these funds "are reserves GLAZA set aside in January 2023 to deal with shortfalls or expenses related to ongoing operating agreement negotiations[,]" inconsistent with GLAZA's duty to disclose all material information to the Zoo. *See* Interim Agreement § 6(D) (requiring GLAZA to cooperate with and provide the Zoo, upon request, information relating to Zoo funds and GLAZA operations).

57. As such, the Zoo continued to remain in the dark with respect to the source(s) of the funds in this account and the specific circumstances under which GLAZA initially allocated to, generated revenue for, and incurred and paid expenses in connection with the GLAZA Restricted account.

58. It also continued to remain unclear why GLAZA waited sixteen months to first disclose the account (as GLAZA claims to have set aside those reserves in January 2023, but waited until May 2024 to disclose them) and why GLAZA continued to generate revenue for and pay expenses in connection with this account (given the parties signed the Interim Agreement many months ago in May 2024).[18]

### GLAZA Unilaterally Cancels the 2025 Beastly Ball, the Zoo's Largest and Most Important Annual Fundraising Event that Has Taken Place Since 1971

59. Since 1971, the Zoo has hosted the Beastly Ball, an annual fundraising gala held during the month of June. The Beastly Ball, which celebrates the Zoo's achievements in animal

---

[18] On December 6, 2024, GLAZA (through counsel) further responded to the City regarding the GLAZA Restricted account and other matters. As further discussed herein, however, counsel's "explanations" raise more questions than they answer.

17

care, conservation, education, and more, while honoring those who make these achievements possible, is the largest and most important annual fundraising event for the Zoo.  The 2024 Beastly Ball, held on June 1, 2024, raised $1.25 million.

60.     Given the event's significance and history, the Interim Agreement specifically incorporates the Beastly Ball within its provisions.

61.     The Interim Agreement requires GLAZA, "for the benefit of the Zoo[,]" to "manage the Zoo Fundraising Program, designed to attract financial contributions and similar support for the Zoo, based on the priorities established by the Zoo Director[.]"  Interim Agreement § 2 at p. 2 & (A)(1).   The Interim Agreement also provides that "GLAZA agrees to fundraise from a variety of sources, including . . . charitable [] events (such as the Beastly Ball)" and that "GLAZA will raise unrestricted funds for the Zoo through a variety of efforts, including but not limited to . . . events such as the Beastly Ball[.]"  *Id.* at § 2(A)(1), (4)(a).

62.     On October 30, 2024, however, GLAZA abruptly informed the Zoo that "given the GLAZA Board's decision to not submit bids" to the RFPs and "the resulting transition of our contractual relationship with the Zoo[,]" GLAZA's "Board has decided that it would not be in the best interest of *any of the parties* to present the Beastly Ball next year."  (Emphasis added.) According to GLAZA's own fiscal projections, GLAZA's sudden and unexpected decision to cancel the 2025 Beastly Ball will result in a net loss of $975,000 in revenue.

63.     Taken aback by this unprecedented development, the Zoo asked GLAZA how it intended to address this deficit.  In response, GLAZA merely and opaquely stated that it would use "best efforts" to reduce expenses and "budget with other unrestricted revenue sources[,]" without providing details or explaining the impact on Zoo operations and the Zoo's endowment. GLAZA also, apparently displeased over the RFP process, claimed that the June 2025 Beastly Ball would not "generate much net revenue, if any" because the "Board of Trustees and their

18

COMPLAINT FOR BREACH OF CONTRACT, BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, BREACH OF FIDUCIARY DUTY, CONVERSION, AND DECLARATORY RELIEF

colleagues and friends" have "little enthusiasm" to support the gala, and "therefore *GLAZA made the prudent decision* to cancel the event." (Emphasis added.)

64.     The 2025 Beastly Ball was scheduled to take place weeks before the Interim Agreement expires on June 30, 2025. Interim Agreement § 1. Accordingly, GLAZA's unilateral decision to cancel the Zoo's largest and most important annual fundraising event, eight months before GLAZA is relieved of its fundraising duties, constitutes a breach of GLAZA's contractual, good faith, and fiduciary obligations.

65.     Adding insult to injury, on November 2, 2024, GLAZA also unexpectedly canceled the Zoo Director's biweekly meetings with Janet Dial, GLAZA's Vice President of Institutional Advancement, on the notion that Ms. Dial is "focused on other priorities[.]" Ms. Dial oversees all of GLAZA's fundraising efforts, both restricted and unrestricted. The Zoo Director and Ms. Dial regularly meet to discuss the status of, prospects for, and issues relating to current and future fundraising matters and donor relations.

66.     While the Interim Agreement permits GLAZA to engage in limited "additional restricted" fundraising, any of those funds must nevertheless "be used solely for the benefit of the Zoo" and such activities "shall be limited so as to not interfere with GLAZA's services and obligations to the City[.]" Interim Agreement § 2(A)(3)(f). Thus, regardless of the newly amended articles which purport to allow GLAZA to raise money for non-Zoo organizations, by contract GLAZA may not do so. The Interim Agreement also requires GLAZA to fundraise, on the City's behalf, "for the benefit of the Zoo" throughout the entire term of the contract. *Id.* at §§ 1, 2 at p. 2.

67.     GLAZA later agreed to make Ms. Dial available for these biweekly meetings after the Zoo objected to the cancellation. However, GLAZA ignored the Zoo's request for an explanation regarding Ms. Dial's "other priorities." To the extent GLAZA is presently engaging

19

COMPLAINT FOR BREACH OF CONTRACT, BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, BREACH OF FIDUCIARY DUTY, CONVERSION, AND DECLARATORY RELIEF

in fundraising efforts that are not for the Zoo's exclusive benefit, such endeavors would be in breach of GLAZA's contractual, good faith, and fiduciary obligations that GLAZA owes to the City.

<u>GLAZA Unilaterally Suspends the Recruitment, Training, and Onboarding of the 2025 Docent Class Even Though These Volunteers Are Critical to Zoo Operations</u>

68.     Under the Interim Agreement, GLAZA must, "for the benefit of the Zoo[,]" "manage the Zoo's Volunteer Program which includes docents . . . based on the needs of the Zoo" throughout the entire term of the contract.  Interim Agreement §§ 1, 2 at p. 2, (D)(1).  The Interim Agreement also provides that "GLAZA's management of the Zoo's Volunteer Program shall include recruitment, training, assignment, scheduling, and supervision of Volunteers" and that "GLAZA shall assign and manage Volunteers based on the priorities and needs reasonably established by the Zoo Director."  *Id.* at § 2(D)(2)-(3).

69.     Here, however, and without any notice to the Zoo, GLAZA abruptly canceled an informational meeting for the 2025 Docent Class, which had been scheduled for November 2, 2024.  The recruiting event was intended to provide prospective docents the opportunity to learn more about the Zoo, the volunteer program, and current docents in-person.  The Zoo relies on the service of hundreds of docents each year to enrich visitors' experiences with the Zoo and support many other Zoo programs and services.

70.     On October 30, 2024, after independently learning of this development, the Zoo asked GLAZA why the meeting was canceled.  The Zoo also asked for GLAZA's plan for the 2025 Docent Class for the remainder of the Interim Agreement.

71.     In response, GLAZA admitted that it suspended the 2025 Docent Class without any input from the Zoo, even though the Interim Agreement did not expire for another eight months.  GLAZA also admitted it had met with the Zoo's current docents, who are involved in

20

COMPLAINT FOR BREACH OF CONTRACT, BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, BREACH OF FIDUCIARY DUTY, CONVERSION, AND DECLARATORY RELIEF

the recruitment, training, and mentoring of new docents, to discuss the transition of services (likewise) without any notice to or input from the Zoo.[19]

72.    GLAZA breached its obligation to recruit, train, and manage docents throughout the entire term of the Interim Agreement based on the Zoo's needs and input.  GLAZA's acts are also inconsistent with its duty to "cooperate and coordinate with the City" to "ensure a smooth transition of services" given the critical role that the docents serve.  Interim Agreement § 11.

GLAZA Refuses to Timely Transfer Ownership, Access, and Control of the
Zoo's Digital Media Even Though GLAZA Was Required to Do So Many Months Ago

73.    As set forth in the Interim Agreement, "GLAZA understands that the [Zoo] intends to transition the management" of the Zoo's marketing program which includes "the Zoo website and social media accounts, and that such transition may occur during the term of this Agreement."  Interim Agreement § 2(H)(2)(a).

74.    The Interim Agreement, which the parties executed in May 2024, therefore makes clear that GLAZA was required to "transfer the ownership, access, username[s], and passwords for the Zoo website, domain, and social media accounts to the [Zoo]" "as soon as practicable after execution of this Agreement[.]"  *Id.*; *see also* Standard Provisions at PSC-21 ("all finished and unfinished works, tangible or not" including but not limited to all websites, domains, and other forms of intellectual property "shall be and remain the exclusive property of [the City] for its use in any manner [the City] deems appropriate").

75.    However, GLAZA still has not transferred ownership, access, and control of the Zoo's digital media—even though the Interim Agreement was executed over six months ago and

---

[19]    The City also discovered that GLAZA stated on the Docent Volunteer webpage of the Zoo's website (https://lazoo.org/join-ourcommunity/volunteers/docent-program/), without first obtaining the Zoo's consent, that the onboarding for the docent program is "on hiatus."

COMPLAINT FOR BREACH OF CONTRACT, BREACH OF THE IMPLIED COVENANT OF GOOD FAITH
AND FAIR DEALING, BREACH OF FIDUCIARY DUTY, CONVERSION, AND DECLARATORY RELIEF

despite the Zoo's multiple requests.  In fact, on October 25, 2024, after the Zoo's second request, GLAZA claimed that it had "tremendous concerns" about granting "external access" of the Zoo's own digital media to the Zoo itself.  Even more incredibly, GLAZA also suggested, without any supporting evidence, that the Zoo could "compromise [the] integrity" of the Zoo website, thereby negatively affecting ticket sales for the upcoming L.A. Zoo Lights holiday festival in addition to membership, fundraising, and other revenue streams.

76.    GLAZA's failure to perform a timely transfer plainly constitutes a breach of the Interim Agreement requiring the transfer to occur "as soon as reasonably practical" after execution of the contract.  GLAZA's failure also plainly constitutes a breach of GLAZA's duty to "cooperate and coordinate with the City" to "ensure a smooth transition of services."  Interim Agreement § 11.

### GLAZA Circulates Mass Communications, Using the City's Property, to the Zoo's Donors, Members, and Volunteers Criticizing the City and the Zoo

77.    On October 18, 2024, GLAZA sent a mass e-mail titled "Important news about GLAZA" to the Zoo's donors and members, without providing any prior notice to the City or the Zoo.

78.    In that e-mail, GLAZA informed Zoo donors and members that it is severing its relationship with the Zoo because the City's RFPs are purportedly "structured as vendor relationships, rather than [a] partnership" and the "financial terms of these RFPs are not fiscally sustainable for GLAZA in the long term."

79.    GLAZA's e-mail, among other things, also (i) addressed the Zoo's donors (incorrectly) as *GLAZA's* donors, (ii) stated that "[t]he future under these RFPs is not in the best interest of the Zoo, the City, or GLAZA[,]" (iii) stated that GLAZA will "move forward separately from the Zoo to continue [its] conservation mission[,]" (iv) suggested that the Zoo's

22

COMPLAINT FOR BREACH OF CONTRACT, BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, BREACH OF FIDUCIARY DUTY, CONVERSION, AND DECLARATORY RELIEF

donors have been supporting GLAZA in some independent capacity, and (v) informed the Zoo's donors that GLAZA will "continue to communicate any new developments with [them]."

80.     Also on October 18, 2024, and likewise without any notice to the City or the Zoo, GLAZA sent a mass e-mail and letter to the Zoo's volunteers.  In that communication, GLAZA (again) incorrectly addressed the Zoo's volunteers as *GLAZA's* volunteers, while making substantially similar statements to those that GLAZA made in its letter addressed to the Zoo's donors.  GLAZA also posted—on the Zoo volunteer Facebook group page[20]—GLAZA's October 17th and October 18th letters to the City, both of which discuss the RFPs and portray the City and the Zoo in a negative light.

81.     Under the Interim Agreement, GLAZA must perform all of its specified duties, including its management of the Zoo's fundraising, membership, and volunteer programs, "for the benefit of the Zoo" throughout the entire term of the contract.  Interim Agreement §§ 1, 2 at p. 2.  Here, GLAZA's mass communications clearly are not "for the benefit of the Zoo" but instead for GLAZA's exclusive and prospective benefit, one of (many) steps GLAZA has recently taken to the detriment of the City and the Zoo.

<u>GLAZA REFUSES TO COMPLY WITH THE CITY'S DEMANDS</u>

<u>CRITICAL TO A SMOOTH TRANSITION OF SERVICES AND THE ZOO'S FUTURE</u>

82.     Given these multiple, alarming developments, the City issued a letter to GLAZA on November 8, 2024.[21]  The City issued the letter to ensure a smooth transition of services and to secure the Zoo's immediate and long-term financial, proprietary, and other interests.

83.     In this letter, the City instructed GLAZA, by no later than November 18, 2024, to:

---

[20]   *See*  https://www.facebook.com/groups/LAZooVolunteers/.
[21]   A true and correct copy of the City's letter is attached hereto as Exhibit 3.

23

COMPLAINT FOR BREACH OF CONTRACT, BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, BREACH OF FIDUCIARY DUTY, CONVERSION, AND DECLARATORY RELIEF

a.      Designate the City as the sole owner and beneficiary of all financial assets under GLAZA's management and/or control having any relation to the Zoo;

b.      Add the Zoo Director as an authorized signer for all such financial assets;

c.      Provide the Zoo Director with usernames, passwords, and associated authentication information (*e.g.*, answers to secret questions) that GLAZA employs for purposes of online access to such financial assets;

d.      Confirm that GLAZA will not use any donor, member, or volunteer list or any of the City's other assets (all of which have been generated for the Zoo as GLAZA's beneficiary) for any fundraising purposes that are not for the exclusive benefit of the Zoo or that otherwise conflict with the duties GLAZA owes the City;

e.      Identify several dates during the first two weeks of January 2025 during which GLAZA is available for a meeting to discuss the scope, timing, and process for the City's inspection of GLAZA's books and records;

f.      Provide (i) the names and contact information of Zoo members, (ii) the names, contact information, and donation dates, amounts, and (any) restrictions for Zoo donors, (iii) information and records relating to the Zoo's sponsors, (iv) records for the 2024 and 2025 Beastly Balls, and (v) records for the 2024 and 2025 Docent Classes; and

g.      Confirm that GLAZA will no longer disseminate mass communications to Zoo donors, members, volunteers, or sponsors, using any of the City's property, relating to the RFPs, the parties' separation, or GLAZA's prospective independent plans without first providing a draft of the proposed communication to and obtaining written approval from the Zoo.

84.     In the letter, the City also instructed GLAZA, by no later than November 12, 2024, to transfer the ownership, access, usernames, and passwords for the Zoo's website,

24

COMPLAINT FOR BREACH OF CONTRACT, BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, BREACH OF FIDUCIARY DUTY, CONVERSION, AND DECLARATORY RELIEF

domain, and social media accounts, which GLAZA was contractually obligated to do many months prior.

85. On December 6, 2024, GLAZA (through counsel) responded to the City's November 8th letter.[22]  However, other than agreeing to meet with the City on or after January 22, 2025 to discuss the City's inspection of GLAZA's books and records, GLAZA refused to comply with the aforementioned instructions.  In fact, GLAZA made crystal clear that it intends to continue to breach the contractual, good faith, and fiduciary obligations that it owes to the City.

86. In its response, GLAZA effectively conceded that all of the assets under GLAZA's current management, aside from those in the GLAZA Restricted account,[23] have only been used (and can only be prospectively used) to support and benefit the Zoo, not other organizations or individuals.  However, and most astonishingly, GLAZA also claimed that it has the right to continue to exert control over the Zoo's endowment (and therefore continue to extract sums for its substantial administrative expenses) even after the Interim Agreement expires—on the quizzical notion that donors supposedly expect GLAZA to continue to control these funds even after GLAZA separates from and potentially operates in competition with the Zoo.

---

[22]    A true and correct copy of GLAZA's response is attached hereto as Exhibit 4.
[23]    GLAZA now claims that, in January 2023, GLAZA received a bequest that included a restricted portion (to be used for a specific Zoo project) and a portion to be used as GLAZA deems appropriate.  GLAZA also claims that it created the GLAZA Restricted account at that time and asserts that it will continue to control this account as it solely deems appropriate.  However, GLAZA was only permitted to raise funds on behalf of the City and for the benefit of the Zoo, never on its own exclusive behalf and for any purpose other than to benefit the Zoo.  It also continues to remain unclear, among other things, why GLAZA waited sixteen months to first disclose the account to the Zoo (since GLAZA now confirms it created the account in January 2023) and why GLAZA continued to generate revenue for that account.

25

COMPLAINT FOR BREACH OF CONTRACT, BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, BREACH OF FIDUCIARY DUTY, CONVERSION, AND DECLARATORY RELIEF

87.     Additionally, GLAZA refused to (i) provide the data relating to the Zoo's members, donors, volunteers, and sponsors, even though the City is the exclusive owner of all of this information under the Interim Agreement, (ii) send drafts of proposed mass communications, stating that "GLAZA does not need permission of the Zoo Director" to communicate with the Zoo's donors and that GLAZA will continue to communicate with them as it pleases, and (iii) promptly transfer the ownership, access, and control of the Zoo's digital media, even though GLAZA was required to do so many months ago, claiming that it may take until January 31, 2025 because the transfer is apparently "complicated."

88.     Further, GLAZA failed to (i) address the City's demand for records relating to the 2024 and 2025 Beastly Balls, while claiming the Beastly Ball is an event "for the benefit of GLAZA itself" even though the Interim Agreement requires all fundraising events (including the Beastly Ball) to be conducted for the Zoo's (not GLAZA's) benefit, (ii) address the City's demand for records relating to the 2024 and 2025 Docent Classes, and (iii) explain why GLAZA unilaterally suspended the 2025 Docent Class without notifying and getting input from the Zoo, as the Interim Agreement requires.

<u>FIRST CAUSE OF ACTION</u>

BREACH OF CONTRACT

AGAINST ALL DEFENDANTS

89.     The City incorporates herein by reference all preceding allegations as though fully set forth herein.

90.     GLAZA has breached the Interim Agreement by (i) claiming an exclusive interest over the Zoo's endowment and other funds, (ii) refusing to relinquish its management and control over the Zoo's endowment and other funds, (iii) allocating funds to, generating revenue

26

COMPLAINT FOR BREACH OF CONTRACT, BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, BREACH OF FIDUCIARY DUTY, CONVERSION, AND DECLARATORY RELIEF

for, paying expenses from, and withholding material information associated with the GLAZA Restricted account, and (iv) pursuing fundraising not for the exclusive benefit of the Zoo.

91. GLAZA has also breached the Interim Agreement by (i) refusing to provide the Zoo with member, donor, volunteer, and sponsor data, (ii) unilaterally canceling the 2025 Beastly Ball, (iii) unilaterally suspending the 2025 Docent Class and conferring with current docents about the transition of services without any notice to or input from the Zoo, (iv) refusing to timely transfer to the Zoo the ownership, access, and control of the Zoo's digital media, and (v) disseminating mass communications, using the City's property, to the Zoo's donors, members, and volunteers not for the benefit of the Zoo but instead for GLAZA's exclusive benefit.

92. GLAZA has further separately breached the Interim Agreement by failing to cooperate and coordinate with the City to ensure a smooth transition of services based on the foregoing breaches.

93. As a direct and proximate result of these breaches, the City has been injured in an amount to be proven at trial but no less than $48,887,762.51, which constitutes the sum of the unrestricted and restricted funds under GLAZA's management based on the information readily available and known to date.

94. To accurately determine the full scope of damages, a forensic audit is necessary to uncover why, as GLAZA quizzically suggests, donors supposedly expect GLAZA to continue to control the Zoo's endowment and other funds (and to continue to unilaterally extract sums therefrom for administrative expenses) even after the Interim Agreement expires. A judicial accounting is likewise necessary to account for which funds, if any, GLAZA may continue to control after the parties separate (pursuant to a (very) short-term defined plan) and which funds GLAZA must relinquish to the City during the transition. And to protect the City from further

COMPLAINT FOR BREACH OF CONTRACT, BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, BREACH OF FIDUCIARY DUTY, CONVERSION, AND DECLARATORY RELIEF

harm, GLAZA should be ordered to specifically perform certain duties and be enjoined from committing certain acts, as specifically described in the prayer.

### SECOND CAUSE OF ACTION

### BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

### AGAINST ALL DEFENDANTS

95. The City incorporates herein by reference all preceding allegations as though fully set forth herein.

96. The covenant of good faith and fair dealing is implied in every contract. The purpose of the implied covenant is to ensure that no party to a contract will do anything which will injure the right of the other to receive the benefits of the agreement. Because contracts differ, the nature and extent of the duties owed under the implied covenant are variable and depend on the contractual purposes.

97. GLAZA, as the City's fiduciary and fiscal agent, has breached the implied covenant by (i) claiming an exclusive interest over the Zoo's endowment and other funds, (ii) refusing to relinquish its management and control over the Zoo's endowment and other funds, (iii) allocating funds to, generating revenue for, paying expenses from, and withholding material information associated with the GLAZA Restricted account, and (iv) pursuing fundraising not for the exclusive benefit of the Zoo.

98. GLAZA has also breached the implied covenant by (i) refusing to provide the Zoo with member, donor, volunteer, and sponsor data, (ii) unilaterally canceling the 2025 Beastly Ball, (iii) unilaterally suspending the 2025 Docent Class and conferring with current docents about the transition of services without any notice to or input from the Zoo, (iv) refusing to timely transfer to the Zoo the ownership, access, and control of the Zoo's digital media, and (v)

28

COMPLAINT FOR BREACH OF CONTRACT, BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, BREACH OF FIDUCIARY DUTY, CONVERSION, AND DECLARATORY RELIEF

disseminating mass communications, using the City's property, to the Zoo's donors, members, and volunteers not for the benefit of the Zoo but instead for GLAZA's exclusive benefit.

99.    GLAZA has further separately breached the implied covenant by failing to cooperate and coordinate with the City to ensure a smooth transition of services based on the foregoing breaches.

100.    As a direct and proximate result of these breaches, the City has been injured in an amount to be proven at trial but no less than $48,887,762.51, which constitutes the sum of the unrestricted and restricted funds under GLAZA's management based on the information readily available and known to date.

101.    To accurately determine the full scope of damages, a forensic audit is necessary to uncover why, as GLAZA quizzically suggests, donors supposedly expect GLAZA to continue to control the Zoo's endowment and other funds (and to continue to unilaterally extract sums therefrom for administrative expenses) even after the Interim Agreement expires.  A judicial accounting is likewise necessary to account for which funds, if any, GLAZA may continue to control after the parties separate (pursuant to a (very) short-term defined plan) and which funds GLAZA must relinquish to the City during the transition.  And to protect the City from further harm, GLAZA should be ordered to specifically perform certain duties and be enjoined from committing certain acts, as specifically described in the prayer.

THIRD CAUSE OF ACTION

BREACH OF FIDUCIARY DUTY

AGAINST ALL DEFENDANTS

102.    The City incorporates herein by reference all preceding allegations as though fully set forth herein.

29

COMPLAINT FOR BREACH OF CONTRACT, BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, BREACH OF FIDUCIARY DUTY, CONVERSION, AND DECLARATORY RELIEF

103.    As the City's fiduciary and fiscal agent, GLAZA owes the City the duty of loyalty, putting the City's interests above its own.  GLAZA also owes the City the duties of care, good faith, confidentiality, obedience, and of prudence and the duty to disclose.

104.    GLAZA has breached its fiduciary duties by (i) claiming an exclusive interest over the Zoo's endowment and other funds, (ii) refusing to relinquish its management and control over the Zoo's endowment and other funds, (iii) allocating funds to, generating revenue for, paying expenses from, and withholding material information associated with the GLAZA Restricted account, and (iv) pursuing fundraising not for the exclusive benefit of the Zoo.

105.    GLAZA has also breached its fiduciary duties by (i) refusing to provide the Zoo with member, donor, volunteer, and sponsor data, (ii) unilaterally canceling the 2025 Beastly Ball, (iii) unilaterally suspending the 2025 Docent Class and conferring with current docents about the transition of services without any notice to or input from the Zoo, (iv) refusing to timely transfer to the Zoo the ownership, access, and control of the Zoo's digital media, and (v) disseminating mass communications, using the City's property, to the Zoo's donors, members, and volunteers not for the benefit of the Zoo but instead for GLAZA's exclusive benefit.

106.    GLAZA has further separately breached its fiduciary duties by failing to cooperate and coordinate with the City to ensure a smooth transition of services based on the foregoing breaches.

107.    As a direct and proximate result of these breaches, the City has been injured in an amount to be proven at trial but no less than $48,887,762.51, which constitutes the sum of the unrestricted and restricted funds under GLAZA's management based on the information readily available and known to date.

108.    To accurately determine the full scope of damages, a forensic audit is necessary to uncover why, as GLAZA quizzically suggests, donors supposedly expect GLAZA to continue to

30

COMPLAINT FOR BREACH OF CONTRACT, BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, BREACH OF FIDUCIARY DUTY, CONVERSION, AND DECLARATORY RELIEF

control the Zoo's endowment and other funds (and to continue to unilaterally extract sums therefrom for administrative expenses) even after the Interim Agreement expires. A judicial accounting is likewise necessary to account for which funds, if any, GLAZA may continue to control after the parties separate (pursuant to a (very) short-term defined plan) and which funds GLAZA must relinquish to the City during the transition. And to protect the City from further harm, GLAZA should be ordered to specifically perform certain duties and be enjoined from committing certain acts, as specifically described in the prayer.

<u>FOURTH CAUSE OF ACTION</u>

CONVERSION

AGAINST ALL DEFENDANTS

109.   The City incorporates herein by reference all preceding allegations as though fully set forth herein.

110.   Any act of dominion wrongfully exerted over another's personal property in denial of or inconsistent with the party's rights therein constitutes conversion. The basic elements of the tort are (i) the plaintiff's ownership or right to possession of personal property, (ii) the defendant's disposition of the property in a manner that is inconsistent with the plaintiff's property rights, and (iii) resulting damages. Conversion is a strict liability tort, and therefore the defendant's good faith, lack of knowledge, and motive are ordinarily immaterial.

111.   GLAZA's refusal to relinquish its management and control over funds raised on the City's behalf for the benefit of the Zoo constitutes conversion. As a direct and proximate result of these breaches, the City has been injured in an amount to be proven at trial but no less than $48,887,762.51, which constitutes the sum of the unrestricted and restricted funds under GLAZA's management based on the information readily available and known to date.

31

COMPLAINT FOR BREACH OF CONTRACT, BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, BREACH OF FIDUCIARY DUTY, CONVERSION, AND DECLARATORY RELIEF

112.    To accurately determine the full scope of damages, a forensic audit is necessary to uncover why, as GLAZA quizzically suggests, donors supposedly expect GLAZA to continue to control the Zoo's endowment and other funds (and to continue to unilaterally extract sums therefrom for administrative expenses) even after the Interim Agreement expires.  A judicial accounting is likewise necessary to account for which funds, if any, GLAZA may continue to control after the parties separate (pursuant to a (very) short-term defined plan) and which funds GLAZA must relinquish to the City during the transition.  And to protect the City from further harm, GLAZA should be ordered to specifically perform certain duties and be enjoined from committing certain acts, as specifically described in the prayer.

FIFTH CAUSE OF ACTION

DECLARATORY RELIEF

AGAINST ALL DEFENDANTS

113.    The City incorporates herein by reference all preceding allegations as though fully set forth herein.

114.    There is an actual controversy relating to the legal rights and duties between the City and GLAZA regarding the (i) ownership and control over the Zoo's endowment and other assets, and (ii) ownership and control over the City's intellectual property, including but not limited to member, donor, volunteer, and sponsor data.

115.    It is appropriate and necessary for this Court to render a declaratory judgment that sets forth the parties' legal rights and duties to prevent prospective contractual breaches by GLAZA and to provide certainty to the parties regarding the ownership and control over the Zoo's endowment and other assets in addition to the City's intellectual property.

116.    The City therefore seeks a judicial declaration, pursuant to section 1060 of the Code of Civil Procedure, which makes clear that (i) the City is the sole owner and beneficiary of

32

COMPLAINT FOR BREACH OF CONTRACT, BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, BREACH OF FIDUCIARY DUTY, CONVERSION, AND DECLARATORY RELIEF

all of the financial assets under GLAZA's current management or control, (ii) GLAZA has no right to continue to exert control over the Zoo's endowment and other funds after the Interim Agreement expires, (iii) the City is the exclusive owner of all intellectual property originated or prepared by GLAZA, including but not limited to member, donor, volunteer, and sponsor data, and (iv) GLAZA has no right to use any work product GLAZA originated or prepared, including but not limited to member, donor, volunteer, and sponsor data, after the Interim Agreement expires.

## PRAYER FOR RELIEF

Wherefore, the City prays that:

1.      The Court award compensatory damages in favor of the City and against Defendants in an amount to be proven at trial but no less than $48,887,762.51, which constitutes the sum of the unrestricted and restricted funds under GLAZA's current management based on the information readily available and known to date;[24]

2.      The Court perform a judicial accounting that (i) identifies the universe of assets under GLAZA's current management or control, (ii) adjudicates which assets, if any, GLAZA may continue to control after the Interim Agreement expires for the benefit of the Zoo, pursuant to a short-term defined plan lasting no more than one year, that sets forth the timing, processes, and other terms relevant to the distribution of these funds, and (iii) adjudicates which assets GLAZA must relinquish to the City before the Interim Agreement expires, and by when;

3.      The Court order Defendants to specifically perform each of the following:

---

[24]      The City reserves the right to seek additional damages for any lobbying or legal costs that GLAZA paid or prospectively will pay, using City assets, that are not for the exclusive benefit of the Zoo through a claw-back against GLAZA and any firm it retains. *See* Interim Agreement § 5(E) (GLAZA may recover lobbying or legal expenses if they are incurred "in the performance of the terms of this Agreement that are for the benefit of the Zoo" but never for "actions against the City").

COMPLAINT FOR BREACH OF CONTRACT, BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, BREACH OF FIDUCIARY DUTY, CONVERSION, AND DECLARATORY RELIEF

a.       Designate the City as the sole owner and beneficiary of all financial assets under GLAZA's current management or control, and further (i) add the Zoo Director as an authorized signer for all such assets, and (ii) provide the Zoo with all usernames, passwords, and account authentication information necessary to access such assets online;

b.       Relinquish management and control over the Zoo's endowment and other funds before the Interim Agreement expires;

c.       Open GLAZA's books and records for purposes of a forensic audit and a judicial accounting;

d.       Transfer to the Zoo the ownership, access, usernames, and passwords for the Zoo's website, domain, and social media accounts; and

e.       Provide the Zoo with all of GLAZA's files, records, and work product having any relation to the Zoo, including but not limited to the Zoo's donors, members, sponsors, and volunteers and fundraising events such as the Beastly Ball;

4.       The Court enjoin Defendants from each of the following:

a.       Continuing to exert management or control over the Zoo's endowment and other funds after the Interim Agreement expires;

b.       Using any of the financial assets under GLAZA's current management or control for any purpose that is not for the exclusive benefit of the Zoo or that otherwise conflict with the duties GLAZA owes the City;

c.       Using any donor, member, or volunteer list (or any of the City's other assets) for any fundraising purposes that are not for the exclusive benefit of the Zoo or that otherwise conflict with the duties GLAZA owes the City;

d.       Disseminating any mass communication to Zoo donors, members, volunteers, or sponsors, using any of the City's property, relating to the RFPs, the parties'

34

COMPLAINT FOR BREACH OF CONTRACT, BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, BREACH OF FIDUCIARY DUTY, CONVERSION, AND DECLARATORY RELIEF

separation, or GLAZA's prospective independent plans without first providing a draft of the proposed communication to and obtaining written approval from the Zoo;

e. Deleting or destroying any files, records, or work product having any relation to the Zoo; and

f. Taking or using any files, records, or any intellectual property having any relation to the Zoo for GLAZA's separate prospective purposes upon the parties' separation;

5. The Court issue a judicial declaration that establishes:

a. GLAZA is the City's fiduciary and fiscal agent;

b. GLAZA breached its contractual, good faith, and fiduciary obligations by claiming an exclusive interest over the Zoo's endowment and other funds and by refusing to provide the Zoo with member, donor, volunteer, sponsor, fundraising, and related data;

c. The City is the sole owner and beneficiary of all of the financial assets under GLAZA's current management or control;

d. The City is the exclusive owner of all intellectual property under GLAZA's current control, including but not limited to member, donor, volunteer, and sponsor data;

e. GLAZA has no right, in law or in equity, to continue to manage or control the Zoo's endowment or other funds after the Interim Agreement expires; and

f. GLAZA has no right, in law or in equity, to use any of the intellectual property under GLAZA's current control, including but not limited to member, donor, volunteer, and sponsor data, after the Interim Agreement expires;

6. The City recover its costs; and

7. The Court grants the City additional and further relief as this Court deems to be just and proper.

35

COMPLAINT FOR BREACH OF CONTRACT, BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, BREACH OF FIDUCIARY DUTY, CONVERSION, AND DECLARATORY RELIEF

Dated: December 20, 2024          Respectfully submitted,

OFFICE OF THE LOS ANGELES CITY ATTORNEY


By: ___*Steven Son*_____

        STEVEN S. SON
        Attorneys for Plaintiff,
        THE CITY OF LOS ANGELES

36

# EXHIBIT 1

# CONTRACT SUMMARY SHEET

TO:   THE OFFICE OF THE CITY CLERK,
      COUNCIL/PUBLIC SERVICES DIVISION          DATE:__05/30/24_____
      ROOM 395, CITY HALL


**(PLEASE DO NOT STAPLE THE CONTRACT FOR THE CLERK'S FILE)**

*__FORM MUST BE TYPEWRITTEN__*


FROM (DEPARTMENT):  ___Zoo Department_____


CONTACT PERSON: ____Mei Kwan_____PHONE:__323-644-4203_____


CONTRACT NO.: _C-145438_____     COUNCIL FILE NO.: ___N/A_____


                                          NEW CONTRACT __X_____
ADOPTED BY COUNCIL: ____N/A_____        AMENDED AND RESTATED ___
                        DATE              ADDENDUM NO. _____
APPROVED BY BPW: ____N/A_____         SUPPLEMENTAL NO. ____
                        DATE              CHANGE ORDER NO. ____
                                          AMENDMENT ____

CONTRACTOR NAME: _____GREATER LOS ANGELES ZOO ASSOCIATION_____

TERM OF CONTRACT: __10/01/2023_____THROUGH: ____06/30/2025_____

TOTAL AMOUNT: _____

PURPOSE OF CONTRACT:

__INTERIM AGREEMENT FOR ZOO SUPPORT PROGRAMS AND RELATED SERVICES_


*NOTE: CONTRACTS ARE PUBLIC RECORDS - SCANNED AND UPLOADED TO THE INTERNET*

**INTERIM AGREEMENT**

**FOR**

**ZOO SUPPORT PROGRAMS AND RELATED SERVICES**

**Between**


**THE CITY OF LOS ANGELES by and through the DEPARTMENT OF THE ZOO**


**And**


**GREATER LOS ANGELES ZOO ASSOCIATION**

**TABLE OF CONTENTS**

SECTION 1. TERM OF AGREEMENT                                              2

SECTION 2. PROGRAMS & SERVICES PROVIDED BY GLAZA                         2

        A. Fundraising Program                                        2

        B. Membership Program                                         5

        C. Publications Program                                       7

        D. Volunteer Program                                          7

        E. Sponsorship Program                                        8

        F. Special Events Program                                     9

        G. Site Rentals & Catered Events Program                      11

        H. Marketing & Public Relations Program                       12

        I. Management of Funds                                         14

SECTION 3. CONCESSIONS SERVICES                                          14

SECTION 4. PERFORMANCE METRICS                                           15

SECTION 5. BUDGET, ACCOUNTING & FISCAL RESPONSIBILITIES                   15

SECTION 6. REPORTING REQUIREMENTS; TRANSPARENCY & ACCOUNTABILITY          16

SECTION 7. DATA PROTECTION                                               17

SECTION 8. ADMINISTRATIVE OFFICE SPACE & UTILITIES                        17

SECTION 9. ADMINISTRATION OF THE ZOO & COORDINATION WITH GLAZA            18

SECTION 10. LIMITED LICENSE TO USE CITY INTELLECTUAL PROPERTY             18

SECTION 11. TRANSITION TO NEW CONTRACTOR SELECTED AFTER RFP              19

SECTION 12. TERMINATION                                                  19

SECTION 13. GLAZA DISSOLUATION                                           19

SECTION 14. RATIFICATION                                                 20

SECTION 15. INCORPORATION OF CITY'S STANDARD CONTRACT PROVISIONS          20

SECTION 16. NOTICES                                                      20

SECTION 17. INCORPORATION OF DOCUMENTS                                   21

**INTERIM AGREEMENT**
**BETWEEN**
**THE CITY OF LOS ANGELES DEPARTMENT OF THE ZOO**
**AND**
**GREATER LOS ANGELES ZOO ASSOCIATION**
**FOR ZOO SUPPORT PROGRAMS AND RELATED SERVICES**

**THIS INTERIM AGREEMENT** ("Agreement") is made and entered into by and between the City of Los Angeles, a municipal corporation ("City"), acting by and through its Department of the Zoo ("Department"), and the Greater Los Angeles Zoo Association, a California nonprofit public benefit corporation ("GLAZA"). The City and GLAZA may hereafter each be referred to individually as a "Party" and collectively as "Parties."

**WHEREAS**, the Los Angeles Zoo and Botanical Gardens (the "Zoo"), located at 5333 Zoo Drive in Griffith Park, Los Angeles, California is owned and operated by the City.  The Department is headed by a General Manager, known as the Zoo Director (all references to the Zoo Director herein shall include the Zoo Director's designees); and

**WHEREAS**, GLAZA is a California nonprofit public benefit corporation recognized as tax exempt pursuant to Section 501(c)(3) of the Internal Revenue Code of 1986, with a mission to support the Zoo and to assist the City in establishing, developing, beautifying, and improving the Zoo; and

**WHEREAS**, on or about July 1, 1997, the City and GLAZA entered into a 25-year operating agreement and subsequent memorandums of understanding (each, an "MOU") whereby GLAZA provided support programs and related services for the Zoo, including fundraising, membership, concessions, special events, site rentals and catered events, sponsorship, marketing and public relations, publications, and volunteer programs (the agreement and all subsequent MOUs, collectively, "1997 Operating Agreement").  The City and GLAZA extended the term of the 1997 Operating Agreement for one additional year, with a final expiration date of September 30, 2023; and

**WHEREAS**, the City is in the process of issuing a Request for Proposals ("RFP") for a new long-term agreement for management of the Zoo's support programs and related services in order to promote fairness, transparency, and ensure that the City is obtaining the services at the best possible price; and

**WHEREAS,** in order to ensure the continuity of critical support programs and related services for the Zoo while the RFP process is completed, the Los Angeles City Council authorized the Department to execute a twenty-one-month interim agreement with GLAZA (C.F. No. 23-1128); and

**WHEREAS**, GLAZA desires to enter into this Agreement to provide the following Zoo support programs and related services for the City as specified herein, including as requested by the City from time to time: fundraising, membership, special events, sponsorship, marketing and public relations, site rentals and catered events, publications, and volunteer programs;

**NOW THEREFORE**, in consideration of the terms, covenants and conditions hereinafter to be kept and performed by the respective Parties, it is agreed as follows:

1

## SECTION 1.  TERM OF THE AGREEMENT

The term of the Agreement shall be for one year and nine months, commencing on October 1, 2023, and terminating on June 30, 2025.

## SECTION 2.  PROGRAMS & SERVICES PROVIDED BY GLAZA

GLAZA will be responsible for seeking and providing financial contributions to support the Zoo and to fund the Zoo's capital improvements.  GLAZA shall perform additional support services as specified in this Agreement to generate additional revenue and attendance for the Zoo, increase general awareness of the Zoo, and to enhance the Department's operations and further its goals and mission.

Specifically, GLAZA will provide and manage the following support programs and related services for the benefit of the Zoo: (1) Fundraising Program; (2) Membership Program; (3) Publications Program; (4) Volunteer Program; (5) Sponsorship Program; (6) Special Events Program; (7) Site Rentals and Catered Events; and (8) Marketing and Public Relations Program.

### A.  Fundraising Program

1. GLAZA will manage the Zoo Fundraising Program, designed to attract financial contributions and similar support for the Zoo, based on the priorities established by the Zoo Director and in accordance with GLAZA's Board-approved budget, as applicable.  Pursuant to the terms of this Agreement, GLAZA is authorized to raise funds on behalf of the City to provide financial support for the Zoo and fund the Zoo's capital improvements.  GLAZA agrees to fundraise from a variety of sources, including but not limited to solicitations from individuals, corporations, and charitable foundations, gifts and bequests, charitable programs and events (such as the Beastly Ball), and grants.

2. GLAZA will be the primary, but not the exclusive, organization authorized to solicit donations for the Zoo on behalf of the City, subject to advance coordination with and approval by the Zoo Director (such approval not to be unreasonably withheld).  In all solicitation requests for the Zoo Fundraising Program, GLAZA shall disclose that it is raising funds on behalf of the City for the Zoo, and that a portion of the donated funds will be used for GLAZA's administrative costs.

3. Restricted Fundraising

   a. Restricted funds are funds donated for the benefit of the Zoo for a specific or limited purpose.  GLAZA will use reasonable, good faith efforts to raise restricted funds on the City's behalf to support Zoo projects, programs, capital improvements, and other specific purposes established and prioritized by the Zoo Director.  GLAZA must obtain the Zoo Director's approval prior to engaging in any campaign to solicit restricted funds for the benefit of the Zoo. The Zoo Director shall respond to such requests for approval within a reasonable time period.

   b. The restricted fundraising goal for the Zoo Fundraising Program for Fiscal Year 2023-24, which runs from July 1, 2023 to June 30, 2024 ("FY 2023-24"), is $1,858,700.  No later than May 1, 2024, the Parties will negotiate in good faith a new restricted fundraising goal for the remaining term of the Agreement that extends beyond June 30,

2

2024, subject to the review and approval of the Board at their regular June 2024 meeting.

c. As part of its restricted fundraising for the Zoo, GLAZA is authorized to apply for and receive institutional and government grants for the benefit of the Zoo on the City's behalf. GLAZA shall receive the Zoo Director's approval prior to applying for any grant on behalf of the City, and keep the Zoo Director informed on the status of grant applications. GLAZA shall obtain the Zoo Director's approval prior to entering into any grant agreement (such approval to enter into the grant agreement to be provided in a timely manner and not to be unreasonably withheld) and will provide the Zoo Director with a copy of any executed grant agreement. As set forth in Section 5.C. below, GLAZA shall manage grant funds collected for the Zoo and use reasonable, good faith efforts to ensure compliance with all required grant conditions, including reporting requirements.

d. GLAZA may retain an indirect cost recovery rate of 10% from restricted funds and grant funds raised for the Zoo to cover GLAZA's costs and expenses relating to the fundraising of such restricted donations and grants. After deducting the indirect cost recovery rate, GLAZA shall transfer all remaining restricted funds to appropriate restricted accounts and shall ensure that such funds will only be expended for their designated purposes.

e. Expenditures by GLAZA of restricted funds donated for the benefit of the Zoo shall require approval of the Zoo Director, which shall be provided through the use of an expenditure request form.

f. Limited Additional Restricted Fundraising

a. GLAZA may raise additional restricted funds for GLAZA's internal and administrative purposes (e.g., to expand IT capabilities or purchase equipment) to be used solely for the benefit of the Zoo. Such additional restricted fundraising shall not require approval from the Zoo Director or be included in the restricted fundraising goal set forth in Section 2(A)(3)(b). However, such additional fundraising shall be limited so as to not interfere with GLAZA's services and obligations to the City under this Agreement.

4. Unrestricted Fundraising

a. Unrestricted funds are funds donated without a restricted or limited purpose. GLAZA will use reasonable, good faith efforts to raise unrestricted funds on the City's behalf to support the Zoo's operations, including but not limited to animal care and wellbeing, animal health, behavioral enrichment, research, conservation, and professional development. GLAZA will raise unrestricted funds for the Zoo through a variety of efforts, including but not limited to special fundraising programs such as the Safari Society and Corporate Leaders programs, commemorative programs, events such as the Beastly Ball, and direct mail and email appeals.

i. Commemorative programs are opportunities for individuals, corporations, and foundations to provide a gift to commemorate an occasion, person, or program with a bench, tile, or other appropriate item. GLAZA shall obtain the Zoo Director's approval prior to offering any commemorative program. The Zoo

3

Director shall respond to such requests for approval within a reasonable time period.

b. For FY 2023-24, GLAZA shall transfer the first $300,000 of unrestricted funds raised for the Zoo to the Zoo Assistance Fund ("ZAF"), to be used as directed by the Zoo Director.  For the remaining term of the Agreement that extends beyond June 30, 2024, GLAZA shall transfer the first $300,000 of unrestricted funds raised for the Zoo to the ZAF, to be used as directed by the Zoo Director.

c. Except as set forth elsewhere in this Agreement (see, e.g. Section 2.A.5.d), GLAZA may retain additional unrestricted funds up to the amount of direct and indirect costs and expenses GLAZA incurs in the performance of its responsibilities under this Agreement and not already paid for by another source.  After deducting any such costs and expenses, GLAZA shall remit 50% of any remaining unrestricted funds to the Department for deposit into the Zoo Enterprise Trust Fund ("ZETF") and retain the other 50% of such remaining unrestricted funds for GLAZA's own use for the benefit of the Zoo.  For FY 2023-24, GLAZA shall remit the Zoo's 50% portion of all remaining unrestricted funds to the Department no later than August 31, 2024 for deposit into the ZETF.  For the term of this Agreement between July 1, 2024 and June 30, 2025, GLAZA shall remit the Zoo's 50% portion of all remaining unrestricted funds to the Department for deposit into the ZETF no later than August 31, 2025.

5. <u>Bequests and Deferred Gifts</u>

a. Bequests and deferred gifts are donations made for the benefit of the Zoo via a bequest or other planned gift vehicle such as a trust or annuity, either restricted or unrestricted. GLAZA may solicit and receive such bequests and deferred gifts on the City's behalf for the benefit of the Zoo.

b. If GLAZA receives a restricted bequest or restricted deferred gift for the Zoo, GLAZA shall place the funds into a restricted account and ensure that such funds will only be expended for the appropriate designated purposes and with the pre-approval of the Zoo Director.

c. If GLAZA receives an unrestricted bequest or unrestricted deferred gift for the Zoo, GLAZA shall invest the funds for the benefit of the Zoo in the endowment fund in accordance with GLAZA's Investment Policy.

d. GLAZA's expenses for managing restricted and unrestricted bequests and deferred gifts held in the endowment fund shall be covered by the earnings of the endowment fund.

e. GLAZA's expenses for managing restricted bequests and deferred gifts outside of the endowment fund shall be covered by the indirect cost recovery rate set forth in Section 2(A)(3)(d) of this Agreement.

6. <u>Endowment</u>

a. GLAZA shall continue to manage the endowment fund for the benefit of the Zoo in accordance with GLAZA's Investment Policy.

4

7. Donor Data

   a. Within 30 days following the execution of this Agreement, GLAZA shall update its privacy policies to reflect that, subject to applicable law, and effective as of the date of such update, GLAZA will share with the Department donor names, contact information, date of donation, donation amounts, and any restrictions on donations contributed for the benefit of the Zoo, if any, received after the date of such update ("Donor Data").

   b. Following GLAZA's update of its privacy policies, subject to applicable law, GLAZA shall provide the Zoo Director with a monthly electronic spreadsheet containing all Donor Data.

**B. Zoo Membership Program**

1. GLAZA will manage the Zoo's Membership Program, including the recruiting and solicitation of new Zoo members and membership renewals, management and operation of a membership administration platform, membership customer service, and operation of the membership booth at the Zoo.

2. GLAZA shall use reasonable, good faith efforts to offer and promote annual membership in the Zoo's Membership Program with the categories, rates, and benefits set forth in Exhibit C.  GLAZA shall not amend the terms of the Membership Program without the prior written approval of the Zoo Director (such approval not to be unreasonably withheld).

3. GLAZA shall manage the membership booth at the front entrance of the Zoo, where GLAZA staff will sell memberships, provide member customer service, and manage member entry into the Zoo.  GLAZA shall operate the membership booth at all times the Zoo is open to the public. GLAZA may use the membership booth as a ticket booth at special night-time ticketed events produced by GLAZA on behalf of the City.

4. GLAZA shall not revoke a person's membership in the Zoo's Membership Program, or otherwise revoke a person's right to enter the Zoo property, without prior reasonable notice to the Zoo Director as the situation allows.

5. GLAZA shall collect membership fees from new and renewing Zoo members on behalf of the Department using the rates set forth in Exhibit C ("Membership Revenue"), to be distributed as follows:

   a. GLAZA shall remit not less than 35% of all Membership Revenue to the Department on a monthly basis for deposit into the ZETF.

   b. GLAZA may use the remaining Membership Revenue to pay for certain costs and expenses incurred in managing the Zoo's Membership Program, Publications Program, Volunteer Program, and the Zoo website and social media, as follows:

      i. GLAZA may retain up to 28% of Membership Revenue to cover the direct costs and expenses of managing the Zoo Membership Program.

      ii. GLAZA may retain up to 15% of Membership Revenue to cover the direct costs and expenses of managing the Zoo's Publications Program, Volunteer Program, and managing the Zoo website and social media accounts.

5

       iii.  GLAZA may retain up to 22% of Membership Revenue to cover GLAZA's administrative overhead costs and expenses.

  c.  After deducting its costs and expenses as authorized above, GLAZA shall remit all remaining Membership Revenue to the Department for deposit into the ZETF.

      i.  For FY 2023-24, GLAZA shall remit all remaining Membership Revenue to the Department no later than August 31, 2024 for deposit into the ZETF. For FY 2024-25, GLAZA shall remit all remaining Membership Revenue to the Department no later than August 31, 2025 for deposit into the ZETF.

6. GLAZA shall not create or otherwise operate or provide for a separate (i.e. non-Zoo related) membership program during the term of this Agreement.

7. Membership Data

  a.  Within 30 days following the execution of this Agreement, GLAZA shall update its privacy policies to reflect that, effective as of the date of such update, all data collected from new and renewing members shall be shared with the Department ("Member Data").

  b.  Following GLAZA's update of its privacy policies, subject to applicable law, GLAZA shall provide the Zoo Director with a monthly electronic spreadsheet containing all Member Data.

**C. Zoo Publications Program**

1. GLAZA shall continue to produce and distribute print and digital publications for the Zoo, at, to the extent not specified herein, publication intervals that are reasonably equal to or more frequent than GLAZA's publication practices under the 1997 Operating Agreement. This shall include member, employee, and other publications including but not limited to *Zoo View* (published quarterly); *Zooscape* (published monthly); and the *Gnus* (published at least monthly). The content and production of these publications shall be coordinated in advance with the Zoo Director.

2. Working with the Zoo's Conservation team, GLAZA shall produce the Zoo's Conservation Strategic Plan Annual Report for which printing shall be funded by the Zoo.

3. GLAZA shall cover its costs and expenses for the Zoo Publications Program, other than the printing of the Zoo's Conservation Strategic Plan Annual Report, from Membership Revenue as authorized under Section 2(B)(5) of this Agreement.

**D. Zoo Volunteer Program**

1. GLAZA will manage the Zoo's Volunteer Program which includes docents, docent specialists, and general research, enrichment, and food preparation volunteers ("Volunteers") based on the needs of the Department.

2. GLAZA's management of the Zoo's Volunteer Program shall include recruitment, training, assignment, scheduling, and supervision of Volunteers. GLAZA shall comply in all material

6

respects with all applicable employment laws, rules and regulations, and use reasonable, good faith efforts to align the Zoo Volunteer Program with the Department's diversity goals and initiatives.  All Volunteers shall undergo fingerprinting and a background check prior to beginning volunteer service, which the City will provide at its own cost.

3.  GLAZA shall assign and manage Volunteers based on the priorities and needs reasonably established by the Zoo Director.  GLAZA and the Zoo Director shall discuss any reassignment or dismissal of Volunteers.

4.  GLAZA shall cover its costs and expenses for the Zoo Volunteer Program from Membership Revenue as authorized under Section 2(B)(5) of this Agreement.

5.  Volunteer Data

   a.  Within 30 days of the execution of this Agreement, GLAZA shall provide to the Department, in electronic format, a copy of all information that GLAZA has collected on all current Zoo Volunteers ("Current Volunteer Data").

   b.  GLAZA retains the right, in its sole discretion, to notify Volunteers that GLAZA has shared or intends to share the Current Volunteer Data with the Department, provided that if any such notification is sent it shall be in a form which has been pre-approved in writing by the Zoo Director and City Attorney (such approval not to be unreasonably withheld). For the avoidance of doubt, nothing in this Agreement shall be deemed to require GLAZA to notify Volunteers in any way.

   c.  Within 30 days following the execution of this Agreement, GLAZA shall update its privacy policies to reflect that effective as of the date of such update, and subject to applicable law, all data collected from new and returning Zoo Volunteers shall be shared with the Department.

   d.  Following GLAZA's update to its privacy policies, GLAZA will provide to the Department a monthly electronic spreadsheet containing all data collected from all new or returning Zoo Volunteers (together with Current volunteer Data, the "Volunteer Data").  On a regular basis, GLAZA will provide to the Department the projected daily schedule for all regularly scheduled Zoo Volunteers on site.

**E.  Zoo Sponsorship Program**

1.  GLAZA will manage the Zoo's sponsorship program to generate additional revenue for the Zoo.  GLAZA shall use reasonable, good faith efforts to seek sponsorships that support and maximize attendance and revenue generation for the Zoo. Any sponsor's values and operations must reflect the Department's mission and conservation and sustainability values.  Any dispute over such values and operations shall be decided at the Zoo Director's sole discretion.

2.  All new Zoo sponsors, terms, and benefits of sponsorship shall be subject to the Zoo Director's review and pre-approval and will be memorialized in a written agreement between the sponsor and GLAZA on behalf of the City.  All Zoo sponsorship agreements are subject to review by the Zoo Director prior to execution, and GLAZA shall provide the Zoo Director with complete copies of all executed sponsorship agreements.  No new or

7

renewing sponsorship agreement may extend beyond the term of this Agreement, unless the City is a party to the agreement or the agreement is assignable to the City at the City's sole option.

3. GLAZA shall collect Zoo sponsorship revenue on the City's behalf, to be distributed as follows:

   a. GLAZA shall remit not less than 25% of all Zoo sponsorship revenue it collects to the Department on a monthly basis for deposit into the ZETF.

   b. GLAZA may retain up to 75% of Zoo sponsorship revenue generated during the term of the Agreement to cover the direct costs and expenses of the Zoo's Sponsorship Program and the direct costs and expenses of the Marketing and Public Relations Program.

   c. After deducting its costs and expenses for managing the Zoo Sponsorship Program and Marketing and Public Relations Program as authorized above, GLAZA shall remit all remaining sponsorship revenue to the Department for deposit into the ZETF.

      i. For FY 2023-24, GLAZA shall transfer all remaining sponsorship revenue it collects to the ZETF no later than August 31, 2024. For FY 2024-25, GLAZA shall transfer all remaining sponsorship revenue it collects to the ZETF no later than August 31, 2025.

4. Sponsorship Data

   a. Within 30 days following the execution of this Agreement, GLAZA shall send to all current Zoo sponsors a communication, which has been pre-approved in writing by the Zoo Director and City Attorney (such approval not to be unreasonably withheld), that requests the sponsor's written consent (email is sufficient) for GLAZA to provide a copy of the sponsorship agreement to the Department.

   b. GLAZA shall provide the Department with a copy of every Zoo sponsorship agreement where the sponsor has consented in writing to sharing such agreement. For any sponsor that does not consent, GLAZA will provide to the Department anonymized sponsorship data reflecting the schedule of payments, nature of the sponsorship, and term of the sponsorship agreement (together with the sponsorship agreements, the "Sponsorship Data"). Nothing in this section shall be read to limit or otherwise restrict any other legal right that the Department may have outside this Agreement to obtain copies of any and all sponsorship agreements.

## F. Special Events Program

1. GLAZA will produce and promote Zoo member events, donor events, day-time public events, and night-time ticketed events to generate additional revenue and publicity for the Zoo. GLAZA will also produce employee events for employees of the Zoo. All special events must be pre-approved by the Zoo Director and coordinated with Department staff.

8

2. <u>Night-time Ticketed Events</u>

   a. GLAZA will use reasonable, good faith efforts to provide coordinated design, planning, management, and operational oversight of night-time ticketed events at the Zoo, including but not limited to Zoo Lights and Brew at the Zoo, to generate additional revenue and promotion for the Zoo.

   b. In requesting the pre-approval required in Section 2(F)(1), GLAZA shall provide the Zoo Director with detailed proposed event budgets, schedules, ticket pricing, staffing plans, and any other information as reasonably requested by the Zoo Director.  If GLAZA will utilize any subcontractors for production of an event, GLAZA shall provide the Zoo Director with a draft of the proposed subcontract for review and pre-approval whenever a subcontractor will be paid $25,000, or more, for that event, and a copy of the subcontract after execution.  The Zoo Director shall respond to all such requests for approval within a reasonable time period.

   c. GLAZA's production of night-time ticketed events for the Zoo shall include: the installation, strike, and load-out, and storage of all event materials; box office and ticketing management; marketing, line management; guest assistance services; security; traffic control, and other services necessary for the successful production of the events.

      i. GLAZA shall be responsible for coordinating with and compensating the Los Angeles Police Department to provide adequate security and the Los Angeles Department of Transportation for adequate traffic management and control for each event. The Zoo's onsite security personnel already employed and working at the Zoo in the performance of their regularly assigned duties will not be responsible for security at any night-time ticketed event.

      ii. The City shall provide and coordinate the management of staffing with GLAZA personnel for custodial and maintenance services, animal care, guest services staff operating the carousel, and EMT services at each night-time ticketed event, as needed.

      iii. GLAZA shall be responsible for paying any overtime pay that is reasonably incurred by City staff, in addition to direct staff costs, and is authorized to deduct those costs from the revenue generated for that event.  The City will provide an invoice to GLAZA detailing any direct City staff costs including overtime incurred, which GLAZA shall pay within 30 days of receipt.

   d. GLAZA shall collect, on behalf of the City, all revenue generated from each night-time ticketed event produced for the Zoo.  GLAZA is authorized to deduct direct expenses for the costs and expenses of producing and marketing a night-time ticketed event from the revenue generated from that event.  GLAZA shall remit all remaining net revenue earned for each event to the ZETF within 30 days of GLAZA's receipt of all invoices, including City overtime pay, following the conclusion of the event, unless otherwise agreed to by the Parties in writing.

9

e.   All equipment and materials purchased by or otherwise acquired by GLAZA (excluding rentals and other items owned by third parties) for Zoo night-time ticketed events shall become the property of the City.

f.   GLAZA shall collect and maintain customer data on the Zoo's night-time ticketed event attendees as available and secured through ticket transactions, marketing and/or promotional arrangements, and agrees to share such data with the Department in electronic format upon request and subject to applicable law ("Customer Data"). Customer Data shall include, but may not be limited to, name, mailing address, email address, and telephone number, whenever available, but shall not include credit card numbers or other similar banking information. GLAZA shall inform ticket purchasers that such Customer Data will be shared with the Department, subject to applicable law. Any electronic ticketing platform engaged to manage online ticket sales for events shall be required to agree to share Customer Data with GLAZA.

g.   For each night-time ticketed event produced for the Zoo, GLAZA shall provide the Zoo Director with a daily report on the event ticket sales, attendance, and revenue.

h.   Zoo Lights Events

   i.   The City and GLAZA have entered into a separate agreement for production of the 2023 Zoo Lights event, which ran from November 16, 2023 to January 7, 2024 (Contract No. C-143891).  Notwithstanding Section 15 of this Agreement, Contract No. C-143891 has not been and shall not be superseded by this Agreement.

3.   <u>Member Events</u>

   a.   GLAZA shall produce a series of Zoo member events as a benefit of the Zoo Membership Program and for member appreciation.  All such events shall be approved in writing by the Zoo Director in advance of their announcement.  GLAZA shall cover all costs and expenses for producing Zoo Member Events from Membership Revenue, only as authorized under Section 2(B)(5) of this Agreement.

4.   <u>Donor Events</u>

   a.   GLAZA may produce a series of Zoo donor events for donor cultivation and appreciation.  Such events may include, but are not limited to, donor dinners, receptions, VIP tours, and travel programs.

   b.   GLAZA shall cover the expenses for producing Zoo donor events from Unrestricted Funds, only as authorized under Section 2(A)(4)(c) of this Agreement.

5.   <u>Employee Events</u>

   a.   Subject to GLAZA's budget and the availability of funds, GLAZA shall use reasonable, good faith efforts to produce all-staff celebrations and events (to include City, GLAZA and concessionaire staff) including, but not limited to, an annual holiday luncheon and Zoo Lights staff party.

10

b.  GLAZA shall cover the costs and expenses of producing employee events from Unrestricted Funds, as authorized under Section 2(A)(4)(c) of this Agreement.

6.  GLAZA shall manage all Zoo special events in accordance with applicable City codes, rules, regulations, ordinances, and laws regarding, without limitation, levels of noise, accounting procedures, and public/private access.  GLAZA shall coordinate with Department staff to ensure minimal impact on animal welfare and daily Department operations.

7.  The City's contracted concessionaire for the Zoo (i.e., SSA Group, LLC) shall be the sole provider of concessions at special events, unless otherwise agreed to in writing by the Zoo Director. GLAZA may provide additional food, beverage, and product vendors at special events with the written approval of the Zoo Director (such approval not to be unreasonably withheld).

8.  The promotion and marketing of special events shall be provided by GLAZA as a part of the Marketing and Public Relations Program.  GLAZA's expenses in promoting and marketing special events, other than night-time ticketed events, shall be covered by Sponsorship Revenue as authorized under Section 2(E)(3) of this Agreement, unless another funding source is agreed to in writing in advance by the Parties.

## G.  Site Rentals & Catered Events Program

1.  GLAZA shall facilitate and manage site rentals and catered events at the Zoo for private parties, to generate additional revenue for the Zoo.

2.  All requests by private parties for site rentals or catered events at the Zoo shall be pre-approved by the Zoo Director prior to GLAZA booking the site rental or catered event, and shall be coordinated with Department staff.  The Zoo Director shall respond within a reasonable time to all requests for such approvals. GLAZA shall utilize the City's existing contracted concessionaire for all site rentals and catered events, unless otherwise agreed to by the Zoo Director.

3.  No new or renewing site rental or catered event agreement may extend beyond the term of this Agreement, unless the City is a party to the agreement or the agreement is assignable to the City at the City's option.  GLAZA shall provide the Zoo Director with copies of all executed site rental or catered event agreements.

4.  GLAZA shall collect revenue generated from site rentals and catered events on behalf of the Department, to be distributed as follows:

a.  GLAZA shall purchase all admission tickets for site rentals and catered events from the Department.

b.  GLAZA shall remit not less than 25% of all site rental fees to the Department on a monthly basis.

c.  GLAZA is authorized to use the remaining site rental fee revenue to offset its costs and expenses incurred in managing the Zoo's Site Rentals and Catered Events Program.  After deducting these authorized costs and expenses, GLAZA shall remit all remaining site rental fee revenue to the Department.

11

i. For FY 2023-24, GLAZA shall remit all remaining site rental revenue it collects to the Department no later than August 31, 2024, for deposit into the ZETF. For FY 2024-25, GLAZA shall remit all remaining site rental revenue it collects to the Department no later than August 31, 2025, for deposit into the ZETF.

**H. Marketing & Public Relations Program**

1. GLAZA shall implement and manage a comprehensive Marketing and Public Relations Program to increase Zoo attendance, revenue, and general awareness of the Zoo. These services shall include, but are not limited to, market research, branding and advertising, earned and owned media, special event promotions, strategic marketing alliances, group sales, and tourism.

   a. To increase awareness and positive image of the Zoo, GLAZA shall use reasonable, good faith efforts to develop strategic marketing alliances with local institutions and environmentally focused groups and initiatives.

   b. GLAZA shall coordinate the Zoo's Marketing and Public Relations Program with the Zoo's Sponsorship Program to secure opportunities for cross promotions and strategic marketing alliances.

   c. GLAZA shall user reasonable, good faith efforts to optimize the mix of media used to spread Zoo marketing messages and to increase and diversify demographic reach, utilizing radio, outdoor, digital, and print advertising plans. GLAZA shall use reasonable, good faith efforts to actively cultivate relationships with local media to maximize news coverage of Zoo events, programs, and exhibits and generate positive attention, as well as promote Zoo attendance.

   d. GLAZA shall use the Zoo's social media in its efforts to reach new audiences and demographics for the benefit of the Zoo and to deepen relationships with current Zoo attendees to encourage future visits and purchases.

   e. GLAZA will use reasonable, good faith efforts to market and promote Zoo special events to increase Zoo attendance, admissions revenue, and night-time ticketed event revenue.

   f. GLAZA will conduct periodic visitor surveys to identify trends in guest experiences, awareness, visitation motivation and demographics. This information will be used to identify opportunities for refinement of the Zoo's target audiences, messaging strategies, and programming decisions. GLAZA shall share the results of all visitor surveys with the Department.

   g. GLAZA shall provide the Department with quarterly reports on the Zoo's media reach and the impact of GLAZA's marketing campaigns.

2. Subject to and until the transition of the Zoo website (www.lazoo.org) and social media accounts to the Department as described below, GLAZA shall continue to manage the Zoo website (www.lazoo.org) and social media accounts (including but not limited to Twitter,

12

Instagram, Facebook, and YouTube) on behalf of the Department.  GLAZA will coordinate with Department staff to confirm that all content on the Zoo website and social media is accurate and current and reflects the Zoo's mission and brand.  GLAZA shall modify or remove any content it places on the Zoo website or social media upon request by the Zoo Director.

    a.  GLAZA understands that the Department intends to transition the management and related costs and expenses of the Zoo website and social media accounts, and that such transition may occur during the term of this Agreement.  The Department agrees to notify GLAZA at least 90 days prior to the date of such transition, unless otherwise mutually agreed by the Parties in writing (email is sufficient). Notwithstanding the foregoing, as soon as practicable after execution of this Agreement, GLAZA shall transfer the ownership, access, username, and passwords for the Zoo website, domain, and social media accounts to the Department.  During the term of the Agreement, the City will provide GLAZA with administrator access to the Zoo website, domain, and social media accounts for the purpose of performing the marketing and public relations services under this Agreement. GLAZA shall retain such administrator access for the duration of this Agreement, unless such access is earlier terminated due to the Department's assumption of all management and related costs and expenses GLAZA will work to ensure a smooth transition of full functionality of the Zoo website and social media accounts to the Department, or the Department's designated contractor.

3.  GLAZA shall not respond to media inquiries on behalf of the Department, unless expressly authorized by the Zoo Director.

4.  Except for direct costs related to managing the Zoo website and social media accounts, GLAZA shall cover direct costs and expenses for the Zoo's Marketing and Public Relations Program from Sponsorship Revenue as authorized under Section 2(E)(3) of this Agreement.  GLAZA shall cover its direct costs and expenses in managing the Zoo website and social media accounts from Membership Revenue, as authorized under Section 2(B)(5) of this Agreement.

**I.  Management of Funds**

1.  GLAZA shall continue to manage the Zoo's restricted funds, the Zoo Surplus Development Fund ("ZSDF"), and the ZAF on behalf of the Zoo.

2.  Management of these funds shall include vendor payments (via check or ACH), vendor liaison (W-9s, address and payment type verifications), vendor records maintenance and research, international wire transfers, credit card management, Department employee travel expense payments or reimbursements, purchase orders, monthly statements and account reconciliations.

3.  Funds in the ZSDF and the ZAF shall be expended only at the direction of the Zoo Director.

4.  Certain expenditures from the ZSDF and ZAF for services may require the use of a written agreement with third party vendors, including but not limited to consultant services.  GLAZA shall review or draft any such written agreements and obtain approval from the Zoo Director prior to their execution.

13

5. All monies remaining in the ZSDF and the ZAF upon the termination of this Agreement shall be transferred by GLAZA to the Department for deposit into the ZETF within 90 days after termination.

## SECTION 3.  CONCESSIONS SERVICES

A. GLAZA previously managed concessions services at the Zoo pursuant to an agreement between GLAZA and SSA, Inc. ("GLAZA/SSA Agreement").  Beginning October 1, 2023, the City has assumed GLAZA's rights and responsibilities under the GLAZA/SSA Agreement and will manage all concession services at the Zoo.  GLAZA shall cooperate with the City and provide any information or copies of records related to GLAZA's previous management of concessions services to assist the Department in its current management of concession services at the Zoo.

B. Transfer of Concessions Commission Revenue into ZSDF

1. For the term of this Agreement, the Department will remit to GLAZA 20% of all concessions commission revenue it receives from SSA, on a monthly basis, for deposit into the ZSDF.  Funds in the ZSDF shall be expended only at the direction of the Zoo Director.

C. Special Vending Agreements

1. Under the 1997 Operating Agreement, GLAZA subcontracted with third-party companies to provide and maintain non-food vending machines at the Zoo ("Special Vending Agreements"), and deposited revenue generated from these subcontracts into the ZSDF on a monthly basis, and subject to the terms of each Special Vending Agreement.  Upon execution of this Agreement, GLAZA shall provide copies of any existing Special Vending Agreements to the Zoo Director. GLAZA shall reasonably cooperate in the assignment of these Special Vending Agreements to the Zoo, and shall no longer manage special vending at the Zoo after the agreements have been assigned.

D. Conservation Round Up Program

1. The Conservation Round Up Program allows Zoo customers to round up their purchase total to the nearest dollar at checkout and donate the extra amount for conservation efforts.  SSA collects these donated funds from the Zoo customer-donors.  GLAZA is authorized to directly receive from SSA all funds donated under the Conservation Round Up Program for placement into a restricted account for Zoo conservation purposes.

## SECTION 4.  PERFORMANCE METRICS

The performance metrics for FY 2023-24, attached hereto as Exhibit B and incorporated herein, establish the expectations for GLAZA's delivery of services under this Agreement and shall be used to evaluate GLAZA's performance.  No later than May 1, 2024, the Parties will negotiate in good faith performance metrics to be set forth in writing for the remaining term of the Agreement beyond June 30, 2024. Such metrics will be presented to the Board for review and approval at their regular June 2024 meeting.

14

The performance metrics set forth in this Agreement or later mutually agreed by the Parties in writing, establish the revenue GLAZA is targeted to raise based on the City's and GLAZA's adopted budgets, by which the City will monitor GLAZA's performance of the services under this Agreement.  As required under Section 6 of this Agreement, GLAZA will regularly report to the Zoo Director on the progress of fundraising and related services for the Zoo compared to the performance metrics.

**SECTION 5.  BUDGET, ACCOUNTING, & FISCAL RESPONSIBILITIES**

A.  The Parties acknowledge that, prior to the execution of this Agreement, GLAZA has provided the Zoo Director with GLAZA's annual operating budget for FY 2023-24.  No later than May 1, 2024, GLAZA shall provide the Zoo Director with GLAZA's projected operating budget for the remaining term of the Agreement beyond June 30, 2024, noting that such projected budget shall be subject to the review and approval of the Board at their regular June 2024 meeting. These budgets shall include a detailed breakdown of all projected revenue and direct and indirect expenses, including overhead and administrative expenses.  Upon reasonable request by the Zoo Director, GLAZA shall provide additional information and details related to GLAZA's budgets.

B.  GLAZA is authorized to retain certain funds that it collects on behalf of the City to pay for the direct and indirect costs and expenses incurred in the performance of its responsibilities under this Agreement, only as set forth in this Agreement.  After deducting its authorized costs and expenses, GLAZA shall remit all remaining funds to the Department for deposit in the ZETF, unless otherwise specified in this Agreement.

C.  In collecting and managing funds for the Zoo on behalf of the City, GLAZA shall act as the City's fiduciary and fiscal agent and ensure proper accounting for all funds collected, including any interest earned.  GLAZA shall maintain a method of accounting in compliance with generally acceptable accounting principles.  All documents, books, and accounting records for Zoo funds held by GLAZA shall be open for inspection by the City upon request and with reasonable prior notice, at any reasonable time during the term of the Agreement.

D.  GLAZA shall inform the Zoo Director of any expenditures that will, or are reasonably expected to, result in a variance equal to or greater than 10 percent of the budgeted expense categories in GLAZA's FY 2023-24 budget and any subsequent approved budget for the remaining term of this Agreement.

E.  No lobbying or legal costs incurred by GLAZA may be included in GLAZA's expenses, direct or indirect, nor are they authorized for reimbursement or compensation under Section 2 of this Agreement, unless the costs are itemized and would be an appropriate expenditure of City resources for the benefit of the Zoo, as reasonably determined and approved by the Zoo Director and City Attorney.  For the avoidance of doubt, legal costs incurred by GLAZA in connection with its operations and activities in the performance of the terms of this Agreement that are for the benefit of the Zoo are hereby deemed an appropriate expenditure, provided such costs are itemized and not for actions against the City.

**SECTION 6.  REPORTING REQUIREMENTS; TRANSPARENCY & ACCOUNTABILITY**

A.  GLAZA agrees to reasonable oversight by the City of its performance under this Agreement to ensure transparency and accountability.

15

B. GLAZA shall provide the Department with a quarterly report on the status of its services compared to the performance metrics established under Section 4 of this Agreement, including an explanation for any deviations from expectations and plans to achieve performance metric targets by the end of FY 2023-24 and the end of the remaining term of the Agreement.

C. GLAZA shall provide the Department with monthly detailed financial reports on all funds raised for the benefit of the Zoo under GLAZA's control, as well as budgets versus actuals relative to Zoo revenue and expenditures made for the benefit of the Zoo.  These reports shall provide an explanation of any deviations from expectations and plans to achieve targets by the end of FY 2023-24 and the end of the remaining term of this Agreement. These reports shall also provide the status of the Zoo's Endowment Fund, including any investments or expenditures therefrom.

D. The Zoo Director may request additional reports and information reasonably necessary to evaluate GLAZA's performance and the status of the programs and related services provided under this Agreement, including the status of Zoo funds under GLAZA's control. GLAZA shall cooperate with the Zoo Director to provide these reports and information upon reasonable request.

E. GLAZA shall have its books and records audited annually by an independent accounting firm reasonably acceptable to the City at GLAZA's expense.  GLAZA will provide the City with the annual audited financial report.

## SECTION 7.  DATA PROTECTION

A. The City represents, covenants, and warrants that it shall collect, use, disclose, transfer, or otherwise process all Donor Data, Member Data, Volunteer Data, Sponsorship Data, and Customer Data (collectively, the "Data") received by the City, including the Department, from GLAZA or GLAZA's agents pursuant to the terms of this Agreement only in compliance with applicable law and with the City's privacy policies.

B. The City represents, covenants, and warrants that the City has industry standard data security policies, procedures, and software in place to protect and secure the Data. The City shall protect the Data in a manner no less secure than the manner in which the City protects its own sensitive information.

C. In the event of a security breach affecting the Data solely in the City's possession or control, the City shall (i) notify GLAZA without undue delay; and (ii) be responsible for making any legally required notifications. The City shall not issue press or media statements or comments about such security breach that names or otherwise identifies, directly or indirectly, GLAZA unless it has obtained GLAZA's prior written consent.

## SECTION 8.  ADMINISTRATIVE OFFICE SPACE & UTILITIES

A. The City will provide GLAZA and its staff rent-free access to the office spaces in what is currently assigned as the GLAZA Administration Building (the "Administrative Office") and associated parking spaces for use in the performance of its responsibilities under this Agreement.

16

B.  GLAZA's use of the Administrative Office shall be in coordination with the Department. GLAZA shall not use nor permit the Administrative Office to be used, in whole or in part, for any purpose other than for the benefit of the Zoo and as set forth in this Agreement except with prior, written consent of the Zoo Director, nor allow any use in violation of any present or future laws, ordinances, rules and regulations relating to sanitation or the public health, safety or welfare of operations at and in connection with the use of the Administrative Office.

C.  The City shall at all times retain possession of the Administrative Office, including absolute and full access to the office during the term of the Agreement, and may make such changes and alterations to the office as may be desired by the City so long as the City provides reasonable advance notice.  GLAZA shall not make any improvements or alterations to the Administrative Office without the Zoo Director's pre-approval.

D.  The City shall pay for all utilities charges associated with GLAZA's use of the Zoo property and Administrative Office, except for GLAZA's telephone and internet services.

E.  Upon expiration or termination of this Agreement, GLAZA shall have 60 days to cease all use of, and operations at, the Zoo, peaceably, quietly, and in as good order and condition as the same now are or may be hereafter improved by GLAZA or the City, normal use and wear and tear thereof excepted.  Any improvements to the Administrative Office made by GLAZA shall become property of the City upon termination of this Agreement.

**SECTION 9.  ADMINISTRATION OF THE ZOO & COORDINATION WITH GLAZA**

A.  The Zoo Director shall be exclusively responsible for the administration and management of the Department and the Zoo property.

B.  The GLAZA President shall serve as the primary liaison between the Department and GLAZA.  The GLAZA President shall be in frequent communication with the Zoo Director regarding the performance of GLAZA's services under this Agreement and to enhance coordination between the Department and GLAZA.  The Zoo Director shall be invited to attend all regular meetings of the GLAZA Board and may be invited to other Board meetings in the Board's sole discretion. For the avoidance of doubt, the Zoo Director shall not be entitled to attend any executive session of any GLAZA Board meeting unless invited in the Board's sole discretion.

C.  The Department and GLAZA agree to encourage cooperation and open communication between the Department's staff and GLAZA's staff.  However, in no event will the Department's staff report to, be treated as, or be supervised by GLAZA employees, and in no event will GLAZA's staff report to, be treated as, or be supervised by Department employees.

D.  GLAZA shall not speak or act on behalf of the Department or City without prior written approval of the Zoo Director, other than in the performance of GLAZA's services in connection with the Zoo's Marketing and Public Relations program, as contemplated by this Agreement.  This includes communications with local, state, or federal officials. GLAZA shall not hold itself out to be the Department or City or operate in a manner that gives that impression.

17

E.  The GLAZA President, or other designated GLAZA staff, shall attend the monthly Zoo Commission meetings and provide public reports regarding the status of Zoo attendance, membership, fundraising, marketing, and any other reasonable, public information requested by the Zoo Commission or the Zoo Director.

F.  The City will provide GLAZA reasonable access to the Zoo property for the performance of the services under this Agreement.   GLAZA's use of the Zoo property shall be in coordination with the Department.   GLAZA shall not use or permit the Zoo property to be used, in whole or in part, for any other purpose other than as set forth in this Agreement except with prior, written consent of the Zoo Director, nor allow any use in violation of any present or future laws, ordinances, rules and regulations relating to sanitation or the public health, safety or welfare of operations at and in connection with the use of the Zoo Property.

G.  In providing the services under this Agreement, GLAZA shall coordinate with the Zoo Director to ensure minimal impact on animal welfare and the Zoo's daily operations.

**SECTION 10.  LIMITED LICENSE TO USE CITY INTELLECTUAL PROPERTY**

A.  The names "Los Angeles Zoo and Botanical Gardens" and "Los Angeles Zoo," and the logo of the Los Angeles Zoo, are trademarks of the City of Los Angeles ("Trademarks"). The City grants GLAZA a limited, royalty-free, non-exclusive license to use the Trademarks for the purposes of performing the services set forth in this Agreement.   Any other use of the Trademarks is prohibited, unless pre-approved in writing by the Zoo Director.   GLAZA shall not authorize any third party to use the Trademarks without pre-approval in writing by the Zoo Director.

B.  Use of the Trademarks without written permission may constitute trademark infringement and unfair competition in violation of federal and state law. Except as permitted in this Agreement, GLAZA may not:

1.  Use the Trademarks in connection with any products or services unrelated to this Agreement.

2.  Use any trademarks confusingly similar to the Trademarks in connection with any products or services unrelated to this Agreement.

3.  Create or maintain a website, unrelated to this Agreement, using a domain name confusingly similar to the Trademarks, or including the words "Los Angeles Zoo and Botanical Gardens" and "Los Angeles Zoo" other than in the proper use of GLAZA's full legal name.

4.  Register or attempt to register the Trademarks or any marks confusingly similar to them.

5.  Challenge or dispute City's ownership of and rights to the Trademarks and the validity of any of City's registrations or applications for the Trademarks.

18

**SECTION 11.  TRANSITION TO NEW CONTRACTOR SELECTED BY RFP**

GLAZA understands that the City is entering into this Agreement on an interim basis while the City conducts a competitive bidding process to select a new contractor for the long-term management of Zoo support programs and related services.  If GLAZA is not the contractor selected to perform these services after the expiration of this Agreement, GLAZA shall cooperate and coordinate with the City and the newly selected contractor to ensure a smooth transition of services.  This shall include providing information and records reasonably related to the services GLAZA has provided for the City under this Agreement and the 1997 Operating Agreement.

**SECTION 12.  TERMINATION**

A.  If this Agreement is terminated or otherwise expires with no extension or successor agreement in place between the Parties, GLAZA may continue pay any outstanding debts, expenses, or obligations incurred during the term of this Agreement, so long as the debts, expenses, or obligations incurred, and the use of funds to pay those debts, expenses, or obligations, are otherwise permitted by this Agreement.

B.  Nothing in this Agreement shall constitute a waiver of the rights of the Parties with regard to any funds or data held by GLAZA.

**SECTION 13.  GLAZA DISSOLUTION**

In the event of GLAZA's dissolution, the City shall cooperate in the assignment or termination of all outstanding agreements or contracts entered into by GLAZA on behalf of the Zoo, all debts and obligations incurred by GLAZA in its operations shall be discharged from funds held by GLAZA for the benefit of the Zoo, and all monies remaining in GLAZA funds and accounts for the specific benefit of the Zoo shall be paid over in full to the City, subject to all applicable laws and regulations.

**SECTION 14.  RATIFICATION**

Due to the need for GLAZA's services to be provided continuously on an ongoing basis, GLAZA has provided services prior to the execution of this Agreement.  To the extent that said services were performed in accordance with the terms and conditions of this Agreement, those services are hereby ratified.

**SECTION 15.  INCORPORATION OF THE CITY'S STANDARD CONTRACT PROVISIONS**

The City's Standard Provisions for City Contracts (Rev. 9/22) [v.1], attached hereto as Exhibit A, are incorporated into and made a part of this Agreement by reference.

**SECTION 16.  NOTICES**

A.  Unless otherwise stated in the Agreement, written notices to the Parties shall be addressed to:

For the City:

>   Denise Verret, Zoo Director
>   City of Los Angeles, Department of the Zoo

19

5333 Zoo Drive
Los Angeles, CA 90027

and to

Office of the City Attorney
General Counsel Division
200 N. Main Street, 700 City Hall East
Los Angeles, CA 90019

For GLAZA:

Dawn Petersen-Amend, Interim President
Greater Los Angeles Zoo Association
5333 Zoo Drive
Los Angeles, CA 90027

B. All such notices may either be delivered personally or may be deposited in the United States mail, properly addressed as aforesaid with postage fully prepaid for delivery by registered or certified mail. Service in such manner by registered or certified mail shall be effective upon receipt.

C. If the name of the person designated to receive the notices, demands, or communications or the address of such person is changed, written notice must be provided as described in this Agreement within five (5) business days of such change.

## SECTION 17.  INCORPORATION OF DOCUMENTS

This Agreement and incorporated documents represent the entire integrated Agreement of the Parties and supersedes all prior written or oral representations, discussions, and agreements. The following Exhibits are attached to, incorporated in, and made part of this Agreement by reference:

Exhibit A – City's Standard Provisions for City Contracts (Rev. 9/22) [v.1]
Exhibit B – GLAZA Performance Metrics
Exhibit C – Zoo Membership Program Levels, Rates, & Benefits

In the event of any inconsistency between any of the provisions of this Agreement and/or exhibits attached hereto, the inconsistency shall be resolved by giving precedence in the following order: (1) This Agreement exclusive of attachments, (2) Exhibit A, (3) Exhibit B, and (4) Exhibit C.

(Signature Page to Follow)

20

IN WITNESS WHEREOF, the City of Los Angeles has caused this Agreement to be executed on its behalf by its duly authorized General Manager of the Department of the Zoo, and GLAZA has executed the same as of the day and year herein below written.

THE CITY OF LOS ANGELES, by and through the Department of the Zoo

By signing below, the signatory attests that they have no personal, financial, beneficial, or familial interest in this contract.

By _____
DENISE VERRET
Zoo Director
Date: 05/30/2024

APPROVED AS TO FORM:
HYDEE FELDSTEIN SOTO, City Attorney

By _____
STEVE R. HOUCHIN
Deputy City Attorney
Date: 5/30/24

ATTEST:
HOLLY WOLCOTT, City Clerk

By _____
Deputy City Clerk

Date: May 30, 2024

GREATER LOS ANGELES ZOO ASSOCIATION

By _____
DAWN PETERSEN-AMEND
Interim President

Date: 29 May 2024

Second Signature:

By _____
ERIKA ARONSON STERN
Chair, GLAZA Board of Trustees

Date: 29 May 2024

0000038894-0001-2

Business Tax Registration Certificate Number: _____

Internal Revenue Service Taxpayer Identification Number: _____

Agreement Number: C-145438

21

# EXHIBIT 2

**ATTACHMENT A**

Standard Provisions for City Contracts (Rev. 9/22) [v.1]

## STANDARD PROVISIONS FOR CITY CONTRACTS

## <u>TABLE OF CONTENTS</u>

**PSC-1**     <u>Construction of Provisions and Titles Herein</u>.................................................**1**

**PSC-2**     <u>Applicable Law, Interpretation and Enforcement</u>.............................................**1**

**PSC-3**     <u>Time of Effectiveness</u>.................................................................................**1**

**PSC-4**     <u>Integrated Contract</u> ..................................................................................**2**

**PSC-5**     <u>Amendment</u> ...............................................................................................**2**

**PSC-6**     <u>Excusable Delays</u>.......................................................................................**2**

**PSC-7**     <u>Waiver</u> ......................................................................................................**2**

**PSC-8**     <u>Suspension</u> ...............................................................................................**3**

**PSC-9**     <u>Termination</u> ...............................................................................................**3**

**PSC-10**    <u>Independent Contractor</u> .............................................................................**5**

**PSC-11**    <u>Contractor's Personnel</u>..............................................................................**5**

**PSC-12**    <u>Assignment and Delegation</u> ........................................................................**6**

**PSC-13**    <u>Permits</u>.....................................................................................................**6**

**PSC-14**    <u>Claims for Labor and Materials</u> ..................................................................**6**

**PSC-15**    <u>Current Los Angeles City Business Tax Registration Certificate Required</u> ....**6**

**PSC-16**    <u>Retention of Records, Audit and Reports</u>.....................................................**6**

**PSC-17**    <u>Bonds</u>.......................................................................................................**7**

**PSC-18**    <u>Indemnification</u> .........................................................................................**7**

**PSC-19**    <u>Intellectual Property Indemnification</u> ...........................................................**7**

**PSC-20**    <u>Intellectual Property Warranty</u> ....................................................................**8**

**PSC-21**    <u>Ownership and License</u>...............................................................................**8**

**PSC-22**    <u>Data Protection</u> .........................................................................................**9**

**TABLE OF CONTENTS (Continued)**

PSC-23   Insurance ................................................................................ 9

PSC-24   Best Terms................................................................................. 9

PSC-25   Warranty and Responsibility of Contractor ................................. 10

PSC-26   Mandatory Provisions Pertaining to Non-Discrimination in Employment ...... 10

PSC-27   Child Support Assignment Orders................................................ 10

PSC-28   Living Wage Ordinance .............................................................. 11

PSC-29   Service Contractor Worker Retention Ordinance ......................... 11

PSC-30   Access and Accommodations ..................................................... 11

PSC-31   Contractor Responsibility Ordinance........................................... 12

PSC-32   Business Inclusion Program ....................................................... 12

PSC-33   Slavery Disclosure Ordinance .................................................... 12

PSC-34   First Source Hiring Ordinance .................................................... 12

PSC-35   Local Business Preference Ordinance ......................................... 12

PSC-36   Iran Contracting Act .................................................................. 12

PSC-37   Restrictions on Campaign Contributions in City Elections............ 12

PSC-38    Contractors' Use of Criminal History for Consideration of Employment Applications ........................................................................ 13

PSC-39    Limitation of City's Obligation to Make Payment to Contractor .... 13

PSC-40   Compliance with Identity Theft Laws and Payment Card Data Security Standards ......................................................................... 14

PSC-41   Compliance with California Public Resources Code Section 5164 .............. 14

PSC-42   Possessory Interests Tax ........................................................... 14

PSC-43   Confidentiality............................................................................ 15

PSC-44   COVID-19 .................................................................................. 15

PSC-45   Contractor Data Reporting…………………………………………….... 15

ii

**Exhibit 1**  Insurance Contractual Requirements ............................................................. **16**

**STANDARD PROVISIONS FOR CITY CONTRACTS**

**PSC-1.** Construction of Provisions and Titles Herein

All titles, subtitles, or headings in this Contract have been inserted for convenience, and shall not be deemed to affect the meaning or construction of any of the terms or provisions of this Contract. The language of this Contract shall be construed according to its fair meaning and not strictly for or against **CITY** or **CONTRACTOR**. The word "**CONTRACTOR**" includes the party or parties identified in this Contract. The singular shall include the plural and if there is more than one **CONTRACTOR**, unless expressly stated otherwise, their obligations and liabilities shall be joint and several. Use of the feminine, masculine, or neuter genders shall be deemed to include the genders not used.

**PSC-2.** Applicable Law, Interpretation and Enforcement

Each party's performance shall comply with all applicable laws of the United States of America, the State of California, and **CITY**, including but not limited to, laws regarding health and safety, labor and employment, wage and hours and licensing. This Contract shall be enforced and interpreted under the laws of the State of California without regard to conflict of law principles. **CONTRACTOR** shall comply with new, amended, or revised laws, regulations, or procedures that apply to the performance of this Contract with no additional compensation paid to **CONTRACTOR**.

In any action arising out of this Contract, **CONTRACTOR** consents to personal jurisdiction, and agrees to bring all such actions, exclusively in state or federal courts located in Los Angeles County, California.

If any part, term or provision of this Contract is held void, illegal, unenforceable, or in conflict with any federal, state or local law or regulation, the validity of the remaining parts, terms or provisions of this Contract shall not be affected.

**PSC-3.** Time of Effectiveness

Unless otherwise provided, this Contract shall take effect when all of the following events have occurred:

A.    This Contract has been signed on behalf of **CONTRACTOR** by the person or persons authorized to bind **CONTRACTOR**;

B.    This Contract has been approved by the City Council or by the board, officer or employee authorized to give such approval;

C.    The Office of the City Attorney has indicated in writing its approval of this Contract as to form; and

D.    This Contract has been signed on behalf of **CITY** by the person designated by the City Council, or by the board, officer or employee authorized to enter into this Contract.

**STANDARD PROVISIONS**
**FOR CITY CONTRACTS (Rev. 9/22) [v.1]**           1                    **ATTACHMENT A**

**PSC-4.** Integrated Contract

This Contract sets forth all of the rights and duties of the parties with respect to the subject matter of this Contract, and replaces any and all previous Contracts or understandings, whether written or oral, relating thereto.  This Contract may be amended only as provided for in the provisions of PSC-5 hereof.

**PSC-5.** Amendment

All amendments to this Contract shall be in writing and signed and approved pursuant to the provisions of PSC-3.

**PSC-6.** Excusable Delays

Neither party shall be liable for its delay or failure to perform any obligation under and in accordance with this Contract, if the delay or failure arises out of fires, floods, earthquakes, epidemics, quarantine restrictions, other natural occurrences, strikes, lockouts (other than a lockout by the party or any of the party's Subcontractors), freight embargoes, terrorist acts, insurrections or other civil disturbances, or other similar events to those described above, but in each case the delay or failure to perform must be beyond the control and without any fault or negligence of the party delayed or failing to perform (these events are referred to in this provision as "Force Majeure Events").

Notwithstanding the foregoing, a delay or failure to perform by a Subcontractor of **CONTRACTOR** shall not constitute a Force Majeure Event, unless the delay or failure arises out of causes beyond the control of both **CONTRACTOR** and Subcontractor, and without any fault or negligence of either of them. In such case, **CONTRACTOR** shall not be liable for the delay or failure to perform, unless the goods or services to be furnished by the Subcontractor were obtainable from other sources in sufficient time to permit **CONTRACTOR** to perform timely. As used in this Contract, the term "Subcontractor" means a subcontractor at any tier.

In the event **CONTRACTOR'S** delay or failure to perform arises out of a Force Majeure Event, **CONTRACTOR** agrees to use commercially reasonable best efforts to obtain the goods or services from other sources, and to otherwise mitigate the damages and reduce the delay caused by the Force Majeure Event.

**PSC-7.** Waiver

A waiver of a default of any part, term or provision of this Contract shall not be construed as a waiver of any succeeding default or as a waiver of the part, term or provision itself. A party's performance after the other party's default shall not be construed as a waiver of that default.

**PSC-8.** <u>Suspension</u>

At **CITY'S** sole discretion, **CITY** may suspend any or all services provided under this Contract by providing **CONTRACTOR** with written notice of suspension. Upon receipt of the notice of suspension, **CONTRACTOR** shall immediately cease the services suspended and shall not incur any additional obligations, costs or expenses to **CITY** until **CITY** gives written notice to recommence the services.

**PSC-9.** <u>Termination</u>

A.   Termination for Convenience

**CITY** may terminate this Contract for **CITY'S** convenience at any time by providing **CONTRACTOR** thirty days written notice. Upon receipt of the notice of termination, **CONTRACTOR** shall immediately take action not to incur any additional obligations, costs or expenses, except as may be necessary to terminate its activities. **CITY** shall pay **CONTRACTOR** its reasonable and allowable costs through the effective date of termination and those reasonable and necessary costs incurred by **CONTRACTOR** to effect the termination. Thereafter, **CONTRACTOR** shall have no further claims against **CITY** under this Contract. All finished and unfinished documents and materials procured for or produced under this Contract, including all intellectual property rights **CITY** is entitled to, shall become **CITY** property upon the date of the termination. **CONTRACTOR** agrees to execute any documents necessary for **CITY** to perfect, memorialize, or record **CITY'S** ownership of rights provided herein.

B.   Termination for Breach of Contract

1.   Except as provided in PSC-6, if **CONTRACTOR** fails to perform any of the provisions of this Contract or so fails to make progress as to endanger timely performance of this Contract, **CITY** may give **CONTRACTOR** written notice of the default. **CITY'S** default notice will indicate whether the default may be cured and the time period to cure the default to the sole satisfaction of **CITY**. Additionally, **CITY'S** default notice may offer **CONTRACTOR** an opportunity to provide **CITY** with a plan to cure the default, which shall be submitted to **CITY** within the time period allowed by **CITY**. At **CITY'S** sole discretion, **CITY** may accept or reject **CONTRACTOR'S** plan. If the default cannot be cured or if **CONTRACTOR** fails to cure within the period allowed by **CITY**, then **CITY** may terminate this Contract due to **CONTRACTOR'S** breach of this Contract.

2.   If the default under this Contract is due to **CONTRACTOR'S** failure to maintain the insurance required under this Contract, **CONTRACTOR** shall immediately: (1) suspend performance of any services under this Contract for which insurance was required; and (2) notify its employees and Subcontractors of the loss of insurance coverage and Contractor's obligation to suspend performance of

**STANDARD PROVISIONS**
**FOR CITY CONTRACTS (Rev. 9/22) [v.1]**      **3**                    **ATTACHMENT A**

services. **CONTRACTOR** shall not recommence performance until **CONTRACTOR** is fully insured and in compliance with **CITY'S** requirements.

3. If a federal or state proceeding for relief of debtors is undertaken by or against **CONTRACTOR**, or if **CONTRACTOR** makes an assignment for the benefit of creditors, then **CITY** may immediately terminate this Contract.

4. If **CONTRACTOR** engages in any dishonest conduct related to the performance or administration of this Contract or violates **CITY'S** laws, regulations or policies relating to lobbying, then **CITY** may immediately terminate this Contract.

5. Acts of Moral Turpitude

   a. **CONTRACTOR** shall immediately notify **CITY** if **CONTRACTOR** or any Key Person, as defined below, is charged with, indicted for, convicted of, pleads nolo contendere to, or forfeits bail or fails to appear in court for a hearing related to, any act which constitutes an offense involving moral turpitude under federal, state, or local laws ("Act of Moral Turpitude").

   b. If **CONTRACTOR** or a Key Person is convicted of, pleads nolo contendere to, or forfeits bail or fails to appear in court for a hearing related to, an Act of Moral Turpitude, **CITY** may immediately terminate this Contract.

   c. If **CONTRACTOR** or a Key Person is charged with or indicted for an Act of Moral Turpitude, **CITY** may terminate this Contract after providing **CONTRACTOR** an opportunity to present evidence of **CONTRACTOR'S** ability to perform under the terms of this Contract.

   d. Acts of Moral Turpitude include, but are not limited to: violent felonies as defined by Penal Code Section 667.5, crimes involving weapons, crimes resulting in serious bodily injury or death, serious felonies as defined by Penal Code Section 1192.7, and those crimes referenced in the Penal Code and articulated in California Public Resources Code Section 5164(a)(2); in addition to and including acts of murder, rape, sexual assault, robbery, kidnapping, human trafficking, pimping, voluntary manslaughter, aggravated assault, assault on a peace officer, mayhem, fraud, domestic abuse, elderly abuse, and child abuse, regardless of whether such acts are punishable by felony or misdemeanor conviction.

e.     For the purposes of this provision, a Key Person is a principal, officer, or employee assigned to this Contract, or owner (directly or indirectly, through one or more intermediaries) of ten percent or more of the voting power or equity interests of **CONTRACTOR**.

6.     In the event **CITY** terminates this Contract as provided in this section, **CITY** may procure, upon such terms and in the manner as **CITY** may deem appropriate, services similar in scope and level of effort to those so terminated, and **CONTRACTOR** shall be liable to **CITY** for all of its costs and damages, including, but not limited to, any excess costs for such services.

7.     If, after notice of termination of this Contract under the provisions of this section, it is determined for any reason that **CONTRACTOR** was not in default under the provisions of this section, or that the default was excusable under the terms of this Contract, the rights and obligations of the parties shall be the same as if the notice of termination had been issued pursuant to PSC-9(A) Termination for Convenience.

8.     The rights and remedies of **CITY** provided in this section shall not be exclusive and are in addition to any other rights and remedies provided by law or under this Contract.

C.     In the event that this Contract is terminated, **CONTRACTOR** shall immediately notify all employees and Subcontractors, and shall notify in writing all other parties contracted with under the terms of this Contract within five working days of the termination.

**PSC-10.** Independent Contractor

**CONTRACTOR** is an independent contractor and not an agent or employee of **CITY**. **CONTRACTOR** shall not represent or otherwise hold out itself or any of its directors, officers, partners, employees, or agents to be an agent or employee of **CITY**.

**PSC-11.** Contractor's Personnel

Unless otherwise approved by **CITY**, **CONTRACTOR** shall use its own employees to perform the services described in this Contract.  **CITY** has the right to review and approve any personnel who are assigned to work under this Contract. **CONTRACTOR** shall remove personnel from performing work under this Contract if requested to do so by **CITY**.

**CONTRACTOR** shall not use Subcontractors to assist in performance of this Contract without the prior written approval of **CITY**. If **CITY** permits the use of Subcontractors, **CONTRACTOR** shall remain responsible for performing all aspects of this Contract and paying all Subcontractors. **CITY** has the right to approve **CONTRACTOR'S** Subcontractors, and **CITY** reserves the right to request replacement of any

**STANDARD PROVISIONS**
**FOR CITY CONTRACTS (Rev. 9/22) [v.1]**          **5**                              **ATTACHMENT A**

Subcontractor. **CITY** does not have any obligation to pay **CONTRACTOR'S** Subcontractors, and nothing herein creates any privity of contract between **CITY** and any Subcontractor.

**PSC-12.** Assignment and Delegation

**CONTRACTOR** may not, unless it has first obtained the written permission of **CITY**:

    A.    Assign or otherwise alienate any of its rights under this Contract, including the right to payment; or

    B.    Delegate, subcontract, or otherwise transfer any of its duties under this Contract.

**PSC-13.** Permits

**CONTRACTOR** and its directors, officers, partners, agents, employees, and Subcontractors, shall obtain and maintain all licenses, permits, certifications and other documents necessary for **CONTRACTOR'S** performance of this Contract. **CONTRACTOR** shall immediately notify **CITY** of any suspension, termination, lapses, non-renewals, or restrictions of licenses, permits, certificates, or other documents that relate to **CONTRACTOR'S** performance of this Contract.

**PSC-14.** Claims for Labor and Materials

**CONTRACTOR** shall promptly pay when due all amounts owed for labor and materials furnished in the performance of this Contract so as to prevent any lien or other claim under any provision of law from arising against any **CITY** property (including reports, documents, and other tangible or intangible matter produced by **CONTRACTOR** hereunder), and shall pay all amounts due under the Unemployment Insurance Act or any other applicable law with respect to labor used to perform under this Contract.

**PSC-15.** Current Los Angeles City Business Tax Registration Certificate Required

For the duration of this Contract, **CONTRACTOR** shall maintain valid Business Tax Registration Certificate(s) as required by **CITY'S** Business Tax Ordinance, Section 21.00 *et seq.* of the Los Angeles Municipal Code ("LAMC"), and shall not allow the Certificate to lapse or be revoked or suspended.

**PSC-16.** Retention of Records, Audit and Reports

**CONTRACTOR** shall maintain all records, including records of financial transactions, pertaining to the performance of this Contract, in their original form or as otherwise approved by **CITY**. These records shall be retained for a period of no less than three years from the later of the following: (1) final payment made by **CITY**, (2) the expiration of this Contract or (3) termination of this Contract. The records will be subject to examination and audit by authorized **CITY** personnel or **CITY'S** representatives at any time. **CONTRACTOR** shall provide any reports requested by **CITY** regarding

**STANDARD PROVISIONS**
**FOR CITY CONTRACTS (Rev. 9/22) [v.1]**      **6**      **ATTACHMENT A**

performance of this Contract. Any subcontract entered into by **CONTRACTOR** for work to be performed under this Contract must include an identical provision.

In lieu of retaining the records for the term as prescribed in this provision, **CONTRACTOR** may, upon **CITY'S** written approval, submit the required information to **CITY** in an electronic format, e.g. USB flash drive, at the expiration or termination of this Contract.

**PSC-17.** Bonds

All bonds required by **CITY** shall be filed with the Office of the City Administrative Officer, Risk Management for its review and acceptance in accordance with Los Angeles Administrative Code ("LAAC") Sections 11.47 *et seq.*, as amended from to time.

**PSC-18.** Indemnification

Except for the active negligence or willful misconduct of **CITY**, or any of its boards, officers, agents, employees, assigns and successors in interest, **CONTRACTOR** shall defend, indemnify and hold harmless **CITY** and any of its boards, officers, agents, employees, assigns, and successors in interest from and against all lawsuits and causes of action, claims, losses, demands and expenses, including, but not limited to, attorney's fees (both in house and outside counsel) and cost of litigation (including all actual litigation costs incurred by **CITY**, including but not limited to, costs of experts and consultants), damages or liability of any nature whatsoever, for death or injury to any person, including **CONTRACTOR'S** employees and agents, or damage or destruction of any property of either party hereto or of third parties, arising in any manner by reason of an act, error, or omission by **CONTRACTOR,** Subcontractors, or their boards, officers, agents, employees, assigns, and successors in interest. The rights and remedies of **CITY** provided in this section shall not be exclusive and are in addition to any other rights and remedies provided by law or under this Contract. This provision will survive expiration or termination of this Contract.

**PSC-19.** Intellectual Property Indemnification

**CONTRACTOR**, at its own expense, shall defend, indemnify, and hold harmless the **CITY**, and any of its boards, officers, agents, employees, assigns, and successors in interest from and against all lawsuits and causes of action, claims, losses, demands and expenses, including, but not limited to, attorney's fees (both in house and outside counsel) and cost of litigation (including all actual litigation costs incurred by **CITY**, including but not limited to, costs of experts and consultants), damages or liability of any nature arising out of the infringement, actual or alleged, direct or contributory, of any intellectual property rights, including, without limitation, patent, copyright, trademark, trade secret, right of publicity, and proprietary information: (1) on or in any design, medium, matter, article, process, method, application, equipment, device, instrumentation, software, hardware, or firmware used by **CONTRACTOR**, or its Subcontractors, in performing the work under this Contract; or (2) as a result of **CITY'S** actual or intended use of any Work Product (as defined in PSC-21) furnished by **CONTRACTOR**, or its Subcontractors, under this Contract. The rights and remedies of **CITY** provided in this section shall not be exclusive

**STANDARD PROVISIONS**
**FOR CITY CONTRACTS (Rev. 9/22) [v.1]**          **7**                    **ATTACHMENT A**

and are in addition to any other rights and remedies provided by law or under this Contract. This provision will survive expiration or termination of this Contract.

**PSC-20.** Intellectual Property Warranty

**CONTRACTOR** represents and warrants that its performance of all obligations under this Contract does not infringe in any way, directly or contributorily, upon any third party's intellectual property rights, including, without limitation, patent, copyright, trademark, trade secret, right of publicity and proprietary information.

**PSC-21.** Ownership and License

Unless otherwise provided for herein, all finished and unfinished works, tangible or not, created under this Contract including, without limitation, documents, materials, data, reports, manuals, specifications, artwork, drawings, sketches, blueprints, studies, memoranda, computation sheets, computer programs and databases, schematics, photographs, video and audiovisual recordings, sound recordings, marks, logos, graphic designs, notes, websites, domain names, inventions, processes, formulas, matters and combinations thereof, and all forms of intellectual property originated and prepared by **CONTRACTOR** or its Subcontractors under this Contract (each a "Work Product"; collectively "Work Products") shall be and remain the exclusive property of **CITY** for its use in any manner **CITY** deems appropriate. **CONTRACTOR** hereby assigns to **CITY** all goodwill, copyright, trademark, patent, trade secret and all other intellectual property rights worldwide in any Work Products originated and prepared under this Contract. **CONTRACTOR** further agrees to execute any documents necessary for **CITY** toperfect, memorialize, or record **CITY'S** ownership of rights provided herein.

**CONTRACTOR** agrees that a monetary remedy for breach of this Contract may be inadequate, impracticable, or difficult to prove and that a breach may cause **CITY** irreparable harm. **CITY** may therefore enforce this requirement by seeking injunctive relief and specific performance, without any necessity of showing actual damage or irreparable harm. Seeking injunctive relief or specific performance does not preclude **CITY** from seeking or obtaining any other relief to which **CITY** may be entitled.

For all Work Products delivered to **CITY** that are not originated or prepared by **CONTRACTOR** or its Subcontractors under this Contract, **CONTRACTOR** shall secure a grant, at no cost to **CITY**, for a non-exclusive perpetual license to use such Work Products for any **CITY** purposes.

**CONTRACTOR** shall not provide or disclose any Work Product to any third party without prior written consent of **CITY**.

Any subcontract entered into by **CONTRACTOR** relating to this Contract shall include this provision to contractually bind its Subcontractors performing work under this Contract such that **CITY'S** ownership and license rights of all Work Products are preserved and protected as intended herein.

**STANDARD PROVISIONS**
**FOR CITY CONTRACTS (Rev. 9/22) [v.1]**      **8**                          **ATTACHMENT A**

**PSC-22.**    <u>Data Protection</u>

      A.      **CONTRACTOR** shall protect, using the most secure means and technology that is commercially available, **CITY**-provided data or consumer-provided data acquired in the course and scope of this Contract, including but not limited to customer lists and customer credit card or consumer data, (collectively, the "City Data"). **CONTRACTOR** shall notify **CITY** in writing as soon as reasonably feasible, and in any event within twenty-four hours, of **CONTRACTOR'S** discovery or reasonable belief of any unauthorized access of City Data (a "Data Breach"), or of any incident affecting, or potentially affecting City Data related to cyber security (a "Security Incident"), including, but not limited to, denial of service attack, and system outage, instability or degradation due to computer malware or virus. **CONTRACTOR** shall begin remediation immediately. **CONTRACTOR** shall provide daily updates, or more frequently if required by **CITY**, regarding findings and actions performed by **CONTRACTOR** until the Data Breach or Security Incident has been effectively resolved to **CITY'S** satisfaction. **CONTRACTOR** shall conduct an investigation of the Data Breach or Security Incident and shall share the report of the investigation with **CITY**. At **CITY'S** sole discretion, **CITY** and its authorized agents shall have the right to lead or participate in the investigation. **CONTRACTOR** shall cooperate fully with **CITY**, its agents and law enforcement.

      B.      If **CITY** is subject to liability for any Data Breach or Security Incident, then **CONTRACTOR** shall fully indemnify and hold harmless **CITY** and defend against any resulting actions.

**PSC-23.**    <u>Insurance</u>

During the term of this Contract and without limiting **CONTRACTOR'S** obligation to indemnify, hold harmless and defend **CITY**, **CONTRACTOR** shall provide and maintain at its own expense a program of insurance having the coverages and limits not less than the required amounts and types as determined by the Office of the City Administrative Officer of Los Angeles, Risk Management (template Form General 146 in Exhibit 1 hereto). The insurance must: (1) conform to **CITY'S** requirements; (2) comply with the Insurance Contractual Requirements (Form General 133 in Exhibit 1 hereto); and (3) otherwise be in a form acceptable to the Office of the City Administrative Officer, Risk Management. **CONTRACTOR** shall comply with all Insurance Contractual Requirements shown on Exhibit 1 hereto. Exhibit 1 is hereby incorporated by reference and made a part of this Contract.

**PSC-24.** <u>Best Terms</u>

Throughout the term of this Contract, **CONTRACTOR**, shall offer **CITY** the best terms, prices, and discounts that are offered to any of **CONTRACTOR'S** customers for similar goods and services provided under this Contract.

**STANDARD PROVISIONS**
**FOR CITY CONTRACTS (Rev. 9/22) [v.1]**      **9**      **ATTACHMENT A**

**PSC-25.** Warranty and Responsibility of Contractor

**CONTRACTOR** warrants that the work performed hereunder shall be completed in a manner consistent with professional standards practiced among those firms within **CONTRACTOR'S** profession, doing the same or similar work under the same or similar circumstances.

**PSC-26.** Mandatory Provisions Pertaining to Non-Discrimination in Employment

Unless otherwise exempt, this Contract is subject to the applicable non-discrimination, equal benefits, equal employment practices, and affirmative action program provisions in LAAC Section 10.8 et seq., as amended from time to time.

A.  **CONTRACTOR** shall comply with the applicable non-discrimination and affirmative action provisions of the laws of the United States of America, the State of California, and **CITY**. In performing this Contract, **CONTRACTOR** shall not discriminate in any of its hiring or employment practices against any employee or applicant for employment because of such person's race, color, religion, national origin, ancestry, sex, sexual orientation, gender, gender identity, age, disability, domestic partner status, marital status or medical condition.

B.  The requirements of Section 10.8.2.1 of the LAAC, the Equal Benefits Ordinance, and the provisions of Section 10.8.2.1(f) are incorporated and made a part of this Contract by reference.

C.  The provisions of Section 10.8.3 of the LAAC are incorporated and made a part of this Contract by reference and will be known as the "Equal Employment Practices" provisions of this Contract.

D.  The provisions of Section 10.8.4 of the LAAC are incorporated and made a part of this Contract by reference and will be known as the "Affirmative Action Program" provisions of this Contract.

Any subcontract entered into by **CONTRACTOR** for work to be performed under this Contract must include an identical provision.

**PSC-27.**   Child Support Assignment Orders

**CONTRACTOR** shall comply with the Child Support Assignment Orders Ordinance, Section 10.10 of the LAAC, as amended from time to time. Pursuant to Section 10.10(b) of the LAAC, **CONTRACTOR** shall fully comply with all applicable State and Federal employment reporting requirements. Failure of **CONTRACTOR** to comply with all applicable reporting requirements or to implement lawfully served Wage and Earnings Assignment or Notices of Assignment, or the failure of any principal owner(s) of **CONTRACTOR** to comply with any Wage and Earnings Assignment or Notices of Assignment applicable to them personally, shall constitute a default by the **CONTRACTOR** under this Contract. Failure of **CONTRACTOR** or principal owner to cure

the default within 90 days of the notice of default will subject this Contract to termination for breach. Any subcontract entered into by **CONTRACTOR** for work to be performed under this Contract must include an identical provision.

**PSC-28.** Living Wage Ordinance

**CONTRACTOR** shall comply with the Living Wage Ordinance, LAAC Section 10.37 *et seq.*, as amended from time to time. **CONTRACTOR** further agrees that it shall comply with federal law proscribing retaliation for union organizing. Any subcontract entered into by **CONTRACTOR** for work to be performed under this Contract must include an identical provision.

**PSC-29.** Service Contractor Worker Retention Ordinance

**CONTRACTOR** shall comply with the Service Contractor Worker Retention Ordinance, LAAC Section 10.36 *et seq.*, as amended from time to time.  Any subcontract entered into by **CONTRACTOR** for work to be performed under this Contract must include an identical provision.

**PSC-30.** Access and Accommodations

**CONTRACTOR** represents and certifies that:

A.    **CONTRACTOR** shall comply with the Americans with Disabilities Act, as amended, 42 U.S.C. Section 12101 et seq., the Rehabilitation Act of 1973, as amended, 29 U.S.C. Section 701 et seq., the Fair Housing Act, and its implementing regulations and any subsequent amendments, and California Government Code Section 11135;

B.    **CONTRACTOR** shall not discriminate on the basis of disability or on the basis of a person's relationship to, or association with, a person who has a disability;

C.    **CONTRACTOR** shall provide reasonable accommodation upon request to ensure equal access to **CITY**-funded programs, services and activities;

D.    Construction will be performed in accordance with the Uniform Federal Accessibility Standards (UFAS), 24 C.F.R. Part 40; and

E.    The buildings and facilities used to provide services under this Contract are in compliance with the federal and state standards for accessibility as set forth in the 2010 ADA Standards, California Title 24, Chapter 11, or other applicable federal and state law.

**CONTRACTOR** understands that **CITY** is relying upon these certifications and representations as a condition to funding this Contract. Any subcontract entered into by **CONTRACTOR** for work to be performed under this Contract must include an identical provision.

**STANDARD PROVISIONS**
**FOR CITY CONTRACTS (Rev. 9/22) [v.1]**        11                          **ATTACHMENT A**

**PSC-31.** Contractor Responsibility Ordinance

**CONTRACTOR** shall comply with the Contractor Responsibility Ordinance, LAAC Section 10.40 *et seq.*, as amended from time to time.

**PSC-32.** Business Inclusion Program

Unless otherwise exempted prior to bid submission, **CONTRACTOR** shall comply with all aspects of the Business Inclusion Program as described in the Request for Proposal/Qualification process, throughout the duration of this Contract. **CONTRACTOR** shall utilize the Business Assistance Virtual Network ("BAVN") at https://www.labavn.org/, to perform and document outreach to Minority, Women, and Other Business Enterprises. **CONTRACTOR** shall perform subcontractor outreach activities through BAVN. **CONTRACTOR** shall not change any of its designated Subcontractors or pledged specific items of work to be performed by these Subcontractors, nor shall **CONTRACTOR** reduce their level of effort, without prior written approval of **CITY**.

**PSC-33.** Slavery Disclosure Ordinance

**CONTRACTOR** shall comply with the Slavery Disclosure Ordinance, LAAC Section 10.41 *et seq.*, as amended from time to time. Any subcontract entered into by **CONTRACTOR** for work to be performed under this Contract must include an identical provision.

**PSC-34.** First Source Hiring Ordinance

**CONTRACTOR** shall comply with the First Source Hiring Ordinance, LAAC Section 10.44 *et seq.*, as amended from time to time. Any subcontract entered into by **CONTRACTOR** for work to be performed under this Contract must include an identical provision.

**PSC-35.** Local Business Preference Ordinance

**CONTRACTOR** shall comply with the Local Business Preference Ordinance, LAAC Section 10.47 *et seq.*, as amended from time to time. Any subcontract entered into by **CONTRACTOR** for work to be performed under this Contract must include an identical provision.

**PSC-36.** Iran Contracting Act

In accordance with California Public Contract Code Sections 2200-2208, all contractors entering into, or renewing contracts with **CITY** for goods and services estimated at $1,000,000 or more are required to complete, sign, and submit the "Iran Contracting Act of 2010 Compliance Affidavit."

**PSC-37.** Restrictions on Campaign Contributions and Fundraising in City Elections

Unless otherwise exempt, if this Contract is valued at $100,000 or more and requires approval by an elected **CITY** office, **CONTRACTOR**, **CONTRACTOR'S** principals, and **CONTRACTOR'S** Subcontractors expected to receive at least $100,000 for performance under the Contract, and the principals of those Subcontractors (the "Restricted Persons")

shall comply with Charter Section 470(c)(12) and LAMC Section 49.7.35. Failure to comply entitles **CITY** to terminate this Contract and to pursue all available legal remedies. Charter Section 470(c)(12) and LAMC Section 49.7.35 limit the ability of the Restricted Persons to make campaign contributions to and engage in fundraising for certain elected **CITY** officials or candidates for elected **CITY** office for twelve months after this Contract is signed. Additionally, a **CONTRACTOR** subject to Charter Section 470(c)(12) is required to comply with disclosure requirements by submitting a completed and signed Ethics Commission Form 55 and to amend the information in that form as specified by law. Any **CONTRACTOR** subject to Charter Section 470(c)(12) shall include the following notice in any contract with any Subcontractor expected to receive at least $100,000 for performance under this Contract:

> "Notice Regarding Restrictions on Campaign Contributions and Fundraising in City Elections
>
> You are a subcontractor on City of Los Angeles Contract # _____. Pursuant to the City of Los Angeles Charter Section 470(c)(12) and related ordinances, you and your principals are prohibited from making campaign contributions to and fundraising for certain elected City of Los Angeles ("**CITY**") officials and candidates for elected **CITY** office for twelve months after the **CITY** contract is signed. You are required to provide the names and contact information of your principals to the **CONTRACTOR** and to amend that information within ten business days if it changes during the twelve month time period. Failure to comply may result in termination of this Contract and any other available legal remedies. Information about the restrictions may be found online at ethics.lacity.org or by calling the Los Angeles City Ethics Commission at (213) 978-1960."

**PSC-38.** Contractors' Use of Criminal History for Consideration of Employment Applications

**CONTRACTOR** shall comply with the City Contractors' Use of Criminal History for Consideration of Employment Applications Ordinance, LAAC Section 10.48 *et seq.*, as amended from time to time. Any subcontract entered into by **CONTRACTOR** for work to be performed under this Contract must include an identical provision.

**PSC-39.** Limitation of City's Obligation to Make Payment to Contractor

Notwithstanding any other provision of this Contract, including any exhibits or attachments incorporated therein, and in order for **CITY** to comply with its governing legal requirements, **CITY** shall have no obligation to make any payments to **CONTRACTOR** unless **CITY** shall have first made an appropriation of funds equal to or in excess of its obligation to make any payments as provided in this Contract. **CONTRACTOR** agrees that any services provided by **CONTRACTOR**, purchases made by **CONTRACTOR** or expenses incurred by **CONTRACTOR** in excess of the appropriation(s) shall be free and without charge to **CITY** and **CITY** shall have no obligation to pay for the services, purchases or expenses. **CONTRACTOR** shall have no obligation to provide any services,

**STANDARD PROVISIONS**
**FOR CITY CONTRACTS (Rev. 9/22) [v.1]**          13          **ATTACHMENT A**

provide any equipment or incur any expenses in excess of the appropriated amount(s) until **CITY** appropriates additional funds for this Contract.

**PSC-40.**   Compliance with Identity Theft Laws and Payment Card Data Security Standards

**CONTRACTOR** shall comply with all identity theft laws including without limitation, laws related to: (1) payment devices; (2) credit and debit card fraud; and (3) the Fair and Accurate Credit Transactions Act ("FACTA"), including its requirement relating to the content of transaction receipts provided to Customers.  **CONTRACTOR** also shall comply with all requirements related to maintaining compliance with Payment Card Industry Data Security Standards ("PCI DSS"). During the performance of any service to install, program or update payment devices equipped to conduct credit or debit card transactions, including PCI DSS services, **CONTRACTOR** shall verify proper truncation of receipts in compliance with FACTA.

**PSC-41.** Compliance with California Public Resources Code Section 5164

California Public Resources Code Section 5164 prohibits a public agency from hiring a person for employment or as a volunteer to perform services at any park, playground, or community center used for recreational purposes in a position that has supervisory or disciplinary authority over any minor, if the person has been convicted of certain crimes as referenced in the Penal Code, and articulated in California Public Resources Code Section 5164(a)(2).

If applicable, **CONTRACTOR** shall comply with California Public Resources Code Section 5164, and shall additionally adhere to all rules and regulations that have been adopted or that may be adopted by **CITY**. **CONTRACTOR** is required to have all employees, volunteers and Subcontractors (including all employees and volunteers of any Subcontractor) of **CONTRACTOR** working on premises to pass a fingerprint and background check through the California Department of Justice at **CONTRACTOR'S** sole expense, indicating that such individuals have never been convicted of certain crimes as referenced in the Penal Code and articulated in California Public Resources Code Section 5164(a)(2), if the individual will have supervisory or disciplinary authority over any minor.

**PSC-42.** Possessory Interests Tax

Rights granted to **CONTRACTOR** by **CITY** may create a possessory interest. **CONTRACTOR** agrees that any possessory interest created may be subject to California Revenue and Taxation Code Section 107.6 and a property tax may be levied on that possessory interest. If applicable, **CONTRACTOR** shall pay the property tax. **CONTRACTOR** acknowledges that the notice required under California Revenue and Taxation Code Section 107.6 has been provided.

**PSC-43.** Confidentiality

All documents, information and materials provided to **CONTRACTOR** by **CITY** or developed by **CONTRACTOR** pursuant to this Contract (collectively "Confidential Information") are confidential. **CONTRACTOR** shall not provide or disclose any Confidential Information or their contents or any information therein, either orally or in writing, to any person or entity, except as authorized by **CITY** or as required by law. **CONTRACTOR** shall immediately notify **CITY** of any attempt by a third party to obtain access to any Confidential Information. This provision will survive expiration or termination of this Contract.

**PSC-44.** COVID-19

Employees of Contractor and/or persons working on its behalf, including, but not limited to, subcontractors (collectively, "Contractor Personnel"), while performing services under this Agreement and prior to interacting in person with City employees, contractors, volunteers, or members of the public (collectively, "In-Person Services") must be fully vaccinated against the novel coronavirus 2019 ("COVID-19"). "Fully vaccinated" means that 14 or more days have passed since Contractor Personnel have received the final dose of a two-dose COVID-19 vaccine series (Moderna or Pfizer-BioNTech) or a single dose of a one-dose COVID-19 vaccine (Johnson & Johnson/Janssen) and all booster doses recommended by the Centers for Disease Control and Prevention. Prior to assigning Contractor Personnel to perform In-Person Services, Contractor shall obtain proof that such Contractor Personnel have been fully vaccinated. Contractor shall retain such proof for the document retention period set forth in this Agreement. Contractor shall grant medical or religious exemptions ("Exemptions") to Contractor Personnel as required by law. If Contractor wishes to assign Contractor Personnel with Exemptions to perform In-Person Services, Contractor shall require such Contractor Personnel to undergo weekly COVID-19 testing, with the full cost of testing to be borne by Contractor. If Contractor Personnel test positive, they shall not be assigned to perform In-Person Services or, to the extent they have already been performing In-Person Services, shall be immediately removed from those assignments. Furthermore, Contractor shall immediately notify City if Contractor Personnel performing In-Person Services (1) have tested positive for or have been diagnosed with COVID-19, (2) have been informed by a medical professional that they are likely to have COVID-19, or (3) meet the criteria for isolation under applicable government orders.

**PSC-45**. Contractor Data Reporting

If Contractor is a for-profit, privately owned business, Contractor shall, within 30 days of the effective date of the Contract and on an annual basis thereafter (i.e., within 30 days of the annual anniversary of the effective date of the Contract), report the following information to City via the Regional Alliance Marketplace for Procurement ("RAMP") or via another method specified by City: Contractor's and any Subcontractor's annual revenue, number of employees, location, industry, race/ethnicity and gender of majority owner ("Contractor/Subcontractor Information"). Contractor shall further request, on an annual basis, that any Subcontractor input or update its business profile, including the Contractor/Subcontractor Information, on RAMP or via another method prescribed by City.

**STANDARD PROVISIONS**
**FOR CITY CONTRACTS (Rev. 9/22) [v.1]**          **15**                    **ATTACHMENT A**

Form Gen. 133 (Rev.10/17)

## EXHIBIT 1

### INSURANCE CONTRACTUAL REQUIREMENTS

**CONTACT** For additional information about compliance with City Insurance and Bond requirements, contact the Office of the City Administrative Officer, Risk Management at (213) 978-RISK (7475) or go online at www.lacity.org/cao/risk. The City approved Bond Assistance Program is available for those contractors who are unable to obtain the City-required performance bonds. A City approved insurance program may be available as a low cost alternative for contractors who are unable to obtain City-required insurance.

**CONTRACTUAL REQUIREMENTS**

CONTRACTOR AGREES THAT:

**1.   Additional Insured/Loss Payee.** The CITY must be included as an Additional Insured in applicable liability policies to cover the CITY'S liability arising out of the acts or omissions of the named insured. The CITY is to be named as an Additional Named Insured and a Loss Payee As Its Interests May Appear in property insurance in which the CITY has an interest, e.g., as a lien holder.

**2.   Notice of Cancellation.** All required insurance will be maintained in full force for the duration of its business with the CITY. By ordinance, all required insurance must provide at least thirty (30) days' prior written notice (ten (10) days for non-payment of premium) directly to the CITY if your insurance company elects to cancel or materially reduce coverage or limits prior to the policy expiration date, for any reason except impairment of an aggregate limit due to prior claims.

**3.   Primary Coverage.** CONTRACTOR will provide coverage that is primary with respect to any insurance or self-insurance of the CITY.  The CITY'S program shall be excess of this insurance and non-contributing.

**4.   Modification of Coverage.** The CITY reserves the right at any time during the term of this Contract to change the amounts and types of insurance required hereunder by giving CONTRACTOR ninety (90) days' advance written notice of such change. If such change should result in substantial additional cost to CONTRACTOR, the CITY agrees to negotiate additional compensation proportional to the increased benefit to the CITY.

**5.   Failure to Procure Insurance.** All required insurance must be submitted and approved by the Office of the City Administrative Officer, Risk Management prior to the inception of any operations by CONTRACTOR.

CONTRACTOR'S failure to procure or maintain required insurance or a self-insurance program during the entire term of this Contract shall constitute a material breach of this Contract under which the CITY may immediately suspend or terminate this Contract or, at its discretion, procure or renew such insurance to protect the CITY'S interests and pay any and all premiums in connection therewith and recover all monies so paid from CONTRACTOR.

**6.   Workers' Compensation.** By signing this Contract, CONTRACTOR hereby certifies that it is aware of the provisions of Section 3700 *et seq.*, of the California Labor Code which require every employer to be insured against liability for Workers' Compensation or to undertake

**STANDARD PROVISIONS
FOR CITY CONTRACTS (Rev. 9/22) [v.1)**          16          **ATTACHMENT A**

Form Gen. 133 (Rev. 10/17)

self-insurance in accordance with the provisions of that Code, and that it will comply with such provisions at all time during the performance of the work pursuant to this Contract.

**7.   California Licensee.** All insurance must be provided by an insurer admitted to do business in California or written through a California-licensed surplus lines broker or through an insurer otherwise acceptable to the CITY. Non-admitted coverage must contain a **Service of Suit** clause in which the underwriters agree to submit as necessary to the jurisdiction of a California court in the event of a coverage dispute. Service of process for this purpose must be allowed upon an agent in California designated by the insurer or upon the California Insurance Commissioner.

**8.   Aggregate Limits/Impairment.** If any of the required insurance coverages contain annual aggregate limits, CONTRACTOR must give the CITY written notice of any pending claim or lawsuit which will materially diminish the aggregate within thirty (30) days of knowledge of same. You must take appropriate steps to restore the impaired aggregates or provide replacement insurance protection within thirty (30) days of knowledge of same. The CITY has the option to specify the minimum acceptable aggregate limit for each line of coverage required. No substantial reductions in scope of coverage which may affect the CITY'S protection are allowed without the CITY'S prior written consent.

**9.  Commencement of Work.**  For purposes of insurance coverage only, this Contract will be deemed to have been executed immediately upon any party hereto taking any steps that can be considered to be in furtherance of or towards performance of this Contract. The requirements in this Section supersede all other sections and provisions of this Contract, including, but not limited to, PSC-3, to the extent that any other section or provision conflicts with or impairs the provisions of this Section.

Case 2:25-cv-02701-DMG-MAA   Document 1   Filed 03/27/25   Page 179 of 199   Page ID #:179

# Required Insurance and Minimum Limits

Name: _____    Date: _____

Agreement/Reference: _____

Evidence of coverages checked below, with the specified minimum limits, must be submitted and approved prior to occupancy/start of operations.  Amounts shown are Combined Single Limits ("CSLs").  For Automobile Liability, split limits may be substituted for a CSL if the total per occurrence equals or exceeds the CSL amount.

**Limits**

____ **Workers' Compensation (WC) and Employer's Liability (EL)**

WC _*Statutory*_

EL _____

☐ Waiver of Subrogation in favor of City          ☐ Longshore & Harbor Workers
                                                 ☐ Jones Act

____ **General Liability** _____

☐ Products/Completed Operations          ☐ Sexual Misconduct _____
☐ Fire Legal Liability _____
☐

____ **Automobile Liability** (for any and all vehicles used for this contract, other than commuting to/from work)          _____

____ **Professional Liability** (Errors and Omissions)          _____

Discovery Period _____

____ **Property Insurance** (to cover replacement cost of building - as determined by insurance company)          _____

☐ All Risk Coverage          ☐ Boiler and Machinery
☐ Flood                      ☐ Builder's Risk
      _____
☐ Earthquake _____  ☐ _____

____ **Pollution Liability**          _____

☐ _____

____ **Surety Bonds -** Performance and Payment (Labor and Materials) Bonds          _____
____ **Crime Insurance**          _____

**Other:** _____
_____
_____
_____

**STANDARD PROVISIONS
FOR CITY CONTRACTS (Rev. 9/22) [v.1]          18**

**EXHIBIT 3**



Office of the Los Angeles City Attorney
Hydee Feldstein Soto

November 8, 2024

VIA E-MAIL

Erika Aronson Stern, Chair
GLAZA Board of Trustees
erika@taborlake.com

Re:    GLAZA – Initiation of Transition of Services

Dear Ms. Aronson Stern:

We are in receipt of a letter dated October 17, 2024 that GLAZA addressed to Mayor Bass. In that letter, GLAZA states that it "will not be submitting any proposals in connection with the recent RFPs" issued by the City in September 2024 and that the parties' relationship will "be ending effective June 30, 2025." Based on GLAZA's express and unequivocal representation that it will no longer provide support services for the Zoo after the Interim Agreement expires—in addition to other material and troubling developments, as discussed herein—the City must now take appropriate steps to ensure a smooth transition of services and to protect its immediate and long-term financial, proprietary, and other interests relating to the Zoo.[1]

I.    ENDOWMENT AND OTHER FUNDS

On May 29, 2024, GLAZA addressed a letter to Deputy Mayor Jacqueline Hamilton claiming, among other things, that the Zoo's $39 million endowment "is GLAZA's responsibility to maintain and allocate appropriately under the terms of its non-profit by-laws" and "[i]f anyone

---

[1]    We remind you that in addition to its contractual obligations and duty of good faith and fair dealing, GLAZA, as an agent of and fiduciary for the City, is held to the highest legal standards and must act in the best interests of the Zoo and the City at all times. *See* Interim Agreement p. 1 & §§ 2, 5(C); *see also Hong Que, Inc. v. Luu*, 150 Cal. App. 4th 400, 411 (2007) ("the agent assumes 'a fiduciary duty to act loyally for the principal's benefit in all matters connected with the agency relationship' ") (quoting Rest. 3d, Agency, § 8.01). GLAZA cannot act or use the City's property to (1) make negative statements about the Zoo, the City, or the RFPs, (2) sow confusion about or mischaracterize GLAZA's role, the nature of the parties' relationship, and to whom donations are actually made, or (3) divert donor resources away from the Zoo to support GLAZA's future (and separate) endeavors. And as the City's agent, GLAZA must obey the City's instructions. *See, e.g., Channel Lumber Co., Inc. v. Porter Simon*, 78 Cal. App. 4th 1222, 1230 (2000) (agents "are fiduciaries; they owe to the principal the basic obligations of agency: loyalty and obedience") (citing Rest. 2d Agency (1958) § 14N, com. a, p. 80); *see also Rianda v. San Benito Title Guarantee Co.*, 35 Cal. 2d 170, 173 (1950) ("It is the duty of an agent to obey the instructions of his principal . . . and, if [the agent] violate[s] instructions or act[s] negligently . . . it would ordinarily be liable for any loss occasioned by its breach of duty.").

201 N. Figueroa Street, Suite 1300, Los Angeles, CA 90012, Tel: (213) 978-8080

from the City believes that the City maintains any authority over allocation of *GLAZA's* endowment, they are grossly mistaken." 5/29/24 GLAZA Letter p. 2 (emphasis added).

On July 31, 2024, we sent you a response explaining, among other things, that: (1) GLAZA's very formation was for the exclusive purpose of assisting and aiding the City to establish, develop, operate, care for, and maintain the Zoo, (2) GLAZA's primary responsibility, for decades, has been to seek and provide financial support to the Zoo and to fund the Zoo's capital improvements, (3) all fundraising efforts were to be conducted "on behalf of the City" and for the Zoo's (not GLAZA's) benefit, (4) if GLAZA's duties come to an end, all funds must be returned to the City to use for the benefit of the Zoo, and (5) the Interim Agreement provides, as has always been clear from the parties' relationship, that "[i]n collecting and managing funds for the Zoo on behalf of the City, GLAZA shall act as the City's fiduciary and fiscal agent[.]" 7/31/24 City Letter pp. 1-2 (citing contractual and other provisions); *see also Fischer v. Machado*, 50 Cal. App. 4th 1069, 1072 (1996) (an agent owes the principal contractual and noncontractual fiduciary duties; "[t]he obligations of an agent are the same as those imposed on a trustee").

In our July 31st letter, we also asked if, despite these facts, GLAZA claims some ownership or beneficial interest in the endowment or in any other funds and, if so, we asked you to explain (1) when, how, and under what authority GLAZA raised funds other than on behalf of the Zoo, (2) the amount of such purported separate funds, (3) if (and how) these supposed separate funds have been segregated within the endowment or other accounts, and (4) if any of GLAZA's fundraising efforts (unrelated to the Zoo) were targeted to raise funds for the endowment. 7/31/24 City Letter p. 2.

GLAZA never responded to our letter. Instead, it appears that GLAZA has begun to take steps to expressly characterize a significant amount of money as its own and separate property, inconsistent with the fiduciary and contractual duties that GLAZA and its officers, directors, Board of Trustees, and administrators owe to the City and the Zoo.

According to GLAZA's monthly restricted fund activity reports, for the very first time in May 2024, GLAZA created a separate "GLAZA Restricted" fund. Likewise in May 2024, GLAZA (1) dedicated $675,000 to this separate fund, (2) generated $144,436.36 in revenue for that fund, and (3) incurred $319,230 in expenses associated with the fund. Around the same time, GLAZA also amended its articles of incorporation, under which GLAZA (for the first time since its formation in 1963, and without notice to the Zoo) reserved the right to support "other organizations in the greater Los Angeles area whose primary mission is to protect and support wildlife conservation and habitats." 5/5/24 Am. and Restated Articles of Inc. § II.[2] Based on the most recent of these restricted fund reports provided to the Zoo, the GLAZA Restricted fund maintained a $701,720.14 positive balance as of September 30, 2024.

On October 21, 2024 and November 4, 2024, Zoo Director Verret asked GLAZA leadership to explain the purpose of this new GLAZA Restricted fund and to specify the restricted uses associated with that fund. GLAZA's only response was that these funds "are reserves GLAZA set aside in January 2023 to deal with shortfalls or expenses related to ongoing operating agreement negotiations." The response is at best vague and evasive, and raises the question of whether GLAZA took an intentional act in breach of fiduciary duties that GLAZA and its management and Board owe to the City and the Zoo. The Zoo's funds in the so-called "GLAZA Restricted" account are still funds that GLAZA only holds on behalf of the Zoo and only manages in its capacity as a fiduciary and current contractual agent for the Zoo.

---

[2]    We note that while GLAZA may have amended its articles in May 2024, the Interim Agreement (effective from October 1, 2023 through June 30, 2025) only permits GLAZA to fundraise "for the benefit of the Zoo." *See* Interim Agreement § 2(A).

201 N. Figueroa Street, Suite 1300, Los Angeles, CA 90012, Tel: (213) 978-8080

We reiterate the Zoo Director's request to account for (1) the source of these funds; (2) the specific circumstances and authority under which GLAZA initially allocated to, generated revenue for, and incurred expenses to this fund; (3) the nature of the expenses paid or payable from these funds; (4) how much in funds—in total since it was created—have been placed in the account and the dates and nature of all expenditures from the fund; and (5) how and why GLAZA waited sixteen months to first disclose this fund to the Zoo, if, in fact as GLAZA now claims, it set aside those "reserves" in January 2023 but first listed the fund in its May 2024 report.  *See* Interim Agreement § 6(D) (requiring GLAZA to provide the Zoo Director, upon reasonable request, additional information relating to the Zoo's finances and GLAZA's operations); *see also Michel v. Moore & Assocs., Inc.*, 156 Cal. App. 4th 756, 762 (2007) ("[a] fiduciary must tell its principal of all information it possesses that is material to the principal's interests").

The City is naturally and rightfully concerned.  GLAZA has signaled its intent to claim some ownership or beneficial interest in the Zoo's endowment and/or other of the Zoo's financial and intangible assets—despite the fact GLAZA has never been permitted to use the Zoo's name, image, intellectual property, or membership to raise funds for GLAZA's own benefit.[3] Given that GLAZA  has given notice that it will no longer service the Zoo after the Interim Agreement expires, the City must ensure that all of the Zoo's assets are readily available to be used to benefit and support the Zoo before the City's replacement contractor(s) assume operational control.  *See* Interim Agreement § 11 (requiring GLAZA to cooperate and coordinate with the City to ensure a smooth transition of services).

The City therefore instructs GLAZA, no later than **November 18, 2024**, to (1) designate the City as the sole owner and beneficiary of the Endowment Fund, Zoo Assistance Fund, Zoo Surplus Development Fund, and any other fund having any relation to the Zoo ("Zoo Funds"), (2) designate the City as the sole owner and beneficiary of every bank, brokerage, and any other type of financial or investment account or vehicle associated with Zoo Funds ("Zoo Accounts"), (3) add Zoo Director Verret as an authorized signer for all Zoo Funds and Zoo Accounts, and (4) provide Zoo Director Verret with all of the usernames, passwords, and associated authentication information (*e.g.*, answers to secret questions) that GLAZA employs for purposes of online access to the Zoo Funds and Zoo Accounts.  *See Fischer*, 50 Cal. App. 4th at 1072 (agent's failure to turn over to principal funds received as agent constitutes conversion).  In the event GLAZA does not timely perform these tasks and provide written confirmation to the Zoo, the City will treat GLAZA's inaction as affirmation of GLAZA's refusal to comply—and act accordingly to ensure that the Zoo's financial assets are secured for the future.

To be clear, the City does not intend to presently take over GLAZA's current administrative functions in connection with the Zoo's financial assets.  GLAZA must continue to effectively manage the Zoo Funds and Zoo Accounts as required by the Interim Agreement and consistent with GLAZA's role as the agent of and fiduciary for the City.  *See* Interim Agreement § 5(C) ("In collecting and managing funds for the Zoo on behalf of the City, GLAZA shall act as the City's fiduciary and fiscal agent").  However, GLAZA's clear and unmistakable statement of its intention to fully sever the parties' long-standing relationship, as well as the facts set forth herein that call into question GLAZA's loyalty, accountability, and conduct, necessitate these

---

[3]    While the Interim Agreement permits GLAZA to engage in limited "additional restricted" fundraising, any of those funds must nevertheless "be used solely for the benefit of the Zoo" and such activities "shall be limited so as to not interfere with GLAZA's services and obligations to the City[.]" Interim Agreement § 2(A)(3)(f).  The City is also alarmed by the fact that GLAZA, on November 2, 2024, suddenly cancelled Zoo Director Verret's biweekly meetings with Janet Dial, GLAZA's Vice President of Institutional Advancement, on the notion that Ms. Dial is "focused on other priorities[.]"  Ms. Dial oversees all of GLAZA's fundraising efforts, both restricted and unrestricted.  And at these meetings, Zoo Director Verret and Ms. Dial regularly discuss the status of all fundraising, potential new or revised fundraising efforts, donor relations, and fundraising events (*e.g.*, Beastly Ball).

Page **4** of **8**

steps to ensure a smooth transition of services to any new contractor(s).

Finally, in light of these questions regarding GLAZA's continuing loyalty to the Zoo, the City hereby further instructs GLAZA to refrain from using any donor, membership, or volunteer list (or any of the City's other tangible or intangible assets) for any fundraising purposes that are not directly on the Zoo's behalf and for the exclusive benefit of the Zoo or that otherwise are inconsistent with the agency, fiduciary, or contractual duties that GLAZA owes the Zoo and the City. *See* Standard Provisions for City Contracts (Rev. 9/22) [v. 1] ("Standard Provisions") at PSC-21 ("all finished and unfinished works, tangible or not" constitute "the exclusive property of CITY for its use in any manner CITY deems appropriate"); Interim Agreement § 2(A) (GLAZA may only fundraise "for the benefit of the Zoo"). Please confirm by **November 18, 2024**, in writing, that GLAZA will follow this instruction. If GLAZA does not timely confirm it will follow this instruction, the City will treat GLAZA's silence as GLAZA's refusal to comply.[4]

II.     <u>ACCOUNTING</u>

The Interim Agreement provides that "[i]n collecting and managing funds for the Zoo on behalf of the City, GLAZA shall act as the City's fiduciary and fiscal agent and ensure proper accounting for all funds collected" under "a method of accounting in compliance with generally acceptable accounting principles." Interim Agreement § 5(C). The Standard Provisions, which are incorporated into the Interim Agreement by reference, also require GLAZA to "maintain all records, including records of financial transactions, pertaining to the performance of this Contract[.]" Standard Provisions at PSC-16; Interim Agreement § 15.

Under the Interim Agreement, "[a]ll documents, books, and accounting records for Zoo funds held by GLAZA shall be open for inspection by the City upon request and with reasonable prior notice, at any reasonable time during the term of the Agreement." Interim Agreement § 5(C). The Standard Provisions further provide that "all records, including records of financial transactions" are "subject to examination and audit by authorized CITY personnel or CITY's representatives at any time." Standard Provisions at PSC-16.

The City hereby exercises its unilateral right to inspect GLAZA's books and records relating to the Zoo Funds and Zoo Accounts. This inspection is necessary to identify and secure all of the Zoo's financial assets—and to identify and remedy any improprieties and/or irregularities[5]—ensuring the continued success of the Zoo during the transition and after the Interim Agreement expires. *See* Interim Agreement § 11 (requiring GLAZA to cooperate and coordinate with the City to ensure a smooth transition of services).

Please provide, by **November 18, 2024**, several dates during the first two weeks of January 2025 that GLAZA is available for a meeting to discuss the scope, timing, and process for this inspection that will be conducted by City personnel and/or a third party authorized by the City. If GLAZA does not timely provide its availability to meet, the City will treat GLAZA's silence as GLAZA's refusal to comply with its contractual and fiduciary obligations.

---

[4]     To be clear, any additional communications—either before or after November 18, 2024—to the Zoo's donors, members, or volunteers regarding such fundraising constitutes a clear, willful, and intentional breach of GLAZA's contractual, good faith and fair dealing, and fiduciary obligations. The City will hold GLAZA and its principals and trustees accountable for such acts to the fullest extent of the law.

[5]     As articulated above, the specific circumstances surrounding the new GLAZA Restricted fund remain unclear. GLAZA also recently canceled the 2025 Beastly Ball, resulting in an approximate $975,000 deficit that must be addressed through other sources without affecting the Zoo's endowment. It is also unclear, among other things, if GLAZA has been claiming expenses in the form of lobbying or legal costs, since GLAZA has not provided the Zoo with any itemized list of such expenditures. *See* Interim Agreement § 5(E) (lobbying or legal costs must be itemized, for the benefit of the Zoo, and approved by the Zoo and the City Attorney).

201 N. Figueroa Street, Suite 1300, Los Angeles, CA 90012, Tel: (213) 978-8080

III.    BEASTLY BALL, DOCENT PROGRAM, DIGITAL MEDIA, AND RFP INQUIRIES

In recent weeks, GLAZA has begun to unilaterally discontinue critical services specified in the Interim Agreement to the detriment of the Zoo.  GLAZA has also delayed and ignored other duties, which conflicts with GLAZA's obligation to ensure a smooth transition of services. *See* Interim Agreement § 11.

On October 30, 2024, GLAZA e-mailed Zoo Director Verret, stating "given the GLAZA Board's decision not to submit bids" to the RFPs and "the resulting transition of our contractual relationship with the Zoo[,]" GLAZA's "Board has decided that it would not be in the best interest of any of the parties to present the Beastly Ball next year."  According to GLAZA's projections for the 2025 fiscal year, GLAZA's sudden and unexpected decision to cancel this annual fundraising event will result in a net loss of $975,000 in revenue.  After Zoo Director Verret asked how GLAZA intended to address this deficit, GLAZA opaquely stated that it would use "best efforts" to reduce expenses and "budget with other unrestricted revenue sources[,]" without providing details or explaining the impact on Zoo operations and the Zoo's endowment. GLAZA also claimed that the June 2025 Beastly Ball would not "generate much net revenue, if any" because the "Board of Trustees and their colleagues and friends" have "little enthusiasm" to support the gala, and "therefore GLAZA made the prudent decision to cancel the event." This, as well, is a separate breach of duty since the Interim Agreement is operative through June 30, 2025, weeks after the 2025 fundraising event would take place.

Without providing any notice to the Zoo, GLAZA also abruptly canceled the Information Meeting for the 2025 Docent Class, which had been scheduled for November 2, 2024.  Upon (independently) learning of this development, Zoo Director Verret sent an e-mail to GLAZA on October 30, 2024, requesting an explanation.  In response, GLAZA admitted that it decided to suspend the docent program without any input from the Zoo and attempted to justify the suspension based on GLAZA's impending departure when GLAZA still has nine months remaining on the Interim Agreement.  And while GLAZA, after receiving Zoo Director Verret's e-mail, removed a statement from the Zoo's Docent Volunteer webpage (https://lazoo.org/join-our-community/volunteers/docent-program/)—stating that "onboarding for the docent program is on hiatus"—GLAZA did not obtain the Zoo's consent to make that statement (or to suspend the docent program) in the first instance.  Under the Interim Agreement, GLAZA is obligated to manage the volunteer program, including by recruiting and training docents, throughout the full term of the Interim Agreement for the benefit of the Zoo.  *See* Interim Agreement § 2(D).

As set forth in the Interim Agreement, "GLAZA understands that the [Zoo] intends to transition the management . . .  of the Zoo website and social media accounts, and that such transition may occur during the term of this Agreement."  Interim Agreement § 2(H)(2)(a).  The Interim Agreement, which the parties executed in May 2024, therefore makes clear that GLAZA was required to "transfer the ownership, access, username[s], and passwords for the Zoo website, domain, and social media accounts to the [Zoo]" "as soon as practicable after execution of this Agreement[.]"  *Id.* (also noting that GLAZA will continue to retain certain administrator access, unless the Zoo orders otherwise).  However, GLAZA still has yet to transfer ownership, access, and control to the Zoo.  And when Zoo Director Verret asked GLAZA in October 2024 for the prompt transfer of ownership, access, and control, GLAZA claimed it had "tremendous concerns" about granting "external access" to the Zoo's own digital media.  Incredibly, GLAZA also suggested, without any supporting evidence, that the Zoo could "compromise [the] integrity" of the Zoo website, thereby negatively affecting ticket sales for the upcoming L.A. Zoo Lights holiday festival in addition to membership, fundraising, and other revenue streams.

Finally, on October 28, 2024, Zoo Director Verret asked GLAZA to provide certain

information, by November 4, 2024, relating to the Zoo's membership, marketing, special events, and publications—so that the Zoo could respond to questions received from prospective bidders.  However, GLAZA has yet to provide the requested information relating to the Zoo's sponsors.  *See* Interim Agreement § 11 (requiring GLAZA to cooperate and coordinate with the City to ensure a smooth transition of services, which "shall include providing information and records reasonably related to the services GLAZA has provided for the City").  As GLAZA knows, all proposals (in response to the RFPs) must be delivered to the City by November 19, 2024.

Based on these concerning developments and GLAZA's statement that it intends to separate from the City, the City must take appropriate steps to ensure a smooth transition of services and the continued success of the Zoo.  The City cannot risk the financial, operational, and reputational harm arising from a cancellation of the Beastly Ball (the largest and most important annual fundraising event for the Zoo that has taken place since 1971) or due to any suspension or cancellation of recruiting, training, and/or onboarding relevant to the 2025 Docent Class (as volunteers are critical to Zoo operations).  The City also cannot risk the Zoo's digital media being used for any purpose that does not benefit the Zoo, or risk GLAZA's incomplete disclosures to negatively impact the RFPs process.

Therefore, the City instructs GLAZA to provide, no later than **November 18, 2024**, copies of: (1) all electronic lists and spreadsheets that identify the names and/or contact information of all Zoo members, for the time period of October 1, 2023 through July 31, 2024, (2) all Donor Data, as the term is defined in section 2(A)(7) of the Interim Agreement, for the time period of October 1, 2023 through July 31, 2024, (3) all of GLAZA's records relating to the 2024 and 2025 Docent Classes, (4) all of GLAZA's records relating to the 2024 Beastly Ball and the just-cancelled 2025 Beastly Ball,[6] and (5) all Sponsorship Data, as the term is defined in section 2(E)(4)(b) of the Interim Agreement, for the time period of October 1, 2023 to the present.  *See* Standard Provisions at PSC-21 ("all finished and unfinished works, tangible or not" constitute "the exclusive property of CITY for its use in any manner CITY deems appropriate").[7]  The City further instructs GLAZA to **immediately** (on or before Tuesday, November 12, 2024) transfer the ownership, access, usernames, and passwords for the Zoo website, domain, and social media accounts (as contemplated by section 2(H)(2)(a) of the Interim Agreement) and **immediately** (on or before Tuesday, November 12, 2024) provide the sponsorship information that Zoo Director Verret requested on October 28, 2024 in connection with the RFPs.  To the extent GLAZA fails to timely perform these tasks, the City will treat GLAZA's failure to do so as affirmation of GLAZA's willful refusal to comply.

IV.    MASS COMMUNICATIONS

It has come to our attention that, on October 18, 2024, GLAZA sent a mass e-mail titled

---

[6]    As noted above, GLAZA claims there is "little enthusiasm" to support the 2025 Beastly Ball, an annual fundraising event that is highly important for and beneficial to the Zoo.  If true, this is undoubtedly the result of GLAZA's dissemination, using City and Zoo resources, of negative statements relating to the RFPs and the end of the parties' relationship for which GLAZA and its management and Board are solely responsible.

[7]    The City may instruct GLAZA to turn over other of the City's property at a later time, as the City continues to transition services and as needs arise.  GLAZA may not use any of the City's property for its own benefit, either during the term of or following the expiration of the Interim Agreement.  *See, e.g.*, Standard Provisions at PSC-21 ("all finished and unfinished works, tangible or not" constitute "work product" that "shall be and remain the exclusive property of CITY"); *see also Santa Monica Ice. & Cold. Storage Co. v. Rossier*, 42 Cal. App. 2d 467, 471 (1941) ("an agent has no right to employ, as against his principal, materials which the agent has obtained only for his principal and in the course of his agency"); Rest. 3d. Agency § 8.05 (2006) (an agent has a duty "not to use the property of the principal for the agent's own purposes or those of a third party").

"Important news about GLAZA" to the Zoo's donors and members—without providing any prior notice to the Zoo.  GLAZA sent the e-mail from glaza_info@lazoo.org and the e-mail included an image of the Zoo's logo.  In the e-mail, GLAZA informs donors and members that it is ending its relationship with the Zoo because the City's RFPs are purportedly "structured as vendor relationships, rather than [a] partnership" and the "financial terms of these RFPs are not fiscally sustainable for GLAZA in the long term."  The e-mail, among other things, also (1) addresses (incorrectly) the Zoo's donors as *GLAZA's* donors, (2) states that "[t]he future under these RFPs is not in the best interest of the Zoo, the City, or GLAZA[,]" (3) states that GLAZA will "move forward separately from the Zoo to continue [its] conservation mission[,]" (4) suggests that donors have been supporting GLAZA in some independent capacity, and (5) informs donors that GLAZA will "continue to communicate any new developments with [them]."

It has also come to our attention that, likewise on October 18, 2024 (and likewise without notice to the Zoo), GLAZA sent a mass e-mail and letter to the Zoo's volunteers.  In that communication, GLAZA (incorrectly) addresses the Zoo's volunteers as *GLAZA's* volunteers, and GLAZA makes substantially similar statements to those that GLAZA made its letter addressed to the Zoo's donors.  In addition, GLAZA posted—on the Facebook group page for Zoo volunteers—GLAZA's October 17th letter addressed to Mayor Bass and GLAZA's October 18th letters addressed to Deputy Mayor Hamilton and the Zoo's volunteers, all of which discuss the RFPs and portray the Zoo and the City in a negative light.

The City hereby instructs GLAZA to cease-and-desist from sending any mass e-mail to (or engaging in any other form of mass communication[8] with) the Zoo's donors, members, volunteers, and/or sponsors, using any of the City's property,[9] that expressly or implicitly reference the RFPs, the parties' forthcoming separation, or GLAZA's prospective conservation mission, goals, and pursuits—without first e-mailing a draft of the communication to and obtaining written approval of the proposed communication from Zoo Director Verret (denise.verret@lacity.org).  The Zoo will return any required revisions and comments to drafts within seventy-two (72) hours.[10]

GLAZA's obligation, as the agent of and fiduciary for the Zoo, to refrain from circulating communications contrary to the Zoo's best interests and the City's express wishes, is clear. The Standard Provisions plainly provide that all documents, materials, data, databases, photographs, video, marks, logos, graphic designs, websites, domain names, and all other forms of intellectual property originated and prepared by GLAZA "shall be and remain the exclusive property of CITY for its use in any manner CITY deems appropriate."  Standard Provisions at PSC-21; *see also* Interim Agreement §§ 2, 10(A) (providing that the Zoo's logo and the Zoo's name constitute trademarks owned by the City that GLAZA may only use for "purposes of performing the services set forth in this Agreement" that are "for the benefit of the Zoo[,]" and "[a]ny other use of the Trademarks is prohibited, unless pre-approved in writing by the Zoo Director").  The Standard Provisions further provide that GLAZA "agrees that a monetary remedy for breach of this Contract may be inadequate, impracticable, or difficult to prove and that a breach may cause CITY irreparable harm[,]" and that the City may therefore seek "injunctive relief and specific performance, without any necessity of showing actual damage or irreparable harm."  Standard Provisions at PSC-21.

---

[8]    As used herein, "mass communication" means any letter, text, website, social media, or any other form of communication intended for or available to the public or a broad audience.

[9]    This includes, but is not limited to, any lists, databases, or other information relating to Zoo donors, members, sponsors, or volunteers, any Zoo-related websites, domains, or social media, the Zoo's logo, the Zoo's name, and any Zoo facilities, computers, equipment, servers, or networks.

[10]    GLAZA does not need advance approval for communications unrelated to the RFPs, GLAZA's separation from the Zoo, or GLAZA's future endeavors, as long as the communication serves the Zoo's interests.  *See, e.g.*, Interim Agreement § 2(B)(1)-(2), (5)-(6) (requiring GLAZA to solicit, recruit, and retain prospective and existing Zoo members).

Please confirm by **November 18, 2024**, in writing, that GLAZA will comply with this procedure. To the extent GLAZA does not timely provide such written confirmation, the City will treat GLAZA's silence as affirmation of GLAZA's refusal to comply.

\*\*\*

To the extent GLAZA has any questions regarding the above, please contact the undersigned.

To avoid any doubt, we emphasize that GLAZA must preserve any and all of its records, including but not limited to all electronic data. *See* Standard Provisions at PSC-16 (GLAZA "shall" maintain all of its records pertaining to its performance under the Interim Agreement "in their original form or as otherwise approved" by the City).

The City reserves all rights against GLAZA, GLAZA's management, officers, directors, and trustees, and any other persons interfering with the rights, property, assets, relationships, contracts, or prospective economic advantages of the City or the Zoo.

Respectfully,
HYDEE FELDSTEIN SOTO, City Attorney

By: *Steven Son*
_____
Steven S. Son
Deputy City Attorney
steven.son@lacity.org

bcc:   Karen Bass, Mayor
Jacqueline Hamilton, Deputy Mayor of Neighborhood Services
Matt Hale, Deputy Mayor of Finance, Operations and Innovation
Denise Verret, Zoo Director
Karen Winnick, Zoo Commission President
Dawn Petersen-Amend, GLAZA Interim President
Janet Dial, GLAZA VP of Institutional Advancement
Jennifer Chan, GLAZA Director of Events
Eric Happe, GLAZA Director of Finance
Lisa Correa, GLAZA Director of Membership
Kirin Daugharty, GLAZA Director of Volunteer Programs
Emily Marrin, GLAZA Director of Marketing & Communications
Brenda Scott Royce, GLAZA Director of Publications
Robert Ellis, GLAZA Board of Trustees Vice Chair
Matt Wilson, GLAZA Board of Trustees Treasurer
Phyllis Kupferstein, GLAZA Board of Trustees Secretary
GLAZA Other and Honorary Trustees

Case 2:25-cv-02701-DMG-MAA   Document 1   Filed 03/27/25   Page 188 of 199   Page ID #:188

**<u>EXHIBIT 4</u>**



2049 CENTURY PARK EAST   SUITE 2300   LOS ANGELES, CA 90067
**T** 310.229.9900   **F** 310.229.9901   www.Venable.com

December 6, 2024

Ben D. Whitwell

**t** 310.229.9934
**f** 310.229.9901
BWhitwell@Venable.com

**<u>VIA ELECTRONIC MAIL ONLY</u>**
*steven.son@lacity.org*

Steven S. Son, Esq.
Deputy City Attorney
Office of the Los Angeles City Attorney
201 N. Figueroa Street
Suite 1300
Los Angeles, CA 90012

Re:     GLAZA - Initiation of Transition of Services

Dear Mr. Son:

Venable is counsel for the Greater Los Angeles Zoo Association ("GLAZA") and this letter is in response to your letter dated November 8, 2024, on behalf of the City of Los Angeles (the "City") to Erika Aronson Stern, Chairman of GLAZA's Board of Trustees (the "November 8 letter"). As the City is aware, the current relationship between GLAZA and the City is set forth in the Interim Agreement between the City (through the City's Department of the Zoo (the "Department")) and GLAZA for the period commencing on October 1, 2023 and terminating on June 30, 2025. The November 8 letter makes several demands on GLAZA for information and demands that GLAZA take certain actions. The November 8 letter also attempts to impose deadlines that are not required under the terms of the Interim Agreement. GLAZA has and will continue to perform its obligations under the Interim Agreement and demands that the City and the Department do likewise. Each of the City's demands set forth in the November 8 letter will be addressed below.

In addition, the November 8 letter contains a number of false and misleading assertions regarding (i) the nature of the relationship between GLAZA and the City, (ii) GLAZA's legal rights and obligations as an independent nonprofit corporation, (iii) GLAZA's rights and obligations with respect to GLAZA's endowment fund (the "Endowment Fund") and (iv) the interactions over the past several months among GLAZA, the City, the Department, and Los Angeles Zoo Director, Ms. Denise Verret. These false and misleading assertions will also be addressed below.



December 6, 2024
Page 2

## I.      GLAZA's Status and Relationship with the City

GLAZA is a California nonprofit public benefit corporation recognized as tax-exempt under Section 501(c)(3) of the Internal Revenue Code and Section 23701d of the California Revenue and Taxation Code, which was formed in 1963 and has operated on a continuing basis since its formation. In fact, the formation of GLAZA predates the founding of the Zoo. GLAZA is controlled by its own Board of Trustees and managed by its own officers and employees. No Department or City official sits on the Board of Trustees or is an officer of GLAZA, nor does the Department or the City have any right to appoint any Trustees or officers of GLAZA. GLAZA is not, and never has been, a department of the City or under City management or control.

GLAZA is not, and never has been, a general agent of the City or the Department, but rather has performed and continues to perform services for the Department as an independent contractor. In fact, the Standard Provisions for City Contracts, which are incorporated into the Interim Agreement, specifically states at PSC-10: **"Contractor is an independent contractor and not an agent or employee of City. Contractor shall not represent or otherwise hold out itself or any of its directors, officers,** partners**, employees, or agents to be an agent or employee of City."** A general agency relationship requires a manifestation of assent by both parties and the principal's right to control the agent's day-to-day operations. *See Mavrix Photographs, LLC v. Livejournal, Inc.*, 873 F.3d 1045, 1054 (9th Cir. 2017); *Barenborg v. Sigma Alpha Epsilon Fraternity*, 33 Cal. App. 5th 70, 85 (2019). Those requirements of assent and control are missing in the relationship between GLAZA and the City or the Department.

The rights and obligations of both GLAZA and the City/Department are established by the terms of the Interim Agreement. This is true even if GLAZA and the City/Department were deemed to be in a general agency relationship, which GLAZA disputes. *See Chen v. PayPal, Inc.*, 61 Cal. App. 5th 559, 575 (2021) ("[t]he existence and extent of the duties of the agent to the principal are determined by the terms of the agreement between the parties, interpreted in light of the circumstances under which it is made") (citation omitted); Rest. (3d) Agency § 8.07 ("An agent has a duty to act in accordance with the express and implied terms of any contract between the agent and the principal."); *id.* § 8.07 cmt. a ("an agent's duties of performance to the principal are subject to the terms of any contract between them"); *id.* § 8.07 cmt. b ("[M]any agents and principals enter into agreements. Contract-law principles of general applicability govern whether such agreements are enforceable and how they are to be interpreted, among other questions.").

## II.      GLAZA's Endowment Fund

GLAZA's Endowment Fund was independently created by resolution of GLAZA's Board of Trustees in 1991 and the Endowment Fund has been managed and invested since its inception pursuant to an Investment Policy adopted by the GLAZA Board of Trustees.

VENABLE LLP

December 6, 2024
Page 3

The primary source of funds for the Endowment Fund is bequests which have been made by donors through their wills and other estate planning documents. Typically, these bequests explicitly designated GLAZA as recipient of the funds from the bequests but generally do not direct how the funds shall be used. An exception is when a bequest has been made with a restriction at the direction of the donor, such as a bequest to support a particular Zoo project or the care and feeding of a specific species. Thus, GLAZA has a fiduciary duty to honor the intent of the donors who bequeathed gifts by administering and managing those gifts as directed by the donors. *City of Palm Springs v. Living Desert Reserve*, 82 Cal. Rptr. 2d 859, 866 (1999) ("A charitable trust is a fiduciary relationship with respect to property arising as a result of a manifestation of an intention to create it, and subjecting the person by whom the property is held to equitable duties to deal with the property for a charitable purpose.") (quoting Rest. (2d) Trusts § 348, p. 210; *Hardman v. Feinstein*, 195 Cal. App. 3d 157, 161 (1987)).

Consistent with fulfilling its fiduciary duty to the donors who made the bequests, upon receiving a specific request from the Zoo Director for funds from the Endowment Fund and before payment of any funds, GLAZA's Board of Trustees must first approve both the purpose and the amount of any distribution from the Endowment Fund after review and recommendation by the GLAZA Finance Committee. Neither the Zoo Director nor the Department has the authority to direct or determine the amount of an expenditure from the Endowment Fund.

Given the duties GLAZA owes to its donors, GLAZA will continue to manage the Endowment Fund. Following termination of the Interim Agreement, GLAZA can and must be able to exercise control over the Endowment Fund in the way that it deems appropriate to fulfill its fiduciary duties to the GLAZA donors who made bequests and to use such funds to support the Zoo.

To transfer the Endowment Fund to the City would be inconsistent with GLAZA's duties to its donors and the language of the Interim Agreement, which specifically does not state that GLAZA will transfer the Endowment Fund to City upon termination of the Interim Agreement. As a contrast, Section 13 of the Interim Agreement provides "[i]n the event of GLAZA's *dissolution (italics added)*, . . . all monies remaining in GLAZA funds and accounts for the specific benefit of the Zoo shall be paid over in full to the City, subject to all applicable laws and regulations." GLAZA has no intention of dissolving, and following termination of the Interim Agreement it will continue as an independent nonprofit corporation with a Board of Trustees and officers and employees. However, as explained further below, in doing so GLAZA will use funds from the Endowment Fund to support the Zoo and not to support other organizations.

The Interim Agreement's provisions with respect to two other funds further show the distinction in how the Endowment Fund is managed and controlled by GLAZA. GLAZA maintains the Zoo Surplus Development Fund ("ZSDF"), which is funded from Zoo concessions. The ZSDF

**VENABLE** LLP

December 6, 2024
Page 4

funds do not come directly from GLAZA services or operations, such as fundraising and membership. Additionally, GLAZA maintains the Zoo Assistance Fund ("ZAF") in connection with its services for the benefit of the Zoo under the Interim Agreement. GLAZA transfers the first $300,000 of unrestricted funds raised for the Zoo each fiscal year into the ZAF.

The ZSDF and ZAF are separate and distinct from the Endowment Fund. Pursuant to the terms of the Interim Agreement (and in contrast to the Endowment Fund), Zoo management determines how the ZSDF and ZAF funds are spent. Section 2(I)(5) of the Interim Agreement specifically requires that the ZSDF and ZAF funds must be returned to the Zoo within 90 days of termination of the Interim Agreement. (*See* Interim Agreement Section 2(I)(5): ("All monies remaining in the ZSDF and the ZAF upon the termination of this Agreement shall be transferred by GLAZA to the Department for deposit into the ZETF within 90 days after termination.") Accordingly, GLAZA will transfer the funds in the ZSDF and the ZAF to the Department within 90 days following termination of the Interim Agreement.

GLAZA has acted, and will continue to act, in accordance with both its obligations to the Zoo under the Interim Agreement and its fiduciary duties to its donors in administering and managing the Endowment Fund. GLAZA cannot place the desire of the City to gain immediate control over the Endowment Fund over the testamentary wishes of the GLAZA donors who provided the funds that make up the Endowment Fund. GLAZA has not used funds or earnings from the Endowment Fund to benefit other organizations or individuals. After the Interim Agreement ends, GLAZA will continue to use the funds in the Endowment Fund at the time of termination and earnings on such funds to support the Zoo rather than to support other causes. Any new bequests made to GLAZA to support any future activities unrelated to the Zoo will be segregated and not commingled with the current Endowment Fund.

### III.   <u>Response to November 8 Letter Demands and Assertions</u>

**<u>Demand</u>**: Transfer the ownership, access, usernames, and passwords for the Zoo website, domain, and social media accounts to the Department (as contemplated by section 2(H)(2)(a) of the Interim Agreement).

GLAZA will transfer the access, usernames, and passwords for the Zoo website and social media accounts to the Department by January 31, 2025. Transferring ownership of the domain name is more complicated and GLAZA will need additional time to complete that transfer, but it will be done as soon as reasonably practicable.

**<u>Demand</u>**: Provide the sponsorship information that Zoo Director Verret requested on October 28, 2024, in connection with the RFPs (relating to the Zoo's membership, marketing, special events, and publications).

**VENABLE** LLP

_____

December 6, 2024
Page 5

While GLAZA is not required under the Interim Agreement to assist the City or the Zoo Director with the RFP process, apart from assisting with a smooth transition to any new contractor(s) selected under the RFP process, GLAZA believes it has provided the information that the Zoo Director requested, and which was not otherwise available to her. If there is specific information that the Zoo Director believes was requested but not provided, and to which she otherwise does not have access, please let us know.

**Demand**: Provide dates during the first two weeks of January 2025 that GLAZA is available for a meeting to discuss the scope, timing, and process for this inspection that will be conducted by City personnel and/or a third party authorized by the City.

GLAZA is available for this meeting on or after January 22, 2025.

**Demand:** Provide copies of: (i) all electronic lists and spreadsheets that identify the names and/or contact information of all Zoo members, for the period of Oct. 1, 2023 – Jul. 31, 2024; (ii) all Donor Data (as defined in the Interim Agreement) for the period of Oct. 1, 2023 – Jul. 31, 2024; (iii) all of GLAZA's records relating to the 2024 and 2025 Docent Classes; (iv) all of GLAZA's records relating to the 2024 Beastly Ball and the canceled 2025 Beastly Ball; and (v) all Sponsorship Data (as defined in the Interim Agreement) for the period of Oct. 1, 2023 to the present.

Sections 2(A)(7), 2(B)(7) and 2(D)(5) of the Interim Agreement address the issue of providing Donor, Membership and Volunteer data to the Zoo Director. GLAZA has and will continue to provide Donor, Membership, and Volunteer data pursuant to the terms of the Interim Agreement.

Section 2(A)(7) of the Interim Agreement provides, with respect to Donor data: "(a) Within 30 days following the execution of this Agreement, GLAZA shall update its privacy policies to reflect that, subject to applicable law, and effective as of the date of such update, GLAZA will share with the Department donor names, contact information, date of donation, donation amounts, and any restrictions on donations contributed for the benefit of the Zoo, if any, received after the date of such update. (b) Following GLAZA's update of its privacy policies, subject to applicable law, GLAZA shall provide the Zoo Director with a monthly electronic spreadsheet containing all Donor, Membership and Volunteer Data." Sections 2(B)(7) and 2(D)(5) specify the same requirements for Membership and Volunteer data.

GLAZA has complied, and will continue to comply, with the terms of Sections 2(A)(7), 2(B)(7) and 2(D)(5). GLAZA is unable to provide any Donor, Membership or Volunteer data to the City for any period prior to the date of its update of its privacy policy as previously discussed with the City during negotiation of the Interim Agreement.



December 6, 2024
Page 6

**Demand:** Designate the City as the sole owner and beneficiary of (i) the Endowment Fund, Zoo Assistance Fund, Zoo Surplus Development Fund, and any other fund having any relation to the Zoo ("Zoo Funds"); and (ii) every bank, brokerage, and any other type of financial or investment account or vehicle associated with Zoo Funds ("Zoo Accounts"). Add the Zoo Director as an authorized signer for all Zoo Funds and Zoo Accounts. Provide the Zoo Director with all of the usernames, passwords, and associated authentication information that GLAZA employs for the purposes of online access to the Zoo Funds and Zoo Accounts.

GLAZA does not, and legally cannot, agree to this demand. GLAZA has and will act in accordance with the provisions of the Interim Agreement. See discussion of Endowment Fund, Zoo Assistance Fund, and Zoo Surplus Development Fund above.

**Demand:** Confirm in writing that GLAZA will refrain from using any donor, membership, or volunteer list (or any of the City's other tangible or intangible assets) for any fundraising purposes that are not directly on the Zoo's behalf and for the exclusive benefit of the Zoo or that are inconsistent with the agency, fiduciary, or contractual duties that GLAZA owes the Zoo and the City. Confirm that GLAZA will cease all communications with donors that are not in the Zoo's best interest or that have not been approved by the Zoo Director.

GLAZA has acted and will continue to act in accordance with its fiduciary duties and the terms of the Interim Agreement. However, while the Interim Agreement authorizes GLAZA to fundraise on behalf of the Zoo, the Interim Agreement does not prohibit or limit GLAZA's right to fundraise during the term of the Interim Agreement for GLAZA's internal and administrative purposes (*See, e.g.*, Section 2(A)(3)(f).)  GLAZA does not need the permission of the Zoo Director to communicate with its donors and GLAZA will continue to communicate with its donors.

**Assertion:** GLAZA created a separate "GLAZA Restricted" fund and, in May 2024, (i) dedicated $675k to this separate fund, (ii) generated over $144k in revenue for the fund, (iii) and incurred over $319k in expenses associated with the fund. As of 9/30/24 the fund maintained a positive balance of over $701k.

In January 2023, GLAZA received a bequest from a donor that included both a restricted portion, to be used for a specific Zoo project, and a portion which the donor directed GLAZA to use as it deemed appropriate. The GLAZA Restricted Fund was initially created at that time with the portion of that bequest given to GLAZA for its discretionary use. GLAZA will continue to control the GLAZA Restricted Fund and use it as GLAZA deems appropriate, consistent with the directions in the donor's bequest.

**VENABLE** LLP

December 6, 2024
Page 7

**Assertion:** GLAZA improperly canceled the Beastly Ball for 2025.

The Beastly Ball is an annual GLAZA fund raising event for the benefit of GLAZA itself. The Beastly Ball is primarily supported by GLAZA's Board of Trustees, along with their family members and friends. The unrestricted funds generated by the Beastly Ball are to support GLAZA itself and GLAZA claims exclusive ownership and control over those funds. GLAZA has at times chosen to raise restricted funds for the benefit of the Zoo at the Beastly Ball, through methods such as a "paddle raise" for Zoo donations, and any such Zoo-dedicated (restricted) funds have been used to benefit the Zoo.

Given the impending termination of the Interim Agreement in June 2025 and the current state of the relationship between GLAZA and the Department, the GLAZA Trustees felt they could not successfully raise enough funds to warrant the expense of hosting the 2025 Beastly Ball, and GLAZA could not devote the significant time required to host the Beastly Ball when most of its efforts will have to focus on transitioning services to the vendors selected during the RFP process. Also, the expense and the lack of an appropriate event space, due to the closure of Treetops, made it impractical for GLAZA to host the Ball. As such, there is no way to successfully conduct the Beastly Ball.

**Assertion:** GLAZA improperly canceled the Nov. 2, 2024 Information Meeting for the 2025 Docent Class.

The process of becoming a Docent requires a 26-week extension course along with three months of on-site training. Given that the Interim Agreement expires at the end of June 2025, there was no way to complete the Docent training process before expiration of the Interim Agreement and no way for GLAZA to assure potential Docents, whom GLAZA would be soliciting, that the Department would continue the program once GLAZA was no longer involved with the Department. Thus, GLAZA is waiting to see which vendor under the RFP process is awarded a contract for the Docent program so that it can coordinate timing and process with that vendor for a new Docent training program as part of the transition services.

**IV.    Failure by the Zoo To Use Donor Funds Appropriately**

There are currently several Zoo projects for which GLAZA donors have provided funding, that the Department has either not yet started or has not yet completed. These delays negatively impact GLAZA's ability to steward these donors and to request additional donations from them. The Department's actions, delays, and inaction have caused several long time Zoo supporters to either cease their support or redirect their support to other causes. The following, among others, are examples.

**VENABLE** LLP

_____

December 6, 2024
Page 8

1. The Department has failed to complete the renovation of the Cape vulture exhibit. GLAZA completed fundraising for this project in 2018, and a California state grant fully funded the increased costs in 2022, yet it is still not complete after six years.

2. The Department has failed to complete the renovation of Swan Lake. The Swan Lake renovation was funded by GLAZA donors in 2018, and a California state grant was obtained in 2022 to cover the increased costs, but the area remains under construction. This project is still not complete after six years.

3. The Department has failed to construct the Angela Collier Garden ("ACG"). The ACG was designed as a large, flexible community and event space that would raise substantial site rental revenue for the Zoo. In 2018 it was fully funded by pledged donations from GLAZA donors (over $6,000,000) and a California state grant ($1,000,000) was obtained in 2022 to cover increased costs. Subsequently, the Department insisted the project be included in the Environmental Impact Report for the Los Angeles Zoo's Vision Plan. Now, held up in litigation, the ACG has not yet begun construction. The Department now estimates the budget to be closer to $14,000,000 if begun in 2025. The $1,000,000 grant from the State needed to be spent by the end of 2024, one major Los Angeles area foundation withdrew its pledge earlier this year, and several private individual donors and family foundations have requested to redirect their donations due to the delay and inefficiencies of the City.

4. Muriel's Ranch contact yard was shut down by the Department in February 2024. The Department's stated reason for permanent closure was aging animals and decaying infrastructure. Upon learning this, GLAZA, the donor foundation, and the Department met to discuss the future of Muriel's Ranch. The donor foundation was willing to continue supporting staffing for the contact yard (plus additional financial support for repairs or animal care, new animals, etc.) but the Department declined to accept this. These long-time donors demanded their money back, revoked continued funding from the foundation, and are now seeking another animal-related facility to support a project in memory of their matriarch.

5. The Department has failed to begin repairs of the François' langur monkey exhibit. The François' langurs are not in their exhibit after one temporarily escaped the enclosure in June 2024. The Department requested $2,000,000 from GLAZA for emergency repairs and renovations to the exhibit. GLAZA raised the funds within a week, transferring $1,500,000 to a City bank account at the direction of the Zoo Director (with her direction to retain $500,000 to pay for design consultations on the project), but to date no repairs have begun.  In addition, it is GLAZA's understanding that the $1,500,000 in funds provided by GLAZA to the Department are no longer in an investment account



December 6, 2024
Page 9

> where additional funds can be earned to benefit the mission of the Zoo, as they would have been under GLAZA's stewardship of the funds and which is required by California's adoption of the Uniform Prudent Management of Institutional Funds Act (California Probate Code, Part 7).

6.  The nursery area in the Winnick Family Children's Zoo has been closed to the public for several months. According to the Department, the pergola above the nursery area is failing, and the area is not safe. GLAZA donors who just recently funded a new axolotl exhibit are anxiously awaiting the reopening of this area to celebrate the naming of the exhibit. No date has been given for reopening.

7.  Treetops, a large event space, experienced a structural failure in mid-May 2024 and was immediately closed off, resulting in the relocation of many scheduled revenue generating site rentals. For safety reasons, the adjacent GLAZA funded and built carousel was also closed to the public. The carousel recently reopened in mid-November (intermittently at first), but Treetops remains closed, eliminating the only covered event space for site rentals and other activities at the Zoo, resulting in a significant loss of revenue from site rentals.

8.  On November 6, 2024, the viewing platform at the Cambodia area of the Elephants of Asia exhibit was closed to the public due to the structural failure of the supporting beams. This is also a popular site rental and fundraising space and has eliminated another revenue-generating location in the Zoo.

Sadly, over the past five years the Zoo has declined markedly, due to the impact of a focus on bureaucratic process over quality and care. The physical state of the Zoo grounds has declined, an increasing number of exhibits are empty, recreational and event spaces are closed to Zoo visitors, and there has been a substantial decline in the number of animals now housed at the Zoo. The overall impact is both significant and deeply distressing to GLAZA. Available site rental venues have decreased due to the disrepair of Treetops, the adjacent gazebos, and the Cambodia viewing platform, limiting GLAZA's ability to grow site rental revenue and the number of member households has declined due to the state of the Zoo (decreasing from 41,296 in September 2023 to 37,606 in September 2024). At the same time, the Zoo Director has requested increasing annual restricted fundraising that would be directed to off-site programs in other countries.

In the past GLAZA raised funds from donors for improvements to the Zoo and coordinated with the Zoo Director to complete the improvements in an efficient and timely manner. All projects on Zoo property are now under the strict purview of the Department and completed by the Bureau of Engineering. When the Department requests funds for animal care, renovations, or remodeling,

**VENABLE** LLP

December 6, 2024
Page 10

GLAZA has regularly provided them in a timely manner. In the past several years, however, most of GLAZA's additional offers of assistance have been ignored or declined by the Department.

Given these circumstances, it is particularly important for GLAZA to continue to carefully manage the Endowment Fund to ensure that the intent of the donors who provided those funds is being scrupulously observed.

**<u>Conclusion</u>**

GLAZA's support for the Zoo and its mission spans over sixty years, so it was with great sadness and surprise when GLAZA received the City's November 8 letter accusing GLAZA of multiple acts of wrongdoing, including breach of fiduciary duty and financial misappropriation. In this letter, GLAZA has responded to the City's false allegations and misleading assertions and has highlighted some of the problems and mismanagement that have plagued the Zoo over the past several years. However, a back-and-forth letter writing campaign will not benefit GLAZA, the City, or the Zoo. Instead, GLAZA truly believes that the most effective way to address both the City's and GLAZA's concerns, and to create a comprehensive and efficient plan for the transition to the vendors selected through the RFP process, is for the parties to meet and resolve these issues.

Sincerely,

Ben D. Whitwell

cc:    Karen Bass, Mayor (karen.bass@lacity.org)

Jacqueline Hamilton, Deputy Mayor of Neighborhood Services (jacqueline.hamilton@lacity.org)

Solomon Rivera, Deputy Chief of Staff for Strategy (Mayor's Office) (solomon.rivera@lacity.org)

Matt Hale, Deputy Mayor of Finance, Operations and Innovation (matt.hale@lacity.org)

Denise Verret, Zoo Director (denise.verret@lacity.org)

Matt Szabo, City Administrative Officer (matt.szabo@lacity.org)

Karen Winnick, Zoo Commission President (karen@karenbwinnick.com